1  ROSEMARIE T. RING (State Bar No. 220769)
   rose.ring@mto.com
2  JONATHAN H. BLAVIN (State Bar No. 230269)
   jonathan.blavin@mto.com
3  JOSHUA PATASHNIK (State Bar No. 295120)
   josh.patashnik@mto.com
4  ELIZABETH A. KIM (State Bar No. 295277)
   elizabeth.kim@mto.com
5  MUNGER, TOLLES & OLSON LLP
   560 Mission Street
6  Twenty-Seventh Floor
   San Francisco, California 94105-2907
7  Telephone:    (415) 512-4000
   Facsimile:    (415) 512-4077
8
   Attorneys for Defendant Facebook, Inc.
9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                         SAN JOSE DIVISION

13

14  SUZANNE-JULIETTE MOBLEY, DANIEL        Case No. 5:16-cv-06440-EJD
    ADRIAN MANRIQUEZ, VICTOR
15  ONUOHA, on behalf of themselves and all   **DEFENDANT'S NOTICE OF MOTION
    others similarly situated,              AND MOTION TO DISMISS FIRST
16                                          AMENDED COMPLAINT;
                Plaintiffs,                  MEMORANDUM OF POINTS AND
17                                          AUTHORITIES IN SUPPORT THEREOF**
         vs.
18                                          Judge:   Hon. Edward J. Davila
    FACEBOOK, INC., and DOES 1-9999,        Date:    June 1, 2017
19                                          Time:    9:00 a.m.
                Defendants.                  Crtrm.:  4
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION TO DISMISS ........................................................................... 1

STATEMENT OF RELIEF SOUGHT ........................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED.......................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION.................... 1

I.      INTRODUCTION................................................................................................ 1

II.     BACKGROUND AND SUMMARY OF ALLEGATIONS .............................. 2

III.    LEGAL STANDARDS ....................................................................................... 4

IV.     ARGUMENT ....................................................................................................... 4

        A.      Section 230 of the CDA Bars Plaintiffs' Claims in Their Entirety ........................... 4

                1.      Facebook Is an Interactive Computer Service Provider .............................. 6

                2.      Plaintiffs' Causes of Action Treat Facebook As a Publisher or
                        Speaker ................................................................................. 6

                3.      The Ads and Targeting Decisions at Issue Are Provided by Other
                        Information Content Providers .......................................................... 9

                        (a)     Neutral Ad-Targeting Tools Are Protected by the CDA................... 9

                        (b)     Plaintiffs' Conclusory Assertions Do Not Defeat CDA
                                Immunity ................................................................... 12

                        (c)     *Roommates* Makes Clear that the CDA Bars Plaintiffs'
                                Claims................................................................... 13

        B.      Plaintiffs Have Failed to Allege Facts Demonstrating Article III Standing............ 14

        C.      Plaintiffs Do Not Allege that Facebook Engaged in Any Unlawful Conduct......... 16

                1.      Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1981............................ 16

                2.      Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1982............................ 17

                3.      Plaintiffs Fail to State a Claim Under the ECOA....................................... 18

                4.      Plaintiffs Fail to State a Claim Under Title VII ........................................ 18

                5.      Plaintiffs Fail to State a Claim Under the FHA ........................................ 19

                6.      Plaintiffs Fail to State a Claim Under the FEHA ...................................... 21

                7.      Plaintiffs Fail to State a Claim Under the Unruh Act................................. 24

# TABLE OF CONTENTS
## Continued

Page

8.    Plaintiffs Fail to State a Claim Under the UCL .......................................... 25

V.    CONCLUSION .................................................................................................. 25

MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ark. ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*,
 160 F.3d 433 (8th Cir. 1998) ..................................................................16

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .................................................................................4, 12

*Atl. Recording Corp. v. Project Playlist, Inc.*,
 603 F. Supp. 2d 690 (S.D.N.Y. 2009) ...................................................13

*Barnes v. Yahoo!, Inc.*,
 570 F.3d 1096 (9th Cir. 2009).................................................................6, 7

*Batzel v. Smith*,
 333 F.3d 1018 (9th Cir. 2003)..................................................................5

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ...................................................................................4

*Bennett v. Spear*,
 520 U.S. 154 (1997) .................................................................................16

*Brush v. San Francisco Newspaper Printing Co.*,
 315 F. Supp. 577 (N.D. Cal. 1970), *aff'd* 469 F.2d 89 (9th Cir. 1972) (per
 curiam) .......................................................................................................19

*Caraccioli v. Facebook, Inc.*,
 167 F. Supp. 3d 1056 (N.D. Cal. 2016) ..................................................6

*Carafano v. Metrosplash.com Inc.*,
 339 F.3d 1119 (9th Cir. 2003)..............................................................5, 9, 11

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
 511 U.S. 164 (1994) ................................................................................18, 21

*Chicago Lawyers Cmte. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
 519 F.3d 666 (7th Cir. 2008).....................................................................7

*Decker v. Nw. Envtl. Def. Ctr.*,
 133 S. Ct. 1326 (2013) .............................................................................20

*Denny v. Hutchinson Sales Corp.*,
 649 F.2d 816 (10th Cir. 1981)................................................................17

*Doe v. MySpace, Inc.*,
 629 F. Supp. 2d 663 (E.D. Tex. 2009) ....................................................13

**TABLE OF AUTHORITIES**
Continued

**Page**

*Earll v. eBay Inc.*,
   2012 WL 3255605 (N.D. Cal. Aug. 8, 2012) ............................................................................24

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc) ........................................................................ passim

*Fair Hous. Council of Suburban Phila. v. Main Line Times*,
   141 F.3d 439 (3d Cir. 1998) ......................................................................................................15

*Fields v. Twitter, Inc.*,
   200 F. Supp. 3d 964 (N.D. Cal. 2016) ........................................................................................8

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
   458 U.S. 375 (1982) ............................................................................................................16, 17

*Ghosh v. Uniti Bank*,
   566 F. App'x 596 (9th Cir. 2014) ..............................................................................................17

*Goddard v. Google, Inc.*,
   640 F. Supp. 2d 1193 (N.D. Cal. 2009) ........................................................................... passim

*Grady v. FDIC*,
   2014 WL 1364932 (D. Ariz. Mar. 26, 2014) ............................................................................18

*Greenfield v. Field Enters., Inc.*,
   1972 WL 155 (N.D. Ill. Feb. 1, 1972) .......................................................................................19

*Herrick v. Grindr, LLC*,
   2017 WL 744605 (S.D.N.Y. Feb. 24, 2017) ..............................................................................11

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017).........................................7, 8, 9

*Jones v. Alfred H. Mayer Co.*,
   392 U.S. 409 (1968) ...................................................................................................................17

*Jones v. Dirty World Ent'mt Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014).......................................................................................9, 12, 13, 14

*Jurin v. Google Inc.*,
   695 F. Supp. 2d 1117 (E.D. Cal. 2010) ....................................................................................11

*Kennedy v. Wells Fargo Bank N.A.*,
   2011 WL 3359785 (N.D. Cal. Aug. 2, 2011)..............................................................................23

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016)...........................................................................................6, 10, 13

**TABLE OF AUTHORITIES**
Continued

Page

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ...............................................................6

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009)...................................................................16

*Llanos v. Estate of Coehlo*,
    24 F. Supp. 2d 1052 (E.D. Cal. 1998) ...................................................20

*Long v. Marubeni Am. Corp.*,
    2006 WL 547555 (S.D.N.Y. Mar. 6, 2006) ...........................................17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .........................................................................14, 16

*McDermott v. N.Y. Metro LLC*,
    664 F. Supp. 2d 294 (S.D.N.Y. 2009) ...................................................15

*Moss v. U.S. Secret Service*,
    572 F.3d 962 (9th Cir. 2009)...................................................................12

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001)...................................................................4

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*,
    591 F.3d 250 (4th Cir. 2009)...................................................................5

*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) ...............................................13, 14

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*,
    323 F. Supp. 2d 1037 (N.D. Cal. 2004) ...............................................5, 7

*Ortiz v. Ga. Pac.*,
    973 F. Supp. 2d 1162 (E.D. Cal. 2013) .................................................22

*Pack v. Fort Washington II*,
    689 F. Supp. 2d 1237 (E.D. Cal. 2009) .................................................23

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007).................................................................5

*Peters v. Lieuallen*,
    746 F.2d 1390 (9th Cir. 1984).................................................................16

*Ragin v. New York Times Co.*,
    923 F.2d 995 (2d Cir. 1991)...................................................................20

**TABLE OF AUTHORITIES**
Continued

Page

*Rivera v. Incorporated Village of Farmingdale*,
  2011 WL 1260195 (E.D.N.Y. Mar. 30, 2011) ........................................................................21

*Rosetta Stone Ltd. v. Google Inc.*,
  732 F. Supp. 2d 628 (E.D. Va. 2010) ....................................................................................8

*Runyon v. McCrary*,
  427 U.S. 160 (1976) ..............................................................................................................17

*S & G Petroleum Co. v. Brice Capital Corp.*,
  1993 WL 497859 (E.D. Pa. Dec. 2, 1993) ............................................................................18

*Saunders v. Gen. Servs. Corp.*,
  659 F. Supp. 1042 (E.D. Va. 1987) ......................................................................................15

*Scott v. Eversole Mortuary*,
  522 F.2d 1110 (9th Cir. 1975) ..............................................................................................17

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
  144 F. Supp. 3d 1088 (N.D. Cal. 2015) ..................................................................................6

*Smith v. Riccelli Brokerage Servs., LLC*,
  2011 WL 2007209 (W.D.N.Y. May 23, 2011) ......................................................................19

*Spann v. Colonial Village, Inc.*,
  899 F.2d 24 (D.C. Cir. 1990) ................................................................................................15

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ................................................................................................14, 15, 16

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Proj., Inc.*,
  135 S. Ct. 2507 (2015) ..........................................................................................................21

*Trans World Airlines v. Thurston*,
  469 U.S. 111 (1985) ..............................................................................................................19

*United States ex rel. Modglin v. DJO Global, Inc.*,
  114 F. Supp. 3d 993 (C.D. Cal. 2015) ....................................................................................3

*United States v. Speakman*,
  594 F.3d 1165 (10th Cir. 2010) ............................................................................................21

*Wilson v. Glenwood Intermtn. Props., Inc.*,
  98 F.3d 590 (10th Cir. 1996) ..........................................................................................14, 15

*Wynn v. Nat'l Broad. Co.*,
  234 F. Supp. 2d 1067 (C.D. Cal. 2002) ................................................................................19

**TABLE OF AUTHORITIES**
Continued

Page

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) .................................................................5, 7

**STATE CASES**

*Casey v. U.S. Bank Nat'l Ass'n*,
    127 Cal. App. 4th 1138 (2005) .............................................................22, 23

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal.4th 163 (1999) .................................................................................25

*Derish v. San Mateo–Burlingame Bd. of Realtors*,
    136 Cal. App. 3d 534 (1982) .......................................................................23

*Fiol v. Doellstedt*,
    50 Cal. App. 4th 1318 (1996) ...............................................................22, 23

*Hill v. StubHub, Inc.*,
    727 S.E.2d 550 (N.C. App. 2012) ..............................................................11

*Javorsky v. W. Athletic Clubs, Inc.*,
    242 Cal. App. 4th 1386 (2015) .............................................................24, 25

*Koebke v. Bernardo Heights Country Club*,
    36 Cal.4th 824 (2005) .................................................................................24

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal.4th 1134 (2003) ...............................................................................25

*Mendoza v. Town of Ross*,
    128 Cal. App. 4th 625 (2005) .....................................................................22

*Schulz v. Neovi Data Corp.*,
    152 Cal. App. 4th 86 (2007) .......................................................................25

*Sunrise Country Club Ass'n v. Proud*,
    190 Cal. App. 3d 377 (1987) ......................................................................24

**FEDERAL STATUTES**

Equal Credit Opportunity Act ("ECOA"),
    15 U.S.C. § 1691(a) .....................................................................................18
    15 U.S.C. § 1691a(e) ...................................................................................18

Civil Rights Act of 1866,
    42 U.S.C. § 1981 ..............................................................................2, 16, 17
    42 U.S.C. § 1982 ...................................................................................2, 17

MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF AUTHORITIES
## Continued

Page

Civil Rights Act of 1964, Title VII,
 42 U.S.C. § 2000e-3(b) ...........................................................................2, 1819

Fair Housing Act ("FHA"),
 42 U.S.C. § 3604(a) ...........................................................................................19
 42 U.S.C. § 3604(c) .....................................................................................20, 23
 42 U.S.C. § 3604(d) .....................................................................................19, 20
 42 U.S.C. § 3605(a) ...........................................................................................20
 42 U.S.C. § 3605(b) ...........................................................................................20

Communications Decency Act ("CDA"),
 47 U.S.C. § 230(b)(1) ..........................................................................................5
 47 U.S.C. § 230(b)(2) ..........................................................................................5
 47 U.S.C. § 230(c)(1) ................................................................................. passim
 47 U.S.C. § 230(e)(3) ..........................................................................................5
 47 U.S.C. § 230(f)(2) ..........................................................................................6

STATE STATUTES

Cal. Bus. & Prof. Code § 10132..................................................................................22

Unfair Competition Act ("UCL"),
 Cal. Bus. & Prof. Code § 17204...........................................................................25

Cal. Civ. Code § 52(a).........................................................................................24, 25

Fair Employment and Housing Act ("FEHA"),
 Cal. Gov't Code § 12927(e).................................................................................22
 Cal. Gov't Code § 12927(h).................................................................................23
 Cal. Gov't Code § 12940(d).................................................................................22
 Cal. Gov't Code § 12940(i)............................................................................22, 23
 Cal. Gov't Code § 12940(k).................................................................................22
 Cal. Gov't Code § 12955(a).................................................................................22
 Cal. Gov't Code § 12955(c).................................................................................23
 Cal. Gov't Code § 12955(g).................................................................................23
 Cal. Gov't Code § 12955(i).................................................................................23
 Cal. Gov't Code § 12955(j).................................................................................23
 Cal. Gov't Code § 12955(k).................................................................................23

FEDERAL REGULATIONS

12 C.F.R. pt. 202, Supp. I..........................................................................................18

12 C.F.R. § 1002.2(1)...............................................................................................18

24 C.F.R. § 100.70(c)(1)...........................................................................................19

MOTION TO DISMISS FIRST AMENDED COMPLAINT

**TABLE OF AUTHORITIES**
Continued

Page

24 C.F.R. § 100.70(d)(2) ............................................................................19

24 C.F.R. § 100.75(c)(3) ............................................................................20

**FEDERAL JUDICIAL RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................1, 4

**TREATISES**

Cal. Fair Housing & Pub. Accommodations § 1:4 ......................................22

**OTHER AUTHORITIES**

55 Ops. Cal. Atty. Gen. 53 (1972) .............................................................22

MOTION TO DISMISS FIRST AMENDED COMPLAINT

## NOTICE OF MOTION TO DISMISS

PLEASE TAKE NOTICE that on June 1, 2017, at 9:00 a.m., before the Honorable Edward J. Davila in Courtroom 4 on the 5th floor of the above-entitled court located in San Jose, California, Defendant Facebook, Inc. ("Facebook") will and hereby does move to dismiss Plaintiffs' First Amended Complaint ("FAC").  This motion is made pursuant to Fed. R. Civ. P. 12(b)(6) and is based on the Notice of Motion and Motion, the Memorandum of Points and Authorities, all pleadings and papers on file, and such other matters as may be presented to this Court.

## STATEMENT OF RELIEF SOUGHT

Facebook seeks an order pursuant to Rule 12(b)(6) dismissing with prejudice the First Amended Complaint and each of its causes of action for failure to state a claim for relief.

## STATEMENT OF ISSUES TO BE DECIDED

Whether the First Amended Complaint states a claim upon which relief can be granted.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**I.       INTRODUCTION**

Defendant Facebook, Inc. operates an online platform that allows users to connect and share through Facebook's website and mobile app.  Facebook is free of charge to users, and is supported in part through ads placed on Facebook by third-party advertisers.  The primary goal in advertising is to reach people who are most likely to be interested in the product or service offered.  Advertisers using traditional media, such as print and television, have long accomplished that goal through targeted advertising—*e.g.*, placing ads for women's clothing in Vogue or running commercials for men's athletic shoes on ESPN.  On Facebook, advertisers may choose to do the same by using self-serve tools on Facebook's ad platform ("Ad Platform") that allow (but do not require) them to target ads based on hundreds of categories that correspond to user interests as expressed through their activities on Facebook, such as an interest in seeing content related to women, parents, Christians, and/or the African American, Asian American and/or US Hispanic communities.

According to Plaintiffs, by allowing advertisers to engage in the commonplace practice of targeted advertising, Facebook unlawfully allows advertisers to use the Ad Platform to *not* show some unspecified ads to them.  Plaintiffs' claims fail, above all, because what they ultimately allege

is that third-party advertisers, not Facebook, control both the content of the advertisements and what targeting criteria to use, if any.  Plaintiffs do not allege that Facebook plays any role in the targeting decisions at issue here.  Nor could they, as Facebook's policies prohibit all unlawful discrimination on its Ad Platform (including discriminatory targeting) and require advertisers to certify that their ads comply with antidiscrimination laws.  Plaintiffs' claims fail for multiple independent reasons.

*First*, the Communications Decency Act ("CDA") preempts Plaintiffs' claims because they seek to hold Facebook liable "as the publisher or speaker" of third-party ads.  47 U.S.C. § 230(c)(1). In Plaintiffs' own words, Facebook has provided "tools to businesses" to "allow them to target" ads to "particular individuals and groups of individuals."  FAC ¶ 3.  Advertisers, not Facebook, are responsible for both the content of their ads and what targeting criteria to use, if any.  Facebook's provision of these neutral tools to advertisers falls squarely within the scope of CDA immunity.

*Second*, Plaintiffs fail to plead Article III standing.  Plaintiffs do not allege that they suffered any actual discrimination or harm as a result of not seeing certain ads, nor that any such harm would be traceable to Facebook, as opposed to the targeting decisions of third-party advertisers.

*Third,* Plaintiffs' veritable kitchen sink of claims, many of which do not even remotely apply to online platforms like Facebook, do not actually allege any unlawful or discriminatory conduct *by Facebook*.  Accordingly, Plaintiffs fail to state a claim under Title VII of the Civil Rights Act ("Title VII"), the Fair Housing Act ("FHA"), the Equal Credit Opportunity Act ("ECOA"), the Civil Rights Act of 1866 ("Section 1981" and "Section 1982"), as well as the Fair Employment and Housing Act ("FEHA"), the Unruh Civil Rights Act ("Unruh Act"), and the Unfair Competition Law ("UCL").

## II.  <u>BACKGROUND AND SUMMARY OF ALLEGATIONS</u>

Third-party advertisers use Facebook's Ad Platform to place ads on Facebook.  FAC ¶¶ 3, 55.  The Ad Platform provides self-serve tools that advertisers can (but are not required to) use to target ads based on hundreds of categories that correspond to users' interests as expressed through their activities on Facebook—including *Behaviors*, such as likely to move, fine jewelry, and/or music on iPhones; *Interests*, such as celebrity figures, baseball, action games, and/or buying a house; and *Demographics*, such as education level, away from family, baby boomers, and/or Fit Moms; and *Location*.  *Id.* ¶¶ 32-34, 41.  Using these categories, Spanish-language TV stations can

target ads to users who have expressed an interest in content related to the US Hispanic category, yoga studios can target ads to users who have expressed an interest in content related to the Fit Moms category, and a neighborhood cafe can target ads to users in the same zip code.  *Id.*

Advertisers also have the ability to target ads by excluding categories, which benefits both advertisers and users.  For example, advertisers who wish to reach users through customized messaging often create more than one ad for the same product—(1) a general ad designed for all Facebook users, and (2) an ad designed to appeal to users who have expressed an interest in content related to the US Hispanic community by using a Hispanic model and/or by presenting the ad in Spanish.  Users in the US Hispanic category will be eligible to see both ads because they are Facebook users (Ad 1) and they have expressed an interest in content related to the US Hispanic community (Ad 2).  But the advertiser might choose to *exclude* the US Hispanic category for Ad 1 and *include* that category for Ad 2 to avoid duplication and to provide a better user experience.

Facebook requires all advertisers to comply with its Advertising Policies, which have always prohibited advertisers from using the Ad Platform to engage in unlawful discrimination. Advertising Policy 7.1 mandates that advertisers "must not use targeting options to discriminate against … users[.]"  Request for Judicial Notice ("RJN"),[1] Ex. B; *see also* Ex. A ["[A]dvertisers may not (1) use our audience selection tools to (a) wrongfully target specific groups of people for advertising …, or (b) wrongfully exclude specific groups of people from seeing their ads; or (2) include discriminatory content in their ads."].[2]

According to Plaintiffs, certain targeting categories—e.g., the "ethnic affinity" categories and location categories—may be used by advertisers seeking to target or exclude based on race or national origin.  FAC ¶¶ 36-38, 43-44.  The ethnic affinity categories include users who have expressed an interest in content related to the African American (US), Asian American (US) and

---

[1] Facebook's motion to dismiss can and should be granted regardless of whether the Court takes judicial notice of the documents attached to the RJN, which simply provide additional "background for understanding [this] dispute."  *United States ex rel. Modglin v. DJO Global, Inc.*, 114 F. Supp. 3d 993, 998 n.23 (C.D. Cal. 2015).

[2] Since December 2016, targeting based on ethnic affinity categories for ads offering housing, employment or credit opportunities has been disallowed.  *See* http://newsroom.fb.com/news/2016/11/updates-to-ethnic-affinity-marketing/.

various Hispanic (US) communities.  *Id.* ¶ 37.[3]  Plaintiffs also allege that "metropolitan areas" are "highly segregated based on race," and location-based targeting may result in "disproportionate[] reach" to certain users, while not reaching other users of "a particular racial or ethnic background or national origin."  *Id.* ¶¶ 44-46.  In addition to the targeting categories, Plaintiffs challenge the Ad Platform's self-serve "Audience" tools, which allow advertisers to target or exclude their existing customers by creating "Custom" or "Lookalike" audiences.  *Id.* ¶¶ 48-49.

Plaintiffs allege that they "have not received (or have not regularly received)" ads related to employment, housing, and/or credit from advertisers who use the targeting tools.  *Id.* ¶ 58.  Plaintiffs assert that they have therefore been "denied employment, housing, and credit opportunities by Facebook and" third-party advertisers.  *Id.*  Plaintiffs offer no allegations of harm beyond these vague assertions concerning unidentified advertisers and ads.  Nor do they allege that Facebook had any role whatsoever in creating the content of these ads or in the decisions made by these unidentified advertisers regarding whether or how to target their ads.

## III.   LEGAL STANDARDS

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  A complaint "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[4]  Though the court accepts all allegations of material fact as true, the Court should not accept mere "labels and conclusions," nor a "formulaic recitation of the elements of a cause of action."  *Id.*

## IV.   ARGUMENT

### A.   Section 230 of the CDA Bars Plaintiffs' Claims in Their Entirety

Plaintiffs' claims seek to hold Facebook liable for the ad content and ad-targeting decisions made by third-party advertisers on Facebook's platform.  *See* FAC ¶ 3 ("Facebook *provides tools* to

---

[3] Facebook does not collect information on the race or ethnicity of its users.  Instead, users become part of an ethnic affinity category because, through their activities on Facebook, they have expressed an interest in content related to the African-American (US), Asian-American (US) and/or Hispanic (US) communities.  As a result, users can be members of more than one ethnic affinity category.

[4] Internal citations and internal quotation marks are omitted throughout unless otherwise noted.

businesses … to allow them to target particular individuals and groups of individuals" to receive their ads) (emphasis added).  The CDA, which prohibits claims seeking to impose liability on websites based on the publication of third-party content, stands as an insurmountable obstacle to that effort.  This alone requires dismissal of the FAC in its entirety, without leave to amend.

Under § 230, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The law bars liability "under any State or local law that is inconsistent with this section."  *Id*. § 230(e)(3).  Section 230 "establish[es] broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'"  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007).  It also extends to federal claims.  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1169 n.24 (9th Cir. 2008) (en banc) (§ 230 extends to claims "under state or federal law").

Through § 230, Congress sought to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see* 47 U.S.C. § 230(b)(1)-(2).  "Congress recognized the threat that tort-based lawsuits pose" to websites that publish third-party content, *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1044 (N.D. Cal. 2004), and sought to prevent such lawsuits "from shutting down websites and other services on the Internet."  *Batzel*, 333 F.3d at 1028.  "None of this means, of course, that the original culpable party who posts [unlawful content] would escape accountability," but "Congress made a policy choice" to preempt "tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997).  Accordingly, the "CDA has been interpreted to provide a 'robust' immunity" for "websites."  *Goddard v. Google, Inc.,* 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (quoting *Carafano v. Metrosplash.com Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).

Courts "aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'"  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting *Roommates*, 521 F.3d at 1175).  Thus, courts

routinely apply the CDA on the pleadings in dismissing complaints.  *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016); *Goddard*, 640 F. Supp. 2d at 1202.

CDA immunity attaches when (1) the defendant is "a provider or user of an interactive computer service," (2) "whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker," (3) "of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  Applying this standard, courts have repeatedly held that Facebook is protected by CDA immunity for claims related to third-party content.  *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065-66 (N.D. Cal. 2016); *Sikhs for Justice, Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096 (N.D. Cal. 2015).  The same is true here.

### 1. Facebook Is an Interactive Computer Service Provider

It is beyond dispute that Facebook, a social networking platform and website, is a provider of an interactive computer service.  *See, e.g.*, *Klayman*, 753 F.3d at 1357 ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access … to a computer server,' 47 U.S.C. § 230(f)(2)"); *Caraccioli*, 167 F. Supp. 3d at 1065 (same).  Plaintiffs have not alleged otherwise.

### 2. Plaintiffs' Causes of Action Treat Facebook As a Publisher or Speaker

The second element of CDA immunity is also satisfied:  The FAC and each of its causes of action make clear that Plaintiffs seek to hold Facebook liable as a publisher of ads displayed on its platform.  Plaintiffs allege that Facebook "has printed or published or caused to be published" discriminatory ads.  FAC ¶ 91; *see also id.* ¶¶ 116, 155, 186.  They allege that Facebook "sell[s] advertising placements to marketers," who "purchase ads that can appear in multiple places" on Facebook's platform.  FAC ¶¶ 30; 91.  And they seek to hold Facebook liable for "provid[ing] tools to businesses ('Businesses') to allow them to target" their ads to "particular individuals and groups of individuals based on information about Facebook users that Facebook collects, analyzes, and categorizes."  *Id.* ¶ 3; *see also id.* ¶ 47 (Facebook "enabl[es]" third-party "[b]usinesses to determine who will and who will not receive their advertisements").  Selling ad space to third parties and providing them tools to display their ads to particular users is publishing activity under the CDA.

1       The case law confirms this commonsense conclusion.  Courts have recognized that a lawsuit

2   treats a defendant as a publisher or speaker when it seeks to "hold a service provider liable for its

3   exercise of a publisher's traditional editorial functions—such as deciding whether to publish,

4   withdraw, postpone or alter content."  *Optinrealbig.com*, 323 F. Supp. 2d at 1044.  "A provider of

5   information services might get sued for violating anti-discrimination laws … or even for negligent

6   publication of advertisements that cause harm to third parties. … [W]hat matters is not the name of

7   the cause of action," but "whether the duty that the plaintiff alleges the defendant violated derives

8   from the defendant's status or conduct as a 'publisher or speaker.'"  *Barnes*, 570 F.3d at 1101-02.

9   Moreover, "[t]he broad construction accorded to section 230 as a whole has resulted in a capacious

10  conception of what it means to treat a website operator as [a] publisher or speaker."  *Jane Doe No. 1*

11  *v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017).

12      Applying these principles, numerous cases recognize that the publication of third-party ads

13  falls squarely within the realm of traditional publisher functions protected by the CDA, even if the

14  ads themselves are discriminatory or otherwise unlawful under federal or state law.  *See, e.g.*,

15  *Chicago Lawyers Cmte. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72

16  (7th Cir. 2008) (CDA barred claim against Craigslist for publishing allegedly discriminatory

17  housing ads in violation of federal FHA); *Goddard*, 640 F. Supp. 2d at 1195-96 (CDA barred claim

18  premised on "allegedly fraudulent web-based advertisements" published by Google); *Zeran*, 129

19  F.3d at 329 (CDA barred claim premised on allegedly fraudulent third-party ads).

20      Likewise, Facebook's provision of "tools to businesses" to "allow them to target" ads to

21  "particular individuals and groups of individuals" (FAC ¶ 3) squarely constitutes traditional

22  publisher activity protected by the CDA.  Indeed, publishers routinely allow advertisers to target ads

23  and assist them in doing so.  For instance, newspapers might sell sporting-goods stores advertising

24  space in the sports section.  Viacom might sell some advertisers airtime on Black Entertainment

25  Television while selling other advertisers airtime on Comedy Central.  That is the same type of

26  service Facebook and other online publishers protected by the CDA offer to their advertisers in

27  providing them tools to help them target and refine delivery of their ads.  *See, e.g.*, *Jane Doe*, 817

28  F.3d at 16 (CDA-protected website allowed ad buyers to "target their advertisements" based on

geography); *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 633 (E.D. Va. 2010) (Google's "providing advertisers the ability to refine their keyword term selection" protected by CDA).  The publication of online ads entails more than blindly displaying them; it also entails providing advertisers with tools to help them reach their target audience.

Courts also have held that the steering of third-party content constitutes a protected publisher function.  In *Roommates*, for example, the Ninth Circuit stated that a website giving users tools "to specify whether they will or will not receive emails" from others "by means of *user-defined* criteria" would be protected, even though it "might help some users exclude email from other users of a particular race or sex."  521 F.3d at 1169.  A recent opinion in this District held that providing messaging services to users allowing them "to contact and communicate with" particular individuals "treat[s]" the service as a "publisher of information" provided by third parties.  *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 976 (N.D. Cal. 2016).  Here, Plaintiffs challenge the provision of tools to third parties to determine who receives their ads, which equally is a protected publisher function.

Separately, Plaintiffs' claims also treat Facebook as a publisher or speaker because they "address the structure and operation" of its website and its "decisions about how to treat" third-party ads.  *Jane Doe*, 817 F.3d at 21.  In *Jane Doe*, the First Circuit rejected the plaintiffs' argument that their efforts to force a website to change certain policies—such as its lack of phone number and email address verification, and allowing anonymous postings, *see id.* at 16—did not implicate the CDA.  The court held that the plaintiffs' claims "challenge features that are part and parcel of the overall design and operation of the website" reflecting "decisions about how to treat" third-party content, which "fall within the purview of traditional publisher functions."  *Id.* at 21.  The court in *Fields* recently applied that reasoning in concluding that the CDA barred a lawsuit seeking to hold Twitter liable for allegedly allowing ISIS operatives to sign up for and use Twitter accounts.  200 F. Supp. 3d at 966.  Citing *Jane Doe*, the court held that Twitter's policy "reflect[ed] choices about what [third-party] content can appear on [Twitter] and in what form."  *Id.* at 973.

The same is true here.  Plaintiffs are candid that their goal is to stop Facebook from "giving [advertisers] the tools and services" that allow them to target their ads based on ethnic affinity groups or other grounds that may bear some relationship to it, such as zip code.  FAC ¶ 44; *see also*

*id.* ¶¶ 36-37, 45-48.  But such policies—about whether and how third parties can control which readers or viewers are more likely to see their content—are "precisely the sort of website policies and practices" to which "section 230(c)(1) extends."  *Jane Doe*, 817 F.3d at 20.

### 3.    The Ads and Targeting Decisions at Issue Are Provided by Other Information Content Providers

It is also clear that all of the "information" at issue here—ads and who they target—is "provided by another information content provider."  47 U.S.C. § 230(c)(1).  Plaintiffs allege numerous facts about Facebook's role in creating the Ad Platform's targeting tools, evidently hoping to avoid CDA immunity on that basis.  But for purposes of the CDA, it is irrelevant that Facebook created the Ad Platform or the targeting tools.  All that matters is whether Facebook has "contribute[d] materially *to the alleged illegality of the conduct*."  *Roommates*, 521 F.3d at 1168 (emphasis added).  Facebook has done no such thing.  Plaintiffs' voluminous allegations cannot hide the basic reality that the FAC is devoid of any allegation that Facebook, rather than third-party advertisers, makes decisions about the content of ads or decides what targeting criteria to select on the Ad Platform.  Because Facebook plays no role in the targeting decisions at issue here, advertisers are the only "information content provider[s]" of the content.

### (a)    Neutral Ad-Targeting Tools Are Protected by the CDA

In attempting to evade the CDA, plaintiffs often argue that the defendant played some role in the creation or development of the content at issue.  Courts regularly reject such efforts, and have adopted "a relatively restrictive definition of 'information content provider,'" under which a website retains immunity so long as it does not create or develop "the particular information at issue" in the case.  *Carafano*, 339 F.3d at 1123-25.  "A material contribution to the alleged illegality of the content does not mean merely taking action … necessary to the display of allegedly illegal content.  Rather, it means being responsible *for what makes the displayed content allegedly unlawful*."  *Jones v. Dirty World Ent'mt Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) (emphasis added).

Here, what "makes the displayed content allegedly unlawful," *id.*, are the advertisers' decisions about how to target particular types of ads to certain groups of users.  As the FAC alleges, Facebook "provides tools to businesses … to *allow them to target* particular individuals and groups

of individuals" their ads on the basis of (among other traits) ethnic affinity groups.  FAC ¶ 3 (emphasis added); *see also, e.g., id.* ¶ 55 (advertisers "use Facebook's targeting tools to exclude which Facebook customers will receive" their ads); ¶ 38 (ethnic affinity groups "can be used by Businesses to exclude Facebook users in these demographic groups from receiving Facebook advertisements"); ¶ 42 ("advertisers … exclude or include Facebook users from receiving advertisements based on their racial demographic backgrounds"); ¶ 44 ("Businesses … exclude and include people who live in particular locations" from receiving ads).  There is no allegation, nor can there be, that *Facebook* decides whether and how to use the ethnic affinity targeting at issue.

To be sure, the FAC contains extensive factual allegations about Facebook's own conduct, but these allegations merely confirm that Facebook's role is limited to "provid[ing] tools" that "allow" advertisers to target their ads.  FAC ¶ 3.  For instance, Plaintiffs allege that Facebook "gives advertisers step-by-step instructions on how to click on the various drop-down menus" to include or exclude certain audiences for their ads (*id.* ¶ 33); that it provides "suggested drop-down forms to select which Facebook users will receive their advertisements" (*id.* ¶ 34); that it "creates profiles of its users—based on their Internet activity" to "assist advertisers who want to target their advertisements to Facebook users who may be interested in employment, housing, or credit opportunities" (*id.* ¶ 41); and that it encourages advertisers to "'choose the right audience'" for their ads and to "'target specific groups'" and "'key locations'" (*id.* ¶ 32).  These allegations share a consistent theme:  Facebook created the Ad Platform, and the tools it provides, to help advertisers target their ads to groups of users most likely to be interested in the goods or services being offered.

These allegations describe the classic sort of "neutral tool" protected by the CDA. *Roommates*, 521 F.3d at 1171.  Courts uniformly have held that such neutral tools, which facilitate the publication of third-party content and which third parties may use for either "proper or improper purposes," do not "contribute[] materially to the alleged illegality" of the third-party content.  *Id.* at 1168, 1172.  They thus are subject to CDA immunity "even if the users committed their misconduct using" such "tools."  *Id.* at 1169 n.24; *see Kimzey*, 836 F.3d at 1270 (a "'neutral tool' operating on 'voluntary inputs' [does] not amount to content development or creation").  Importantly, such neutral tools are protected *even if* they may be deemed in some sense to "encourage[]," "enable[],"

1    or "assist[]" (FAC ¶ 37) third parties in engaging in unlawful conduct.

2            For example, in *Carafano*, a dating website provided its users with a "detailed questionnaire"

3    that included multiple-choice questions where "members select[ed] answers ... from menus

4    providing between four and nineteen options" in creating their profiles.  339 F.3d at 1121.  The

5    plaintiff argued that these menus included "sexually suggestive" phrases that facilitated the creation

6    of a defamatory impersonated profile.  *Id*.  The Ninth Circuit held that "[d]oubtless, the

7    questionnaire facilitated the expression of information by individual users" but the "selection of the

8    content was left exclusively to the user"; thus, the defendant "cannot be considered an 'information

9    content provider'" because "no profile has any content until a user actively creates it."  *Id*. at 1124.

10           Similarly, in *Goddard*, the plaintiff challenged Google's "Keyword Tool" that "suggest[ed]

11   the phrase 'free ringtone' to advertisers, claiming that "the suggestion of the word 'free,' when

12   combined with Google's knowledge 'of the mobile content industry's unauthorized charge

13   problems,' makes the Keyword Tool 'neither innocuous nor neutral.'"  640 F. Supp. 2d at 1197.  The

14   court rejected this argument, holding that "[l]ike the menus in *Carafano,* Google's Keyword Tool is

15   a neutral tool.  It does nothing more than provide options that advertisers may adopt or reject at their

16   discretion."  *Id*. at 1198; *see also, e.g.*, *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal.

17   2010) (same); *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. App. 2012) (pricing tool for tickets

18   that suggested prices above that allowed by law was "a prototypically 'neutral tool'").

19           Most recently, in *Herrick v. Grindr, LLC*, 2017 WL 744605 (S.D.N.Y. Feb. 24, 2017), the

20   plaintiff argued that the defendant, a social networking app, was "not merely a publisher of third-

21   party content but is also a creator of content by virtue of the sorting and matching functions and geo-

22   locational services that it integrated" into the app, which a third party used for unlawful harassment.

23   *Id.* at *3.  The court rejected this argument.  It held that the plaintiff had not "identified any acts by

24   Grindr—other than 'neutral assistance'—that might make Grindr the 'provider' of the false profiles"

25   the user had created.  *Id*. at *4.  "The fact that these offerings have been weaponized by a particular

26   Grindr user" to create fake profiles "does not make Grindr the creator of the allegedly tortious

27   conduct."  *Id.*  "Moreover, to the extent Grindr has 'contributed' to the harassment by providing

28   functionality such as geo-location assistance, that is not what makes the false profiles tortious."  *Id.*

Just so here.  Although Plaintiffs make numerous allegations about ways in which Facebook designed the Ad Platform and provided a variety of functionality to advertisers, that functionality is not "what makes the displayed [ads] allegedly unlawful."  *Jones*, 755 F.3d at 410.  Rather, what makes the ads allegedly unlawful are the discriminatory targeting decisions that might have been made by some unidentified advertisers—not the neutral tools provided on Facebook's Ad Platform.  The provision of these neutral tools does not transform Facebook into a content provider.

**(b)**     **Plaintiffs' Conclusory Assertions Do Not Defeat CDA Immunity**

Apart from Plaintiffs' allegations regarding the tools Facebook provides to advertisers using the Ad Platform, the FAC makes a number of assertions regarding Facebook's supposed role in "encouraging" or "assisting" advertisers' targeting decisions.  *See, e.g.*, FAC ¶ 37 ("Facebook encourages, enables, and assists advertisers to include or exclude who will view the advertisements based on the race or perceived race of the Facebook user"); ¶¶ 42, 44, 46, 48.  The only factual allegations supporting such alleged encouragement or assistance, however, concern the provision of the tools themselves.  *See id*. ¶ 3 (the "tools that Facebook provides Businesses enable and encourage" advertiser conduct); *id*. ¶ 44 ("by giving them the tools and services to do so with precision, Facebook encourages, enables and assists Businesses to place advertisements that often will disproportionately reach people of a particular" background).  Nowhere does the FAC allege, nor could it, that Facebook actually instructs or otherwise actively encourages advertisers to engage in discriminatory targeting; indeed, Facebook expressly prohibits such conduct, *see supra* at 3.

Beyond the allegations concerning the tools themselves, Plaintiffs' "encouragement" and "assistance" assertions are wholly conclusory and should not be credited.  They are not properly pleaded allegations regarding Facebook's actual conduct, but mere conclusory labels Plaintiffs have attached to describe that conduct.  *See Iqbal*, 556 U.S. at 686; *Moss v. U.S. Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009) ("[t]he allegation of systematic … discrimination, … without any factual content to bolster it, is just the sort of conclusory allegation that the *Iqbal* Court deemed inadequate").  Multiple courts have applied this principle in precisely the circumstance at issue here.  For instance, in *Goddard*, the plaintiff "allege[d] in conclusory fashion that Google *assisted its AdWords customers in drafting their advertisements*," but "offered no allegations to support this

claim" and "fail[ed] to explain how Google 'controlled' or 'collaborated' with" advertisers "in the creation of any allegedly fraudulent advertisement."  640 F. Supp. 2d at 1202 (emphasis added).  As the Ninth Circuit has emphasized, "threadbare allegations" of a website's authorship of content "are implausible on their face and are insufficient to avoid immunity under the CDA."  *Kimzey*, 836 F.3d at 1268.  "Were it otherwise, CDA immunity could be avoided simply by reciting a common line that user-generated statements are not what they say they are."  *Id.* at 1268-69.  Plaintiffs cannot circumvent the CDA merely by asserting that Facebook "encourag[es], enabl[es], and assist[s] advertisers" (FAC ¶ 37) in engaging in allegedly unlawful targeting.[5]

**(c)    *Roommates* Makes Clear that the CDA Bars Plaintiffs' Claims**

The operation of Facebook's Ad Platform stands in stark contrast to the kind of website functionality for which courts have denied CDA immunity—and, in particular, to the situation at issue in *Roommates*.  There, the Ninth Circuit held that where a roommate-search website "*require[d]* each subscriber to disclose his sex, sexual orientation, and whether he would bring children to a household," and to "describe his preferences in roommates with respect to the same three criteria," the site lost its CDA immunity because it "bec[a]me[] the developer, at least in part, of that information."  521 F.3d at 1161, 1166 (emphasis added).  Numerous other courts have correctly interpreted *Roommates* in this way, recognizing that the case "turned entirely on the website's decision to *force* subscribers to divulge the protected characteristics and discriminatory preferences 'as a condition of using its services'" and "carved out only a narrow exception" to CDA immunity.  *Goddard*, 640 F. Supp. 2d at 1198 (emphasis in original).[6]

---

[5] Even if Plaintiffs *had* alleged facts suggesting that Facebook actually "encouraged" advertisers to target their ads in certain ways—which, again, the FAC does not allege—that still would not displace CDA immunity.  *See, e.g.*, *Jones*, 755 F.3d at 414 (citing *Roommates* and expressly declining to adopt "encouragement test of immunity under the CDA"); *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 986-87 (N.D. Cal. 2015) (recognizing that *Jones* "adopted the Ninth Circuit's reasoning in *Roommates.com*" that in order to forfeit CDA immunity, a website "must have done more than merely 'encourage' the creation of the challenged conduct," but "must have *required* another to create that content" (emphasis added)).

[6] *See also, e.g.*, *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) (*Roommates* "was based solely on the fact that" the website "*required* potential subscribers" to input unlawful content (emphasis in original)); *Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) ("[t]he Ninth Circuit repeatedly stated throughout its en banc opinion that the

1    Here, advertisers are not required to use the audience options at all, let alone in a way that

2    would direct their ads to, or away from, any users on the basis of race, national origin, or any other

3    protected classification.  As the FAC alleges (¶ 3), the Ad Platform merely "allows" advertisers to

4    use the targeting options if they so choose.  That core principle settles the matter:  because Facebook

5    does not *require* (or, indeed, even encourage) advertisers to target their ads in a discriminatory

6    manner, Facebook retains its CDA immunity and Plaintiffs' claims are barred in their entirety.

7    **B.    Plaintiffs Have Failed to Allege Facts Demonstrating Article III Standing**

8    The FAC must be dismissed on the separate ground that Plaintiffs have not alleged facts

9    demonstrating Article III standing.  The "'irreducible constitutional minimum' of standing consists

10   of three elements":  (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the

11   defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.*

12   *Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

13   (1992)).  Here, Plaintiffs do not allege that they suffered any actual discrimination or harm as a

14   result of not seeing certain ads on Facebook, nor that any harm is traceable to Facebook, as opposed

15   to the purported targeting decisions of unidentified third-party advertisers.

16   *First*, Plaintiffs have failed to allege injury in fact.  To do so, they must show that they have

17   "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual

18   or imminent, not conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct. at 1548.  As the Supreme Court

19   recently emphasized, "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist" and

20   must be "'real'" rather than "'abstract.'"  *Id.*  Where, as here, a plaintiff alleges a violation of a

21   statute, "Article III standing requires a concrete injury even in the context of a statutory violation,"

22   and a "bare" allegation that the defendant violated the law will not suffice.  *Id.* at 1549.

23   Courts addressing similar claims have held that it is not enough for a plaintiff merely to

24   allege that he or she received a discriminatory advertisement.  The Tenth Circuit has held that a

25   plaintiff must allege that the ad either deterred her from seeking to enter into a transaction or

26   deprived her of the opportunity to do so.  *Wilson v. Glenwood Intermtn. Props., Inc.*, 98 F.3d 590,

27   _____

28   Roommates.com website *required* its users to provide certain information as a condition of its use"
     (emphasis in original)); *Opperman*, 84 F. Supp. 3d at 987 (*Roommates* applies only where a website
     "required another to create [the] content"); *Jones*, 755 F.3d at 414 (same).

MOTION TO DISMISS FIRST AMENDED COMPLAINT

595-96 (10th Cir. 1996) ("mere receipt of a discriminatory advertisement" is insufficient absent

allegation that plaintiff was seeking to "liv[e] in the advertised housing"); *see also Spann v.*

*Colonial Village, Inc.*, 899 F.2d 24, 29 n.2 (D.C. Cir. 1990).  Other courts likewise have held that

receipt of a discriminatory ad alone does not confer Article III standing, while suggesting that an

allegation of "psychic injury or substantial insult or distress" would suffice.  *McDermott v. N.Y.*

*Metro LLC*, 664 F. Supp. 2d 294, 305-06 (S.D.N.Y. 2009); *see also Fair Hous. Council of Suburban*

*Phila. v. Main Line Times*, 141 F.3d 439, 434-44 (3d Cir. 1998) ("that a particular advertisement

violates the [FHA] is not sufficient to satisfy the requirements of Article III").

Here, under either approach, Plaintiffs' factual allegations are deficient.  Plaintiffs do not

allege that they have received any discriminatory ads.  If *actually seeing* a discriminatory ad alone is

insufficient to confer Article III standing, there is no basis for concluding that *not* seeing an ad is

sufficient.  Plaintiffs allege only that they have "been interested in obtaining housing, employment,

and credit opportunities" and "in doing so" have "reviewed advertisements" on Facebook.  FAC

¶¶ 25-27.  On that basis alone, Plaintiffs have sued Facebook.  Plaintiffs have not alleged that they

were actually looking for housing, employment, or credit ads on Facebook, nor (more importantly)

have they alleged that the ads they *did* see were less desirable than the ads they believe advertisers

allegedly chose to exclude them from seeing.  Instead, Plaintiffs allege only that they were shown

some ads but not others—which, given the volume of ads on Facebook, is inevitable—and that

unspecified advertisers may have excluded them from seeing certain ads.  Under the case law cited

above, Plaintiffs have failed to allege facts showing any concrete harm, even psychic injury or

distress.[7]  At best, they have alleged only a "bare" statutory violation, *Spokeo*, 136 S. Ct. at 1549,

which is not sufficient (and indeed, they have not alleged even that, *see infra* at 16-25).

*Second*, Plaintiffs have failed to allege any injury that is "fairly traceable" to Facebook.

---

[7] Even if Plaintiffs *had* sought to allege psychic injury or distress, which they have not, it is doubtful
whether that sort of theory applies here in the first place.  Courts have held that these theories of
injury may come into play where a reader sees an ad that is *overtly discriminatory on its face*, but no
court has extended these theories to cases where a plaintiff alleges unlawful targeting of facially
neutral ads.  It is difficult to see how a plaintiff plausibly could allege that she suffered any "loss of
dignity," "emotional distress," or "humiliation," *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042,
1060-61 (E.D. Va. 1987), merely as a result of allegedly *not* seeing certain ads.

*Spokeo*, 136 S. Ct. at 1547.  To establish fair traceability, a plaintiff must show that her injury results from "the challenged action of the defendant," and not from "the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560.  Only if the defendant's actions had a "determinative or coercive effect" on the third party's actions can a plaintiff establish standing. *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009).

For reasons similar to those discussed above (*supra* at 9-14), the facts alleged by Plaintiffs do not show fair traceability.  Facebook's provision of neutral targeting tools to advertisers does not have a "determinative or coercive effect," *Bennett*, 520 U.S. at 169, upon advertisers in making their targeting decisions, and Plaintiffs allege no facts suggesting otherwise.  Nor have Plaintiffs adequately linked any asserted injury to any particular ad—much less any specific conduct of Facebook.  *See Ark. ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*, 160 F.3d 433, 434-35 (8th Cir. 1998) (no fair traceability where plaintiff failed to show that any "discriminatory effects" were "*specifically attributable*" to defendant's allegedly discriminatory advertising (emphasis added)).

### C.     Plaintiffs Do Not Allege that Facebook Engaged in Any Unlawful Conduct

Apart from the CDA and Article III, Plaintiffs have failed to allege any facts plausibly suggesting that *Facebook*, as opposed to certain unnamed third-party advertisers, engaged in any unlawful or discriminatory conduct.  The FAC includes more than a dozen theories of liability (¶¶ 69-189), but quantity is no substitute for quality.  Plaintiffs' causes of action share a common and insurmountable defect:  even if some advertisers violated Facebook's policies and engaged in unlawful discrimination, Plaintiffs cannot show that Facebook may be held liable for their actions.

### 1.     Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1981

Plaintiffs' section 1981 claim (FAC ¶¶ 122-27) fails because (1) Plaintiffs fail to allege intentional discrimination, and (2) Facebook has not refused to contract with Plaintiffs.

*First*, section 1981 prohibits only *intentional*, race-based discrimination in the "making, enforcement, performance, modification, and termination of contracts."  42 U.S.C. § 1981(b); *see Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Peters v. Lieuallen*, 746 F.2d 1390, 1393 (9th Cir. 1984).  Plaintiffs allege no facts suggesting that Facebook intentionally discriminates against users based on race.  On the contrary, Facebook expressly

prohibits such conduct.  *Supra* at 3.  Plaintiffs allege only that Facebook "encourages, enables, and assists *advertisers* to include or exclude who will view the advertisements," and that some unspecified advertisers may have done so in a discriminatory manner "us[ing] Facebook's targeting tools."  FAC ¶¶ 37, 55, 63, 67, 75, 79, 84, 87, 91, 95, 106, 107, 109, 112, 124 (emphasis added).  These allegations give rise to no inference of intentional discrimination on *Facebook*'s part.  Nor does the provision of facially neutral tools suggest the requisite intent.  *Gen. Bldg. Contractors*, 458 U.S. at 388 (holding that § 1981 encompasses only intentional discrimination, not disparate impact).

*Second*, Plaintiffs do not and cannot plead any facts showing that Facebook discriminated in the making, enforcing, or performing of any contracts (for employment or otherwise).  The "right to 'make and enforce contracts' is violated if a private offeror refuses to extend … the same opportunity to enter into contracts" based on race.  *Runyon v. McCrary*, 427 U.S. 160, 170-71 (1976).  Plaintiffs' claims are based on hypothetical future contracts for employment or housing offered by third-party advertisers, not Facebook.  Nor could Plaintiffs rely on an aiding-and-abetting theory of liability, as section 1981 does not encompass such a theory.  *Gen. Bldg. Contractors*, 458 U.S. at 391-92; *Long v. Marubeni Am. Corp.*, 2006 WL 547555, at *4 n.4 (S.D.N.Y. Mar. 6, 2006).

## 2. Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1982

For similar reasons, Plaintiffs' section 1982 claim (FAC ¶¶ 128-34) also fails.

*First*, like section 1981, section 1982 requires a showing of discriminatory intent.  *Ghosh v. Uniti Bank*, 566 F. App'x 596, 597 (9th Cir. 2014); *Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 822 (10th Cir. 1981).  Plaintiffs fail to allege any such intent on Facebook's part.  *Supra* at 16-17.

*Second*, section 1982 does not apply to advertising platforms like Facebook.  Section 1982 prohibits "racial discrimination in the sale of property."  *Scott v. Eversole Mortuary*, 522 F.2d 1110, 1113 (9th Cir. 1975); 42 U.S.C. § 1982 (prohibiting interference with person's right to "inherit, purchase, lease, sell, hold [or] convey" property on basis of race).  Plaintiffs do not and cannot allege that Facebook sells, leases, or conveys real property to users.  Moreover, the Supreme Court has held that section 1982, unlike the FHA, "does not prohibit advertising or other representations that indicate discriminatory preferences."  *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968).  Thus, Plaintiffs have not alleged any actionable conduct under section 1982 even with respect to

advertisers, much less Facebook.  And Plaintiffs cannot proceed on aiding-and-abetting liability here either, because Congress has not provided for it.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) ("If … Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text.").

### 3.     Plaintiffs Fail to State a Claim Under the ECOA

Plaintiffs fail to state a claim under the Equal Credit Opportunity Act (ECOA) (FAC ¶¶ 135-144) for the simple reason that the statute does not apply to Facebook.  The ECOA prohibits "any creditor" from discriminating against "any applicant, with respect to any aspect of a credit transaction." 15 U.S.C. § 1691(a).  Plaintiffs do not and cannot allege that Facebook is a "creditor." The ECOA defines a "creditor" as "any person who regularly extends, renews or continues credit." *Id.* § 1691a(e).  Plaintiffs fail to allege any facts remotely suggesting that Facebook "regularly extends, renews, or continues credit," and cannot because Facebook is not a bank or credit agency.

Plaintiffs argue that Facebook is a "creditor" under 12 C.F.R. § 1002.2(1) because Facebook "regularly refers applicants or prospective applicants to creditors."  FAC ¶ 137.  But the FAC is bereft of facts to support this conclusory assertion.  Moreover, the Consumer Financial Protection Bureau has explained that section 1002.2(1) is intended to cover persons "who accept applications and refer applicants to creditors" or "select creditors to whom credit requests can be made."  12 C.F.R. pt. 202, Supp. I (e.g., "automobile dealers" and "home builders").  Facebook does not "accept applications and refer applicants to creditors" nor does Facebook "select creditors to whom" requests can be made.  Facebook provides a platform for advertisers to publish ads, some of which may be credit-related.  Nor can Plaintiffs rely on an aiding-and-abetting theory.  The text of the ECOA does not contemplate such liability, *cf. Cent. Bank of Denver*, 511 U.S. at 176, and courts have so held.  *See Grady v. FDIC*, 2014 WL 1364932, at *7 (D. Ariz. Mar. 26, 2014); *S & G Petroleum Co. v. Brice Capital Corp.*, 1993 WL 497859, at *2 (E.D. Pa. Dec. 2, 1993).

### 4.     Plaintiffs Fail to State a Claim Under Title VII

Plaintiffs' Title VII claim (FAC ¶¶ 176-189) fails because that statute does not apply to Facebook in this context either.  Title VII applies only to covered entities, including "employer[s]" and "employment agenc[ies]."  42 U.S.C. § 2000e-3(b).  Plaintiffs' sole theory appears to be that

Facebook acts as an "employment agency" because it publishes employment ads "on behalf of Businesses." FAC ¶ 179. But the Ninth Circuit rejected this theory decades ago. In *Brush v. San Francisco Newspaper Printing Co.*, the plaintiff brought a Title VII claim against newspapers that published third-party employment ads. 315 F. Supp. 577, 578 (N.D. Cal. 1970), *aff'd* 469 F.2d 89 (9th Cir. 1972) (per curiam). The court rejected the plaintiff's argument that newspapers should be treated as "employment agencies" because they published such ads and categorized the ads by sex. 469 F.2d at 90; 315 F. Supp. at 578, 583 (citing text and legislative history); *see Greenfield v. Field Enters., Inc.*, 1972 WL 155, at *4 (N.D. Ill. Feb. 1, 1972) (same). Plaintiffs' argument here is no different. Providing a platform for third parties to publish their ads does not transform Facebook into an employment agency. And aiding-and-abetting liability is not available under Title VII either. *See Smith v. Riccelli Brokerage Servs., LLC*, 2011 WL 2007209, at *5 (W.D.N.Y. May 23, 2011) ("[I]t is clear that Title VII does not provide for aider and abettor liability.").[8]

### 5.    Plaintiffs Fail to State a Claim Under the FHA

Plaintiffs' FHA claims (FAC ¶¶ 145-175) fare no better. *First*, Plaintiffs fail to state a claim under 42 U.S.C. § 3604(a) and its related regulations, 24 C.F.R. § 100.70(c)(1) and (d)(2). Section 3604(a) makes it unlawful to "refuse to sell or rent after the making of a bona fide offer" or "refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny" a dwelling because of a protected trait. As noted, Plaintiffs do not and cannot allege that Facebook sells, leases, or conveys real property to users. Rather, as Plaintiffs allege, third-party advertisers, not Facebook, "seek applicants for the sale or rental or [sic] dwellings." FAC ¶ 147. At most, Plaintiffs allege that certain advertisers may use Facebook to target their ads for the sale or rental of property. But even that allegation (which still would fail to state a claim *against Facebook*) falls short. Targeted advertising is not a refusal to sell or rent, nor does it make a dwelling unavailable.

*Second*, Plaintiffs' claim under 42 U.S.C. § 3604(d) fails for similar reasons. Section

---

[8] Moreover, courts interpreting analogous statutes have held that there is no such aider-and-abettor liability. *See Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1113-14 (C.D. Cal. 2002) (no aiding-and-abetting liability under the Age Discrimination in Employment Act (ADEA)); *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 n.16 (1985) (interpretation of ADEA and Title VII apply with "equal force" to each other because relevant provisions are "identical").

3604(d) prohibits "represent[ing] to any person … that a dwelling is not available for inspection, sale, or rental" based on a protected trait.  Again, Plaintiffs fail to allege any such misrepresentation, much less that *Facebook* (as opposed to certain unnamed advertisers) has made one.

*Third*, 42 U.S.C. § 3605(a) does not apply to Facebook either.  It prohibits an entity "whose business includes engaging in residential real estate-related transactions," defined as including the "making or purchasing" of real estate loans, or the "selling, brokering, or appraising of residential real property."  *Id.* § 3605(a)-(b).  Plaintiffs do not and cannot allege that Facebook makes or purchases real estate loans, or sells, brokers, or appraises residential real property.

*Fourth*, Plaintiffs' theory of liability under 42 U.S.C. § 3604(c) also fails.  Although section 3604(c) pertains to advertising, there is no indication that it imposes liability on online platforms for providing ad-targeting tools to third-party advertisers.  Section 3604(c) makes it unlawful to publish any advertisement that "indicates any preference, limitation, or discrimination based on" a protected trait.   Applying this language, the test is whether a challenged advertisement "would discourage an ordinary reader" of a protected class from applying to rent or purchase the dwelling, or would "suggest" to the ordinary reader that certain protected classes are "preferred or dis-preferred." *Llanos v. Estate of Coehlo*, 24 F. Supp. 2d 1052, 1057 (E.D. Cal. 1998).  This test assumes that the plaintiff actually sees an advertisement whose content is either facially or implicitly discriminatory. *See id.*; *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991) (section 3604(c) requires evaluating content of advertisement).  Here, Plaintiffs fail to plead that the content of any advertisement is discriminatory, and thus fail to state a claim under section 3604(c).

Plaintiffs cite 24 C.F.R. § 100.75(c)(3), which prohibits "[s]electing media or locations for advertising" housing that "deny particular segments of the housing market information about housing opportunities" on a protected ground.  FAC ¶ 157.[9]  But the plain language of the regulation

---

[9] It is doubtful whether this regulation is compatible with the statute, which prohibits "statement[s]" or "advertisement[s]" that "*indicate[]* any preference, limitation, or discrimination based on" a protected trait.  42 U.S.C. § 3604(c) (emphasis added); *see Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1334 (2013) ("[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated.").  This statutory language encompasses only ads that, on their face, are either explicitly or implicitly discriminatory.  But this Court need not reach that issue, because—however the statute is read—the regulation does not apply to Facebook.

does not apply to advertising platforms like Facebook; it applies to the advertisers themselves. Facebook does not engage in "[s]electing media or locations for advertising"; Facebook and other platforms *are* the "media or locations" that third-party advertisers may select, and third-party advertisers also control their ad-targeting decisions on Facebook (*supra* at 2-4, 9-14).  Thus, even assuming the regulation applies to online advertising, it only prohibits certain conduct by advertisers, e.g., the parties wholly responsible for deciding where, how, and when to publish their ads.  As Plaintiffs allege throughout the FAC, it is advertisers, not Facebook, who choose whether and how to use the targeting tools at issue.  *See, e.g.*, FAC ¶¶ 3, 38, 41, 147, 148, 158.

*Fifth*, Plaintiffs cannot rely on an aiding-or-abetting theory of liability to skirt these fundamental problems with their FHA claims.  The text of the FHA does not provide for such liability, so it is not available.  *See Cent. Bank of Denver*, 511 U.S. at 176; *Rivera v. Incorporated Village of Farmingdale*, 2011 WL 1260195, at *3 (E.D.N.Y. Mar. 30, 2011) (noting that such a theory of liability under the FHA has not been recognized).

*Sixth*, Plaintiffs fail to state a disparate-impact claim under the FHA (FAC ¶ 148).  An FHA disparate-impact claim requires allegations of "facts at the pleading stage" consisting of "statistical evidence demonstrating a causal connection" between the defendant's policy and a racial disparity. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Proj., Inc.*, 135 S. Ct. 2507, 2523 (2015); *see also id.* at 2524 (cautioning that courts must "examine with care … at the pleading stage" whether a plaintiff has stated a disparate-impact claim, lest defendants face "abusive disparate-impact claims" that "displace valid governmental and private priorities").  Plaintiffs fail to allege any statistical disparity, which is the first step in a disparate-impact claim.  Nor do they allege the requisite "causal connection."  *Id.* at 2523.  Any discriminatory targeting would be caused by the intentional choices of advertisers alone.  These "intentional" decisions "break the causal chain" between any harm and Facebook's conduct, because they are a "superseding cause" of the alleged discrimination.  *United States v. Speakman*, 594 F.3d 1165, 1174 (10th Cir. 2010).

### 6.      Plaintiffs Fail to State a Claim Under the FEHA

Plaintiffs' FEHA housing and employment claims (FAC ¶¶ 83-121) fail for reasons similar to those requiring dismissal of their comparable federal FHA and Title VII claims.

*First*, Plaintiffs fail to state a claim under Cal. Gov't Code sections 12940(d) or (k). Plaintiffs allege that Facebook is an "employment agency" and therefore a "covered entity."  FAC ¶¶ 84, 86.  Facebook is no more an "employment agency" under FEHA than it is under Title VII. *See Mendoza v. Town of Ross*, 128 Cal. App. 4th 625, 635 (2005) (courts "look to federal decisions interpreting [Title VII] for assistance in interpreting the FEHA" "[b]ecause the antidiscrimination objectives and relevant wording … are similar"); 55 Ops. Cal. Atty. Gen. 53 (1972) (citing *Brush* and concluding that a newspaper is not an employment agency under FEHA's predecessor statute).

*Second*, Plaintiffs fail to allege the elements of an aiding-and-abetting claim.  Section 12940(i) incorporates common law aiding and abetting standards, including the intent and substantial assistance requirements.  *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325 (1996). Plaintiffs fail to allege that Facebook provides substantial assistance to advertisers, with the intent to discriminate.  *See Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144, 1146 (2005)  Any alleged failure to prevent advertisers from acting unlawfully does not constitute "substantial assistance."  Such a theory would "conflate[] an 'aiding and abetting' claim with a claim brought under Cal. Gov. Code § 12940(k), which makes it unlawful for a [covered entity] to fail to take all reasonable steps necessary to prevent discrimination."  *Ortiz v. Ga. Pac.*, 973 F. Supp. 2d 1162, 1184 (E.D. Cal. 2013).  And for the reasons discussed above, Facebook is not a covered entity.  Nor have Plaintiffs identified any advertiser's violation of the law they believe Facebook abetted.

*Third*, Plaintiffs fail to state a claim for housing discrimination under California Gov't Code section 12955(a).  Plaintiffs fail to allege any facts showing that Facebook is an "owner."  *See* Cal. Gov't Code § 12927(e) (defining "owner").  Plaintiffs assert that Facebook is an "agent or salesperson of housing accommodations."  (FAC ¶ 102.)  But Plaintiffs fail to plead any facts showing an agency relationship between Facebook and advertisers or that Facebook is a "real estate … salesperson."  Plaintiffs cannot plead such facts, because Facebook is not a "real estate broker or salesperson" under California law.  *See* Cal. Fair Housing & Pub. Accommodations § 1:4 ("Real estate brokers and salespersons are professionals licensed and regulated by the State of California Bureau of Real Estate."); Cal. Bus. & Prof. Code § 10132 (definition of real estate salesperson). Courts routinely disregard "conclusory" assertions of agency like Plaintiffs' and should do so here.

1   *See, e.g.*, *Kennedy v. Wells Fargo Bank N.A.*, 2011 WL 3359785, at *3 (N.D. Cal. Aug. 2, 2011).

2   *Fourth*, Plaintiffs cannot state a housing-discrimination claim under Cal. Gov't Code

3   § 12955(k), which makes it unlawful to "make unavailable or deny a dwelling based on

4   discrimination."  Facebook cannot make unavailable or deny a dwelling, because Facebook does not

5   sell, lease, or otherwise offer any dwellings to its users.  Plaintiffs allege that Facebook "provid[es]

6   information" and targeting tools to third-party advertisers, but Plaintiffs do not and cannot allege

7   that Facebook decides whether to sell or rent accommodations to users.  *Supra* at 2-4, 9-14.

8   *Fifth*, Plaintiffs cannot state a claim under Cal. Gov't Code section 12955(i), which applies

9   only to entities "whose business involves real estate-related transactions."  Like the FHA, the FEHA

10   defines "real estate-related transactions" as the "making or purchasing of loans," the "selling,

11   brokering, or appraising" of property, or the "use of territorial underwriting requirements."  *Id.*

12   § 12927(h).  Plaintiffs do not and cannot allege that Facebook does any of these things.

13   *Sixth*, Plaintiffs' discriminatory advertising claim under Cal. Gov't Code section 12955(c)

14   suffers from the same fatal flaws as Plaintiffs' section 3604(c) claim under the FHA.  The "language

15   of sections 12955(c) and 3604(c) are substantially similar and subject to the same analysis."  *Pack v.*

16   *Fort Washington II*, 689 F. Supp. 2d 1237, 1248 (E.D. Cal. 2009).  Plaintiffs' section 12955(c)

17   claim should be dismissed for the reasons discussed above.  *Supra* at 20-21.

18   *Seventh*, Plaintiffs cannot state a claim under Cal. Gov't Code section 12955(j), which makes

19   unlawful the discriminatory denial of "access to, or membership or participation in, a multiple

20   listing service, real estate brokerage organization, or other service."  Section 12955(j) protects

21   brokers and salespersons, not applicants for housing.  *Cf. Derish v. San Mateo–Burlingame Bd. of*

22   *Realtors*, 136 Cal. App. 3d 534, 539-40 (1982) (multiple listing service could exclude public from

23   access and membership).  Plaintiffs fail to allege that Facebook has denied any broker or salesperson

24   access or membership to a multiple listing service, brokerage organization, or other service.

25   *Eighth*, Plaintiffs' aiding-and-abetting claim under Cal. Gov't Code section 12955(g) (FAC

26   ¶ 114), like their claim under section 12940(i), fails because Plaintiffs do not allege that Facebook

27   had the requisite intent to discriminate or provided "substantial assistance or encouragement" to

28   advertisers violating FEHA.  *See Fiol*, 50 Cal. App. 4th at 1325; *Casey*, 127 Cal. App. 4th at 1144.

1    Nor do they identify any advertiser's violation of the law they believe Facebook abetted.

2                    **7.    Plaintiffs Fail to State a Claim Under the Unruh Act**

3            Plaintiffs' Unruh Act claim (FAC ¶¶ 77-82) fails at the outset because "a plaintiff seeking to

4    establish a case under the Unruh Act must plead and prove intentional discrimination." *Koebke v.*

5    *Bernardo Heights Country Club*, 36 Cal.4th 824, 854 (2005).  Plaintiffs make no such allegation.

6    *See supra* at 16-17.  As the California Supreme Court has held, the statutory text, and in particular

7    its reference to "'aiding'" and "'inciting'" discrimination (Cal. Civ. Code § 52(a)), "imply willful,

8    affirmative misconduct on the part of those who violate the Act." *Koebke*, 36 Cal.4th at 853.

9    Plaintiffs allege no facts demonstrating that Facebook willfully or affirmatively discriminated

10   against users based on a protected trait.  Plaintiffs' allegations speak only to whether unspecified

11   *advertisers* may have engaged in discriminatory conduct.  Nor can any discriminatory intent be

12   inferred from Facebook's provision of a neutral tool used by advertisers, in their sole discretion, to

13   engage in a practice that is commonplace in advertising.  *Id.* at 854; *see also Earll v. eBay Inc.*, 2012

14   WL 3255605, at *5 (N.D. Cal. Aug. 8, 2012) (dismissing Unruh Act claim where "allegations

15   describe a facially neutral" policy and so did not "demonstrate intentional discrimination").

16           Plaintiffs also fail to allege facts indicating that any conduct violated the Unruh Act.  The

17   Act "prohibits only unreasonable, arbitrary, or invidious discrimination, not differential treatment

18   based on actual characteristic differences or differences in needs of users." *Sunrise Country Club*

19   *Ass'n v. Proud*, 190 Cal. App. 3d 377, 380-81 (1987).  "Invidious discrimination is the treatment of

20   individuals in a manner that is malicious, hostile, or damaging." *Javorsky v. W. Athletic Clubs, Inc.*,

21   242 Cal. App. 4th 1386, 1404 (2015).  The Act does not prohibit discriminatory policies that "do[]

22   not perpetuate any invidious stereotypes," *id.* at 1401, or policies based on "actual characteristic

23   differences or differences in needs of users." *Sunrise Country Club*, 190 Cal. App. 3d at 380-81.

24           Plaintiffs do not, and cannot, allege that Facebook has engaged in any unreasonable,

25   arbitrary, or invidious discrimination.  Rather, Plaintiffs allege that Facebook has developed a tool

26   that "enabl[es]" third-party "[b]usinesses to determine who will and who will not receive their

27   advertisements."  (FAC ¶ 47.)  But developing a tool that allows third parties to target ads does not

28   amount to "unreasonable, arbitrary, or invidious discrimination."  As discussed above (*supra* at 2-4),

the Ad Platform allows advertisers to engage in a broad range of targeted advertising, including based on users' expressed interest in content related to certain ethnic affinity groups, that do not rest on unfair or harmful stereotypes or the "undesirable propensities" of a class. *See Javorsky*, 242 Cal. App. 4th at 1395 (differential treatment "may be reasonable, and not arbitrary, in light of the nature of the enterprise or its facilities, legitimate business interests … and public policy").

Nor can Plaintiffs claim that Facebook's conduct in developing the Ad Platform constitutes "aid[ing] or incit[ing]" any discrimination. Cal. Civ. Code, § 52(a). No aiding-and-abetting liability is available for the same reasons such a theory of liability fails under the FEHA. Facebook has "do[ne] no more than provid[e its] usual, legitimate service" to advertisers; that some may abuse the service does not amount to intentional substantial assistance or encouragement warranting aiding-and-abetting liability. *Schulz v. Neovi Data Corp.*, 152 Cal. App. 4th 86, 94 (2007).

### 8.     Plaintiffs Fail to State a Claim Under the UCL

Plaintiffs' UCL claim (FAC ¶¶ 69-76) fails both because Plaintiffs have not alleged any unlawful, unfair, or fraudulent conduct, and because they are entitled to no relief under the UCL. A plaintiff may "borrow" violations of other laws to state a claim under the "unlawful" prong of the UCL. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999). But, for the reasons discussed, Plaintiffs fail to allege that Facebook has violated any laws. Nor do Plaintiffs allege any "unfair" or "fraudulent" conduct by Facebook. And even if they had, they would not be entitled to relief. A private UCL plaintiff must show that she has "lost money or property as a result of the unfair competition," Cal. Bus. & Prof. Code § 17204, but Plaintiffs allege no facts suggesting that they have. Moreover, to obtain restitution—the only form of monetary relief available under the UCL—the plaintiff must have lost money or property "*to the defendant*." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1147-48 (2003) (emphasis added). Plaintiffs allege no such thing, so their UCL claim must be dismissed. *See, e.g., L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 867-68 (N.D. Cal. 2015). Plaintiffs also request punitive damages, but such damages cannot be recovered in a UCL action. *Korea Supply*, 29 Cal.4th at 1148.

### V.     <u>CONCLUSION</u>

For these reasons, the Court should dismiss Plaintiffs' FAC without leave to amend.

1    DATED:  April 3, 2017                 MUNGER, TOLLES & OLSON LLP
                                              ROSEMARIE T. RING
2                                             JONATHAN H. BLAVIN
                                              JOSHUA PATASHNIK
3                                             ELIZABETH A. KIM

4

5

6    By:  */s/ Rosemarie T. Ring*
                                              ROSEMARIE T. RING
7                                       Attorneys for Defendant Facebook, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS FIRST AMENDED COMPLAINT