Jahan C. Sagafi (Cal. Bar No. 224887)
Relic Sun (Cal. Bar No. 306701)
OUTTEN & GOLDEN LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-mail: jsagafi@outtengolden.com
E-mail: rsun@outtengolden.com

William Most (Cal. Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
637 Kerlerec St.
New Orleans, LA 70116
Phone: (504) 509-5023
E-mail: williammost@gmail.com

Jason R. Flanders (Cal. Bar No. 238007)
Sarah M.K. Hoffman (Cal. Bar No. 308568)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (916) 202-3018
E-mail: jrf@atalawgroup.com
E-mail: smkh@atalawgroup.com

Adam T. Klein (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-mail: atk@outtengolden.com

P. David Lopez (admitted *pro hac vice*)
Peter Romer-Friedman (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW
Second Floor West
Washington, DC 20001
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
E-mail: pdl@outtengolden.com
E-mail: prf@outtengolden.com

*Attorneys for Plaintiffs and proposed Class Members*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| SUZANNE-JULIETTE MOBLEY, DANIEL ADRIAN MANRIQUEZ, and VICTOR ONUOHA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendants. | Case No. 16-cv-06440-EJD<br><br>**PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Judge: Hon. Edward J. Davila |

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 1

LEGAL STANDARD ................................................................................................................ 5

ARGUMENT ............................................................................................................................. 5

I.      Plaintiffs Have Standing To Challenge Facebook's Discrimination. .............................. 5

II.     Plaintiffs Have Stated Plausible Federal and State Claims............................................... 9

      A.      Plaintiffs Amply Allege Intentional Discrimination by Facebook. ...................... 9

      B.      Plaintiffs State a Claim Under Section 1981. ..................................................... 10

      C.      Plaintiffs State a Claim Under Section 1982. ..................................................... 12

      D.      Plaintiffs State Claims Under Title VII of the Civil Rights Act. ....................... 13

      E.      Plaintiffs State a Claim Under the Equal Credit Opportunity Act...................... 15

      F.      Plaintiffs State Claims Under the Fair Housing Act. .......................................... 16

      G.      Plaintiffs State Claims Under the California Fair Employment and Housing Act. .......... 21

      H.      Plaintiffs State a Claim Under the California Unruh Civil Rights Act............................ 23

III.    Facebook Has No Immunity Under the Communications Decency Act. ..................................... 24

      A.      Facebook Creates or Develops the Information Plaintiffs Challenge in this Case. .......... 24

      B.      Facebook Is Not a Publisher of Most of the Information Plaintiffs Challenge. ............... 28

      C.      Prior Cases Granting Facebook CDA Immunity Are Inapposite...................................... 30

CONCLUSION........................................................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE(S)**

*Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd.*,
160 F.3d 433 (8th Cir. 1998) ................................................................................. 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................. 5

*Bank of Am. Corp. v. City of Miami, Fla.*,
137 S. Ct. 1296 (2017) ................................................................................. 6, 7, 8

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ...................................................................... 28, 29

*Bennett v. Spear*,
520 U.S. 154 (1997) .............................................................................................. 7

*Brown v. City of Oneonta, N.Y.*,
221 F.3d 329 (2d Cir. 2000) ............................................................................... 10

*Bruin v. Mills Coll.*,
No. 06 Civ. 5209, 2007 WL 419783 (N.D. Cal. Feb. 6, 2007) .......................... 11

*Brush v. S.F. Newspaper Printing Co.*,
315 F. Supp. 577 (N.D. Cal. 1970) .................................................................... 13

*Burks v. Poppy Const. Co.*,
57 Cal. 2d 463 (1962) ......................................................................................... 23

*Caraccioli v. Facebook, Inc.*,
167 F. Supp. 3d 1056 (N.D. Cal. 2016) ........................................................ 11, 30

*Casey v. U.S. Bank Nat'l Ass'n*,
127 Cal. App. 4th 1138 (2005) ........................................................................... 21

*Chapman v. Pier 1 Imports Inc.*,
631 F.3d 939 (9th Cir. 2011) ............................................................................... 6

*Chew v. Hybl*,
No. 96 Civ. 03459, 1997 WL 33644581 (N.D. Cal. Dec. 9, 1997) ............... 16, 18

*Cmty. House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007) ..................................................................... 10, 17

PLS.' OPP. TO FACEBOOK'S MOT. TO DISMISS
Case No. 16-cv-06440-EJD

*Doe v. Backpage.com,*
  817 F.3d 12 (1st Cir. 2016) ........................................................................ 28

*Doe v. Internet Brands, Inc.,*
  824 F.3d 846 (9th Cir. 2016) ............................................................. 5, 28, 29

*Don Wilson Builders v. Superior Ct. for L.A. Cty.,*
  220 Cal. App. 2d 77 (Ct. App. 1963) ......................................................... 23

*EEOC v. Borden's, Inc.,*
  724 F.2d 1390 (9th Cir. 1984) .................................................................... 10

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ........................................................................ 6

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,*
  521 F.3d 1157 (9th Cir. 2008) ............................................................. *passim*

*Fraley v. Facebook,*
  830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................. 24, 27, 30

*Franklin v. Allstate Corp.,*
  No. 06 Civ. 1909, 2007 WL 1991516 (N.D. Cal. July 3, 2007) .................. 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
  528 U.S. 167 (2000) ...................................................................................... 6

*Garcia v. Country Wide Fin. Corp.,*
  No. 07 Civ. 1161, 2008 WL 7842104 (C.D. Cal. Jan. 17, 2008) ................ 19

*Gilligan v. Jamco Dev. Corp.,*
  108 F.3d 246 (9th Cir. 1997) ...................................................................... 19

*Gladstone Realtors v. Vill. of Bellwood,*
  441 U.S. 91 (1979) ........................................................................................ 8

*Gomez v. Alexian Bros. Hosp.,*
  698 F.2d 1019 (9th Cir. 1983) ...................................................................... 7

*Guenther v. Lockheed Martin Corp.,*
  No. 11 Civ. 380, 2017 WL 976939 (N.D. Cal. Mar. 14, 2017) .............. 5, 25

*Gurrola v. Jervis,*
  No. 08 Civ. 8029, 2009 WL 9548218 (C.D. Cal. Apr. 2, 2009) ................. 22

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................................ 6, 7, 8, 9

*Heckler v. Mathews*,
   465 U.S. 728 (1984) ........................................................................................................... 7

*Hous. Rights Ctr. v. Snow*,
   No. 05 Civ 4644, 2007 WL 91148 (E.D. Cal. Jan. 3, 2007) ............................................ 16

*Hous. Rights Ctr. v. Sterling*,
   404 F. Supp. 2d 1179 (C.D. Cal. 2004) ........................................................................... 18

*Hunter by Brandt v. Regents of the Univ. of Cal.*,
   971 F. Supp. 1316 (C.D. Cal. 1997) ................................................................................ 10

*Imagineering, Inc. v. Kiewit Pac. Co.*,
   976 F.2d 1303 (9th Cir. 1992) ......................................................................................... 11

*Isbister v. Boys' Club of Santa Cruz, Inc.*,
   40 Cal. 3d 72 (1985) ........................................................................................................ 23

*Jones v. Alfred H. Mayer Co.*,
   392 U.S. 409 (1968) ......................................................................................................... 12

*Jones v. Dirty World Entm't Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ........................................................................................... 25

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ....................................................................................... 30

*Lac Du Flambeau Band of Lake Super. Chippewa Indians v. Stop Treaty Abuse-Wisc., Inc.*,
   41 F.3d 1190 (7th Cir. 1994) ........................................................................................... 12

*Lansing v. Sw. Airlines Co.*,
   980 N.E.2d 630 (Ill. App. Ct. 2012) ................................................................................ 29

*Ledbetter v. Goodyear Tire & Rubber Co.*,
   550 U.S. 618 (2007), *superseded on other grounds by* Pub. L. No. 111-2 (Jan. 29, 2009) ................. 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ....................................................................................................... 8

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
   350 F.3d 1018 (9th Cir. 2003) ........................................................................................... 6

*London v. Coopers & Lybrand*,
   644 F.2d 811 (9th Cir. 1981) ........................................................................................ 11

*Long v. Playboy Enterprises Int'l, Inc.*,
   No. 11 Civ. 2128, 2012 WL 12869314 (C.D. Cal. Mar. 7, 2012) ............................... 24

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .................................................................................................... 5

*Morris v. Office Max, Inc.*,
   89 F.3d 411 (7th Cir. 1996) ...................................................................................... 10

*Morrow v. Miss. Publishers Corp.*,
   No. 72 Civ. 17, 1972 WL 236 (S.D. Miss. Nov. 27, 1972) ....................................... 14

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
   658 F.3d 375 (3d Cir. 2011) ...................................................................................... 17

*NAACP v. Ameriquest Mortg. Co.*,
   635 F. Supp. 2d 1096 (C.D. Cal. 2009) ................................................................... 12

*NAACP v. ITT Cmty. Dev. Corp.*,
   399 F. Supp. 366 (D.D.C. 1975) ......................................................................... 17, 18

*Opperman v. Path, Inc.*,
   87 F. Supp. 3d 1018 (N.D. Cal. 2014) ..................................................................... 25

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
   212 F.3d 493 (9th Cir. 2000) ...................................................................................... 9

*Patton v. Hanassab*,
   No. 14 Civ. 1489, 2015 WL 589460 (S.D. Cal. Feb. 12, 2015) ................................ 10

*Phiffer v. Proud Parrot Motor Hotel*,
   648 F.2d 548 (9th Cir. 1980) .................................................................................... 12

*Phillips v. Bramucci*,
   No. 15 Civ. 1533, 2015 WL 4452142 (N.D. Cal. July 20, 2015) .............................. 11

*Pittsburg Press Co. v. Pittsburgh Comm'n on Human Rel.*,
   4 Pa. Cmwlth. 448 (1972) ....................................................................................... 3, 9

*Pittsburg Press Co. v. Pittsburgh Comm'n on Human Rel.*,
   413 U.S. 376 (1973) .................................................................................................... 3

*Ragin v. Steiner, Clateman and Assocs., Inc.*,
    714 F. Supp. 709 (S.D.N.Y. 1989) ................................................................. 17

*Runyon v. McCrary*,
    427 U.S. 160 (1976) ......................................................................................... 11

*S.F. Baykeeper v. W. Bay Sanitary Dist.*,
    791 F. Supp. 2d 719 (N.D. Cal. 2011) ............................................................. 8

*Shaare Tefila Congregation v. Cobb*,
    481 U.S. 615 (1987) ......................................................................................... 12

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
    144 F. Supp. 3d 1088 (N.D. Cal. 2015) ........................................................... 30

*Sischo-Nownejad v. Merced Cmty. Coll. Dist.*,
    934 F.2d 1104 (9th Cir. 1991) ........................................................................ 10

*Southern Cal. Hous. Rights Ctr. v. Krug*,
    564 F. Supp. 2d 1138 (C.D. Cal. 2007) ........................................................... 16

*Spokeo Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...................................................................................... 8

*Sullivan v. Little Hunting Park, Inc.*,
    396 U.S. 229 (1969) ......................................................................................... 12

*Surrell v. Cal. Water Serv. Co.*,
    518 F.3d 1097 (9th Cir. 2008) ........................................................................ 10

*Tarin v. Cty. of L.A.*,
    123 F.3d 1259 (9th Cir. 1997) ........................................................................ 10

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
    135 S. Ct. 2507 (2015) .......................................................................... 4, 19, 21

*Thomas v. S.F. Hous. Auth.*,
    No. 16 Civ. 03819, 2017 WL 878064 (N.D. Cal. Mar. 6, 2017) .................... 19, 20

*Toll Bros., Inc. v. Twp. of Readington*,
    555 F.3d 131 (3rd Cir. 2009) ........................................................................... 8

*Trafficante v. Metro Life Ins. Co.*,
    409 U.S. 205 (1972) ........................................................................................... 8

*Treadway v. Gateway Chevrolet Oldsmobile Inc.*,
  362 F.3d 971 (7th Cir. 2004) ................................................................. 15

*United States v. E. River Hous. Corp.*,
  90 F. Supp. 3d 118 (S.D.N.Y. 2015) ..................................................... 19

*United States v. Real Estate One, Inc.*,
  433 F. Supp. 1140 (E.D. Mich. 1977) ................................................... 17

*United States v. Space Hunters, Inc.*,
  429 F.3d 416 (2d Cir. 2005) ................................................................. 17

*United States v. Speakman*,
  594 F.3d 1165 (10th Cir. 2010) ............................................................ 21

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) ................................................................ 5

*Winchell v. English*,
  62 Cal. App. 3d 125 (Ct. App. 1976) ................................................... 23

*Winfield v. City of N.Y.*,
  No. 15 Civ. 5236, 2016 WL 6208564 (S.D.N.Y. Oct. 24, 2016) .......... 19

**STATUTES**

15 U.S.C. § 1691 ................................................................... 2, 15, 16, 29

42 U.S.C. § 1981 .......................................................................... 11

42 U.S.C. § 1982 .......................................................................... 12

42 U.S.C. § 2000 ............................................................. 2, 10, 13, 29

42 U.S.C. § 3604 ................................................................... *passim*

42 U.S.C. § 3605 ............................................................. 2, 16, 19, 22

47 U.S.C. § 230 ................................................................ 24, 25, 28

Cal. Bus. Prof. Code § 10131 ........................................................ 22

Cal. Gov. Code § 12927 ................................................................ 22

Cal. Gov. Code § 12940 ......................................................... *passim*

Cal. Gov. Code § 12955 ......................................................... *passim*

Cal. Gov. Code § 12993 ................................................................ 22

**OTHER AUTHORITIES**

12 C.F.R. § 1002 ............................................................................................................ 15

12 C.F.R. pt. 202, Supp. I ............................................................................................. 15

24 C.F.R. § 100.60 ........................................................................................................ 16

24 C.F.R. § 100.70 ................................................................................................... 16, 17

24 C.F.R. § 100.75 ................................................................................................... 17, 18

24 C.F.R. § 100.80 ........................................................................................................ 17

53 Fed. Reg. 44992 (Nov. 7, 1988)............................................................................... 16

Cal. Fair Housing and Public Accommodations § 1:7..................................................... 22

Commission Decision No. 74-117, CCH EEOC Decisions (1983)................................. 14

EEOC Compliance Manual...................................................................................... 13, 14

Merriam-Webster.com ................................................................................................... 19

Robert G. Schwemm, Housing Discrimination Law & Litigation § 15:1 (2017) ............. 17, 18

## INTRODUCTION

The Court should deny Defendant Facebook, Inc.'s ("Facebook") Motion to Dismiss.  ECF No. 34.  As the First Amended Complaint ("FAC"), ECF No. 28, describes, Facebook violates federal and state antidiscrimination laws by deploying sophisticated computer science technologies to target recruitment and advertising of employment, housing, and credit opportunities in a way that discriminates against African Americans, Latinos, and Asian Americans ("people of color").  Specifically, Facebook classifies its users based on race and national origin and, then, in conjunction with advertisers, unlawfully discriminates by excluding people of color from receiving certain advertisements ("ads") based on their protected statuses, as well as the locations where they live.  Facebook is not merely a passive publisher of other companies' ads.  Instead, it is a modern-day marketing and recruitment firm that identifies people who are interested in economic opportunities, classifies them based on race, national origin, and location, works closely with employers, housing providers, and creditors to select which people to target, and then delivers ads to the selected people using advanced computer science technologies.  Facebook's assertion that it has a right to target ads to people based on their race or national origin flies in the face of decades of federal and state jurisprudence that make clear that such practices are prohibited.  All Americans, regardless of their race or national origin, have the same needs and deserve the same rights to hear about opportunities for a job, a home, an apartment, a student loan, or a mortgage, not just because equal opportunity is the right thing to do but because the law requires it.

Plaintiffs—people of color who were denied job, housing, and credit opportunities due to Facebook's practice—have standing, as they allege economic harm, discrimination, and the denial of information and integration.  Federal and state civil rights laws make it possible to hold Facebook accountable for this discrimination.  The Communications Decency Act ("CDA") does not immunize this conduct, because Facebook creates or develops, solely or in part, the information challenged in this case, and most of Plaintiffs' claims do not rely on treating Facebook as a publisher of the information.

## FACTUAL BACKGROUND

Plaintiffs allege that they and similarly situated people of color were denied the opportunity to pursue employment, housing, and credit opportunities because Facebook has engaged—and continues to engage—in a pattern or practice of discriminatory recruiting and advertising.  FAC ¶¶ 1, 4, 12-17, 55.

From the 1950s to 1970s, Congress and the California legislature enacted employment, housing, and other civil rights laws to combat "the intransigence of ongoing systemic discrimination caused by individual bad actors and societal forces." *Id.* ¶¶ 6-10. Even earlier, immediately after the Civil War Congress enacted "Sections 1981 and 1982 to ensure that all persons would have an equal right to make and enforce contracts and purchase and sell real property." *Id.* ¶ 5. By enacting laws like Title VII of the Civil Rights Act, the Fair Housing Act ("FHA"), and the Equal Credit Opportunity Act ("ECOA"), Congress banned discriminatory recruitment, marketing, advertising, and hiring in the context of employment, housing, and credit. *Id.* ¶¶ 6-7. These laws specifically bar publications, advertising, and statements that discriminate based on race or national origin. 42 U.S.C. § 3604(c); 42 U.S.C. § 2000e-3(b); Cal. Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code §§ 12940(d), 12955(c). They also bar a broad range of discriminatory practices that involve recruiting applicants for employment, housing, and credit opportunities, such as discriminating, classifying or segregating applicants for employment based on race or national origin; making housing unavailable, providing inaccurate information, or discriminating in housing and housing loans based on race or national origin; discriminating against credit applicants based on race or national origin; and, under California law, aiding and abetting such actions. 42 U.S.C. § 2000e-2(b); 42 U.S.C. §§ 3604(a), (d), 3605(a); 15 U.S.C. § 1691(a); FEHA §§ 12940(i), (k), 12955(a), (g), (k).

Plaintiffs allege that Facebook violates these and other federal and state laws (1) by intentionally discriminating against people of color by excluding them from receiving Facebook's recruitment, marketing, and advertising of employment, housing, and credit opportunities expressly based on their race or national origin, and (2) by applying facially neutral criteria—like the zip code a person lives in or his or her similarity to a business' existing customers—that disproportionately exclude people of color from receiving ads, especially in racially segregated areas. FAC ¶¶ 14, 55-57, 83-189.

As technology has changed, so has the way in which businesses recruit and market economic opportunities. Before the advent of the internet, businesses would hire a recruiting or marketing firm to devise strategies for identifying whom to recruit or market to, the publications to advertise in, and the content of their ads, and for purchasing ads in papers or magazines that passively publish ads. *Id.* ¶ 11. In that era, there was a clear division between a recruiting/marketing firm that targeted employees or

customers and the paper that neutrally published ads.[1]  Facebook has eliminated that distinction by

handling both roles, while employing highly sophisticated targeting technologies.  As the FAC explains:

> In the modern day, when Businesses want to recruit applicants for employment, housing, and credit opportunities, Facebook performs the necessary functions to create the advertisement; collect, develop and provide databases of information on Facebook users to Businesses so that such Businesses can discriminate between various populations in their recruitment, marketing and/or or advertising campaigns; develop the recruitment, marketing and/or advertising strategy to determine which people will and will not receive the advertisements; and deliver the advertisements to those people.

*Id.* ¶ 12.  Nearly all of Facebook's revenue comes from "selling advertising placements."  *Id.* ¶ 30.  With

over 191 million American users, "Facebook is . . . one of the most popular tools for businesses to

recruit applicants for employment, housing, and credit opportunities," "and for individuals to seek" such

opportunities.  *Id.* ¶ 2.  "92 percent of employment recruiters use social media to recruit applicants," and

"66 percent of employers who recruit [applicants] via social media employ Facebook."  *Id.* ¶ 53.

Instead of designing its recruitment and marketing services to promote equal opportunity,

Facebook has developed its services to "facially discriminate based on . . . race and national origin" and

"other characteristics that have an unjustified adverse impact based on race or national origin."  *Id.* ¶ 14.

Facebook's discriminatory recruiting, marketing, and information services work in the following

way.  First, Facebook monitors and analyzes each user's online activity, then identifies each user's

demographics, interests, and behaviors to create a personalized user profile.  *Id.* ¶¶ 36-42.  Through its

"Demographics" category, Facebook identifies "the race or perceived race of the Facebook user,"

including "African-American," "Hispanic," and "Asian American," though it has no category for white

Facebook users.  *Id.* ¶¶ 37-39.  These explicitly race- and national origin-based categories are created so

that businesses can "exclude Facebook users in these demographics groups from receiving Facebook

ad[s]."  *Id.* ¶¶ 38-40.  To make the platform useful for recruiting applicants for economic opportunities,

Facebook identifies its users as having interests directly related to employment, housing, and credit,

---

[1] Still, when newspapers have classified or segregated economic opportunities based on immutable characteristics, they have been held accountable for such discrimination.  For instance, *Pittsburg Press Co. v. Pittsburgh Comm'n on Human Rel.*, 4 Pa. Cmwlth. 448 (1972), held a paper was liable for classifying job ads based on sex, *id.* at 461-67, and the Supreme Court held the Constitution does not bar such liability.  *Pittsburg Press Co. v. Pittsburgh Comm'n on Human Rel.*, 413 U.S. 376, 379-81 (1973).

such as "Finding a New Job," an "Apartment," or a "Student loan." *Id.* ¶ 41. Facebook compiles these myriad personal details on its users in sophisticated databases. *Id.* ¶¶ 12, 36-42.

Next, Facebook provides access to the information in these databases to businesses, so that they can target recruitment and advertising of economic opportunities to specific populations of users; this targeting includes carving out users from receiving ads based on their race, national origin, and/or location (down to a single zip code). *Id.* ¶¶ 12, 34-37. Facebook gives these businesses step-by-step instructions on how they can *and should* use Facebook's ad platform to target ads to "the right people in the right places," by using these segregation tools. *Id.* ¶¶ 32-36; *see id.* ¶ 49 (telling advertisers to "[b]e specific about who you want to reach," because "[w]hen you narrow your targeting you can focus on reaching the people *who matter most* to your business"). Facebook provides businesses with drop-down option menus that include race and national origin categories, enabling and encouraging a determination of the "final audience" that will receive an ad and recruitment. *Id.* ¶ 35. In some cases, Facebook creates a "Lookalike Audience" for businesses to recruit Facebook users who are similar to their existing customers or employees based on demographics (like race or national origin) and location. *Id.* ¶ 48.

Facebook's ad platform is explicitly race- and national origin-based and involves disparate treatment against people of color. The only racial or national origin demographics groups that can be excluded from receiving ads are people of color (African Americans, Hispanics, and Asian Americans), but not whites. *Id.* ¶¶ 38-40. And when the ad platform excludes users in a zip code from receiving an ad, Facebook's "mapping tool draws a bright red line around the zip code," though it is "well-settled that redlining (the exclusion of whole communities from economic opportunities) . . . constitutes unlawful discrimination[.]" *Id.* ¶¶ 16, 43.[2] Moreover, because race and national origin are highly correlated with geography, especially in highly segregated metropolitan areas, excluding users based on their zip code (or a one mile radius) has an unjustified disparate impact on people of color. *Id.* ¶¶ 44-46, 55.

Once the business and Facebook determine which categories of users will receive employment,

---

[2] *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2515 (2015) (after "*de jure* residential segregation" ended, "various practices were followed . . . to encourage and maintain the separation of the races," such as "discriminatory lending practices, often referred to as redlining," which "precluded minority families from purchasing homes in affluent areas").

housing, or credit ads and which users will be excluded, Facebook determines, based on its own profiling, which specific users will and will not see the ad, and places the ad on the "news feed" of the users' Facebook pages so that the users can pursue the relevant economic opportunity. *Id.* ¶¶ 12, 29, 54. When Facebook sends the ad, Facebook even tells users why they are receiving the ad, such as their race or racial affiliation, location, or similarity to other customers. *Id.* ¶ 51. In sum, Facebook engages in a pattern and practice of discriminatory recruitment and advertising of employment, housing, and credit opportunities based on race or national origin, or neutral characteristics that have a disparate impact on people of color like a user's zip code. *Id.* ¶ 55. As a result, Plaintiffs and other people of color "have been denied employment, housing, and credit opportunities" provided to similarly situated whites, causing them to suffer discrimination, economic harm, a denial of information they have an equal right to receive, and segregation. *Id.* ¶ 58; *see id.* ¶¶ 15, 89, 99, 103, 110, 113, 120, 143, 152, 159, 166, 174.

## LEGAL STANDARD

Rule 12(b)(6) dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support" one. *Guenther v. Lockheed Martin Corp.*, No. 11 Civ. 380, 2017 WL 976939, at *2 (N.D. Cal. Mar. 14, 2017) (Davila, J.) (quotations omitted). At this stage, "the court must generally accept as true all 'well pleaded factual allegations,'" and "construe the alleged facts in the light most favorable to the plaintiff," drawing all reasonable inferences for plaintiffs. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009)). These standards apply to an entire motion to dismiss, including CDA issues. *E.g.*, *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 848 (9th Cir. 2016).

## ARGUMENT

### I.    Plaintiffs Have Standing To Challenge Facebook's Discrimination.

Plaintiffs plainly pled facts sufficient to confer Article III standing. To show standing at the pleading stage, Plaintifffs "need only show that the facts alleged, if proved, would confer standing." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003). At this stage, a court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Plaintiffs have standing because: (1) they suffered an "injury in fact" that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged action; and (3) a favorable decision will likely redress the injuries. *Friends*

*of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).[3]  In a class case, only one named plaintiff must have suffered injury.  *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003).  Courts are "instructed [] to take a broad view of constitutional standing in civil rights cases."  *Chapman v. Pier 1 Imports Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (quotations omitted).

Plaintiffs satisfy these standards.  They allege that they are people of color "resid[ing]" in communities of color, and they "sought" "to obtain[] housing, employment, and credit opportunities, and in doing so [] reviewed ad[s] that various Businesses and Facebook selected for [Plaintiffs] to receive."  FAC ¶¶ 25-27.  But due to Facebook's pattern or practice of discrimination:

> Plaintiffs and members of the proposed Class have not received (or have not regularly received) Facebook advertisements for employment, housing and/or credit opportunities . . . including advertisements that were provided to similarly situated white individuals . . . .  As a result, Plaintiffs and members of the proposed Class have been denied employment, housing, and credit opportunities by Facebook and such Businesses.

*Id.* ¶ 58.  For each cause of action, Plaintiffs allege that "due to Facebook's pattern or practice":

> Plaintiffs and members of the putative class have been denied the opportunity to receive and respond to employment [housing, and credit] advertisements that Facebook provided to similarly situated white potential applicants, and accordingly suffered economic and non-economic harm.

FAC ¶¶ 89, 99, 103, 110, 113, 120, 143, 152, 159, 166, 174, 183, 188; *see also id.* ¶¶ 81, 126.

The allegations identify harms directly connected to Facebook's conduct: (1) "economic harm" due to the denial of "employment, housing, and credit opportunities," *id.* ¶ 58; (2) "discrimination" based on protected statuses; (3) "perpetuat[ion] [of] segregation," and denial of "the benefits of living in a[n] . . . integrated society," *id.* ¶¶ 15-17; and (4) denial of information that laws require to be given on an equal basis.  *Id.* ¶¶ 55-58.  The Supreme Court has held *each* of these types of harm confers standing.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982) (stating the Supreme Court previously found standing where plaintiffs alleged discrimination "deprived them of . . . living in an integrated society and had caused them economic injury") (quotations omitted); *Bank of Am. Corp. v. City of*

---

[3] Facebook only challenges Plaintiffs' Article III constitutional standing, and does not challenge prudential standing.  While Facebook does not challenge redressability, the damages and injunctive relief Plaintiffs seek to stop Facebook's ongoing violations would plainly redress their injuries.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 974, 979 (9th Cir. 2011).

*Miami, Fla.*, 137 S. Ct. 1296, 1302-03 (2017) (same); *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) ("we have long recognized as judicially cognizable" "injury" of being "subject[ed] [] to unequal treatment" based on protected trait; "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group" is a concrete standing injury); *Havens*, 455 U.S. at 374 (black tester had standing for denial of "statutorily created right" to get information on housing opportunity given to white applicants); *Gomez v. Alexian Bros. Hosp.*, 698 F.2d 1019, 1021 (9th Cir. 1983) (finding standing where defendant deprived or interfered with employment opportunity).

In its main challenge to standing, Facebook argues that if there may not be standing for a person who *solely* claims to have *seen* an ad with discriminatory content, there cannot be standing for a person of color who *never saw* an ad directed to a white person. MTD at 14-15. This view misapprehends the nature of the injuries here. Plaintiffs' injuries do not stem from *seeing* ads with discriminatory content. They are caused directly by Facebook's practice of *not sending* ads to and *not recruiting* people of color due to their race or national origin while sending the same ads to white people, thus *depriving people of color* of economic opportunities, denying them statutorily-mandated information, classifying and discriminating against them, and fostering segregation. These are well established harms that give rise to standing to challenge civil rights violations. *Supra* at 6-7. Facebook's argument ignores decades of Supreme Court case law, including *Havens*, which recognized that a person of color has standing when she is denied information on an economic opportunity that is provided to a white person. 455 U.S. at 374. The rest of Facebook's injury arguments ignore Plaintiffs' detailed standing allegations, including how Facebook failed to send people of color ads it sent to similarly situated whites, denying people of color "the opportunity to receive and respond to" employment, housing, and credit opportunities. FAC ¶¶ 58, 81, 89, 99, 103, 110, 113, 120, 126, 143, 152, 159, 166, 174, 183, 188.

Facebook's causation argument fares no better. It argues that Plaintiffs' injuries stem from the independent actions of advertisers who use Facebook's drop-down forms to exclude people of color from receiving ads. MTD at 15-16. But as Facebook's own authority shows, traceability does not require a "defendant's actions [to be] the very last step in the chain of causation" or solely cause an injury. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Facebook not only takes the *first step* in its illicit scheme by creating racial data and giving it to advertisers, but also the *last step* by delivering the

1   discriminatory ads to its users.  Moreover, to establish Article III standing, an indirect causal

2   relationship suffices.  *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 749 (N.D. Cal.

3   2011) (citing *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3rd Cir. 2009)).[4]

4           Here, there is a close, direct relationship between Facebook's *own* conduct and Plaintiffs'

5   injuries:  *Facebook* determines the race or national origin of each user; organizes its ad platform with

6   drop-down forms so advertisers can use illicit racial data to target users based on protected classes; and

7   delivers ads based on illicit classifications *for and on behalf of* advertisers to its users.  FAC ¶¶ 11-15,

8   33-41, 51, 55, 79, 124, 130, 139, 147, 162, 169.  The Supreme Court has held plaintiffs *had standing*

9   where there was a far less direct connection between a defendant's violation and a plaintiff's injury.[5]

10          Finally, Facebook asserts that Plaintiffs must have seen the ads Facebook sent to white users but

11  excluded people of color (including Plaintiffs) from receiving.  MTD at 15-16.  This argument would

12  require Plaintiffs to identify information to which they lack access, and contravenes Supreme Court case

13  law that found standing in cases where people of color who were subjected to racial steering did not

14  identify the specific opportunities they were denied (*e.g.*, a specific apartment).  *Havens*, 455 U.S. at

15  368, 373-74 (finding standing where African Americans were steered away from housing opportunities

16  even though they did not identify a specific housing unit the landlord refused to show them); *accord*

17  *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-14 (1979).[6]

18  _____

19  [4] Even under a prudential standing analysis applied to the FHA—though Facebook only attacks Article
    III standing—causation only "requires some direct relation between the injury asserted and the injurious

20  conduct alleged."  *City of Miami*, 137 S. Ct. at 1306 (quotations omitted) (applying prudential standing
    analysis of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)).

21  [5] *Havens*, 455 U.S. at 379-80 (non-profit group had standing to challenge landlord's illegal refusal to
    give housing information to applicants); *Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205, 208 (1972)

22  (white tenants had standing to challenge landlord's steering away black tenants since violations denied

23  white tenants "benefits of living in an integrated community").  Contrary to Facebook's assertion, as
    noted above Plaintiffs allege many forms of concrete harm beyond "statutory violations."  MTD at 15.

24  And *Spokeo Inc. v. Robins*, 136 S. Ct. 1540 (2016), does not help Facebook—it reaffirmed that denying
    a person information that Congress decided he or she should have *alone* confers standing.  *Id.* at 1549.

25
    [6] The only case Facebook cites for this principle, the out-of-circuit *Ark. ACORN Fair Hous., Inc. v.*

26  *Greystone Dev., Ltd.*, 160 F.3d 433 (8th Cir. 1998), is inapplicable.  There, a non-profit lacked standing

27  because the group could not identify any harm to itself (in the form of "resources" expended)
    "specifically attributable" to discriminatory ads, not because the non-profit failed to identify a specific

28  ad not sent to a person of color.  *Id.* at 434-35.  Also, as *Greystone* noted, different legal standards apply

## II.   Plaintiffs Have Stated Plausible Federal and State Claims.

### A.   Plaintiffs Amply Allege Intentional Discrimination by Facebook.

In moving to dismiss several claims, Facebook wrongly argues that Plaintiffs fail to allege intentional discrimination, without offering any *legal* authority on what type of conduct constitutes intentional discrimination or explanation why the FAC's allegations fall short of the legal standard. MTD at 16-17, 24.  But the FAC amply pleads intentional discrimination.  It alleges in numerous places:

> by engaging in a pattern or practice or providing . . . marketing, recruitment . . . [and] advertising . . . services *for and on behalf of Businesses* that seek applicants for employment, housing, and credit opportunities via Facebook . . . employ[ing] Facebook's targeting tools to exclude which Facebook customers will receive such opportunities . . . *based expressly on race or national origin* of the Facebook user, *Facebook has intentionally discriminated* against African-Americans, Latinos, Asian Americans, and other non-white individuals based on race or national origin.

FAC ¶ 79 (emphasis added); *see also* ¶¶ 124, 130, 139, 147, 162, 169, 179.

In particular, the FAC points to Facebook's express racial classifications and segregation of users, resulting in inferior treatment of people of color compared to whites.  *Id.* ¶¶ 33-39.  It alleges that Facebook determines the race or national origin of each user and that Facebook "include[s] or exclude[s] who will view the ad[s] based on the race or perceived race of the Facebook user." *Id.* ¶¶ 35, 37-40. The ad exclusion option only applies to people of color, not white Facebook users.  *Id.* ¶¶ 37-38. Facebook even tells users they have received ads due to their race.  *Id.* ¶ 51.  Facebook performs such race-based services "*for and on behalf* of Businesses that seek applicants for employment, housing, and credit opportunities," *id.* ¶ 55 (emphasis added), including by playing a direct role in identifying applicants, developing advertising strategies, and creating and delivering ads to users.  *Id.* ¶¶ 12, 29-41.[7]

---

to non-profits' organizational standing when they challenge violations that directly affect others than to a natural person's standing for violations directed at him or her.  *Id.* (citing *Havens*, 455 U.S. at 378).

[7] These allegations contradict Facebook's claim that its targeting tools are "neutral" and only advertisers engage in discrimination.  MTD at 17, 24.  Also, Facebook offers no authority that having a policy that asks advertisers not to discriminate immunizes Facebook for *its own* discriminatory marketing and recruitment, especially since it performs marketing and recruitment "for and on behalf of" advertisers. FAC ¶¶ 55, 57, 63, 84, 106.  45 years ago, a court observed "[w]e have long passed that point in the advancement of civil rights whereby a declaration of intent" in a "disclaimer" "can be used as a screen or defense for actual discrimination."  *Pittsburg Press*, 4 Pa. Cmwlth. at 462; *cf. Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 517 (9th Cir. 2000) (Title VII's "purpose" "would be undermined" if mere existence of anti-discrimination policy "allow[ed] employers to escape" liability).

Facebook's actions are classic types of intentional discrimination. Its policy or practice that treats people of color differently and less favorably than whites is a facially discriminatory practice and form of disparate treatment that always constitutes intentional discrimination.  The Ninth Circuit has made clear that a facially discriminatory policy that "treat[s]" two groups "differently" provides "the intent necessary to support a finding of discrimination under the disparate treatment theory," and "facially discriminatory practices are intentional discrimination" "regardless of the subjective motivation." *EEOC v. Borden's, Inc.*, 724 F.2d 1390, 1393 (9th Cir. 1984) (internal quotations omitted).[8]  Also, Facebook's racial classification and segregation of its users is intentional discrimination.  A plaintiff may "plead intentional discrimination" by "point[ing] to a law or policy that expressly classifies persons on the basis of race." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 337 (2d Cir. 2000) (quotations omitted); *see Hunter by Brandt v. Regents of the Univ. of Cal.*, 971 F. Supp. 1316, 1323 n.12 (C.D. Cal. 1997) ("use of racial classifications was a form of intentional discrimination.").  Indeed, Title VII's intentional discrimination provision expressly states that it is "unlawful" to "limit, segregate, or classify . . . applicants for employment" based on "race" or "national origin."  42 U.S.C. § 2000e-2(a)(2).[9]

## B.    Plaintiffs State a Claim Under Section 1981.

Plaintiffs agree with Facebook that § 1981 bars only intentional discrimination.  MTD at 16-17. But as described above, the FAC *does* allege intentional discrimination.  *Supra* at 9-10.  Facebook argues that Plaintiffs must have a contract or attempt to contract with Facebook to state a § 1981 claim. Facebook "cite[s] no authority, however, for the proposition that persons other than parties to a contract cannot be held liable under § 1981, and, indeed, the authority is to the contrary." *Franklin v. Allstate*

---

[8] *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 634 (2007), *superseded on other grounds by* Pub. L. No. 111-2 (Jan. 29, 2009) (employer who "adopts a facially discriminatory pay structure . . . because of race [] engages in intentional discrimination whenever it" applies it); *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991) ("[d]isparate treatment involves intentional discrimination"); *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007) ("facially discriminatory policy is one which on its face applies less favorably to a protected group").

[9] The same intentional discrimination standards apply to the other federal and state laws here.  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (Title VII disparate treatment legal principles apply to § 1981); *Tarin v. Cty. of L.A.*, 123 F.3d 1259, 1263-64 n.2 (9th Cir. 1997) (same "test" under "Title VII applies to FEHA claims"); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (stating same regarding § 1981 and § 1982); *Patton v. Hanassab*, No. 14 Civ. 1489, 2015 WL 589460, at *4 (S.D. Cal. Feb. 12, 2015) (stating same regarding FHA, FEHA, and Unruh Act claims).

*Corp.*, No. 06 Civ. 1909, 2007 WL 1991516, at *5 (N.D. Cal. July 3, 2007) (citing *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1313 (9th Cir. 1992)).  As the Ninth Circuit held, "[a]n important purpose of section 1981 is to eliminate race based interference with the right of each citizen to contract," and thus "courts have not imposed a privity of contract type requirement that would otherwise protect third parties from section 1981 liability."  *Imagineering*, 976 F.2d at 1313.  For example, a person who "interferes with a job applicant's right to enter into an employment contract" with another party may be sued under § 1981.[10]  This Court has recognized a § 1981 claim against a person who lacked contractual privity.  *Phillips v. Bramucci*, No. 15 Civ. 1533, 2015 WL 4452142, at *8 (N.D. Cal. July 20, 2015) (Davila, J.) (inmate stated § 1981 claim over Warden's "removal of the black entertainment station").

Here, Plaintiffs allege Facebook interferes with the rights of Plaintiffs to enter into contracts for employment, housing, and credit based on their race by classifying them based on race and then denying them information on opportunities to enter into such contacts.  FAC ¶¶ 37-40, 55, 58, 123-26.

Also, the FAC *does* describe how *Facebook* treats people of color differently in performing a contract *between Facebook and its users*. It identifies the Statement of Rights and Responsibilities, an "agreement" that "governs [Facebook's] relationship with users."[11]  It describes how non-white users are subjected to racial discrimination in the *performance* of this contract and the *enjoyment of the benefits and privileges* of the contractual relationship with Facebook, including how people of color, but not white users, are excluded "from receiving Facebook advertisements," FAC ¶ 38, and how people of color are "denied employment, housing, and credit opportunities by Facebook and such Businesses" sent to whites.  *Id.* ¶ 58; *see* 42 U.S.C. § 1981(b) (barring discrimination in "the making, performance . . .

---

[10] *London v. Coopers & Lybrand*, 644 F.2d 811, 818 (9th Cir. 1981); *see, e.g.*, *Bruin v. Mills Coll.*, No. 06 Civ. 5209, 2007 WL 419783, at *3 (N.D. Cal. Feb. 6, 2007) (applying § 1982's rule that there can be an "action against third parties" to § 1981, and holding § 1981 applies to supervisors who discriminated against employee).  Contrary to Facebook's misleading citation to *Runyon v. McCrary*, 427 U.S. 160 (1976), *Runyon* merely stated that § 1981 is violated when a "private offeror refuses" to contract with a black person, but did not address whether third-parties to a contract may be sued.  *Id.* at 170-71.

[11] FAC ¶¶ 21, 23 & n.1, Statement of Rights and Responsibilities, https://www.facebook.com/terms.php ("This agreement . . . governs our relationship with users and others who interact with Facebook . . . . This Statement makes up the entire agreement between the parties regarding Facebook[.]").  Facebook's Statement of Rights and Responsibilities is incorporated by reference into a complaint that directly relies upon it.  *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1062 n.3 (N.D. Cal. 2016) (Davila, J.).

1    and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship").

2        **C.    Plaintiffs State a Claim Under Section 1982.**

3        Facebook erroneously argues that § 1982 only bars intentional discrimination and Plaintiffs fail

4    to allege intentional discrimination.  MTD at 17.  "The Ninth Circuit has held that disparate impact

5    claims are appropriate under section 1982." *NAACP v. Ameriquest Mortg. Co.*, 635 F. Supp. 2d 1096,

6    1104 (C.D. Cal. 2009) (citing *Phiffer v. Proud Parrot Motor Hotel*, 648 F.2d 548, 551 (9th Cir. 1980)).

7    And, the FAC *does* allege intentional discrimination—Facebook's recruitment of applicants for the

8    purchase and leasing of housing involves disparate treatment and racial classifications.  *Supra* at 9-10.

9        Furthermore, while the Supreme Court has said in dicta that § 1982 "does not prohibit

10   advertising or other representations that indicate discriminatory preferences," *Jones v. Alfred H. Mayer*

11   *Co.*, 392 U.S. 409, 413 (1968), here Plaintiffs do not solely challenge discriminatory advertising.

12   Instead, they challenge Facebook's discriminatory recruitment and information services that limit and

13   interfere with the ability of people of color to "purchase" or "lease" "real [] property," including by

14   identifying the races of its users, identifying which users want to purchase or rent homes, and providing

15   this information to advertisers for recruitment purposes.  42 U.S.C. § 1982; *see* FAC ¶¶ 33-41, 130-31.

16   Thus, whether or not *Facebook itself* sends an ad, Facebook plays a direct role in discriminatory

17   recruitment that interferes with the opportunities of people of color to buy or lease real property.

18       Facebook is wrong that § 1982 only governs the conduct of those who sell, lease, or convey

19   property.  MTD at 17.  Section 1982 bars "interference with property rights," including where there is no

20   contractual privity or attempted privity between a plaintiff and defendant.  *Shaare Tefila Congregation*

21   *v. Cobb*, 481 U.S. 615, 616-18 (1987) (reversing dismissal of synagogue's claims against defendants

22   who desecrated a temple, and citing *Jones*, 392 U.S. at 409).  Property rights are "protected by § 1982

23   against the actions of third parties, as well as against the actions of" a contracting party.  *Sullivan v.*

24   *Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969); *see Lac Du Flambeau Band of Lake Super.*

25   *Chippewa Indians v. Stop Treaty Abuse-Wisc., Inc.*, 41 F.3d 1190, 1191-93 (7th Cir. 1994) (affirming

26   § 1982 violation where protesters interfered with Indians' property rights by insulting plaintiffs and

27   blocking access to land).  Thus, Facebook can be liable since it interferes with Plaintiffs' opportunities

28   to enter into contracts to buy or lease property from others by refusing to provide Plaintiffs with

1  information that is necessary to pursue contracts due to race.  FAC ¶¶ 37-40, 55, 58, 129-33.

2  **D.      Plaintiffs State Claims Under Title VII of the Civil Rights Act.**

3  Facebook does not dispute that Plaintiffs have alleged *conduct* that violates Title VII's bar on (1)

4  racial discrimination or classifications in referring or recruiting workers, 42 U.S.C. § 2000e-2(b), and (2)

5  publishing "any notice or advertisement relating to employment" that "indicat[es] any preference,

6  limitation, specification, or discrimination, based on race [or] national origin."  *Id.* § 2000e-3(b).[12]

7  Instead, Facebook solely asserts it is not a proper Title VII defendant since it is not an "employment

8  agency," analogizing Facebook to a newspaper that passively publishes third parties' discriminatory ads.

9  MTD at 19 (citing *Brush v. S.F. Newspaper Printing Co.*, 315 F. Supp. 577, 578 (N.D. Cal. 1970)).

10  Facebook's argument ignores Title VII's plain language, which defines an "employment agency"

11  as a person "who "regularly undertak[es] . . . to procure employees for an employer or to procure for

12  employees opportunities to work for an employer and includes an agent of such a person."  42 U.S.C.

13  § 2000e(c).  The FAC describes how Facebook procures workers for employers and employment

14  opportunities for workers: Facebook "regularly receives compensation from employers to place

15  advertisements for employers—and provide related marketing, recruitment, sourcing, advertising,

16  branding, information, and/or hiring services—to recruit applicants for employment and encourage them

17  to apply for employment with such employers."  FAC ¶ 185; *see id.* ¶¶ 12, 178.[13]  These allegations

18  amply allege that Facebook is an "employment agency" under Title VII.  Facebook's actions are no

19  different than an employment agency that searches for workers who are interested in finding jobs,

20

21  [12] *See* EEOC Compliance Manual § 631.4 Employment Agencies (describing range of activities that

22  violate §§ 2000e-2(b), 2000e-3(b), such as bias in "not referring women or minorities," "[c]ategorizing,
    grouping, or classifying job applicants, jobs, or employers on a prohibited basis and making referrals

23  based on those categorizations," to "otherwise discriminate" such as "segregating facilities or job
    applicants," or to publish ads that "express or imply a preference for a particular" protected class).

24  [13] The FAC also describes in detail how procuring workers for employers is a big business for

25  Facebook: Facebook "identif[ies]" Facebook users who are "seeking employment" "so that Facebook
    can assist advertisers who want to target their advertisements to Facebook users who may be interested

26  in employment [] opportunities." FAC ¶ 41.  Facebook is "one of the largest venues for employers . . . to
    seek applicants for employment"; "most individuals who seek employment opportunities use Facebook

27  to look for work"; "the vast majority of job seekers have Facebook profiles"; "92 percent of employment
    recruiters use[] social media to recruit applicants for employment" and "66 percent of employers who

28  recruit via social media employ Facebook to recruit applicants for employment."  *Id.* ¶ 53.

categorizes the workers by race and zip code, gives a database of the workers to an employer, and then contacts only certain workers on the list in accordance with the employer's discriminatory preferences.

Contrary to Facebook's argument, federal courts and the EEOC have recognized that a newspaper *can* be an employment agency if it takes affirmative acts to classify ads in a discriminatory way, such as creating two separate columns for "Female" and "Male" jobs and honoring advertisers' designation of ads for a specific group. *Morrow v. Miss. Publishers Corp.*, No. 72 Civ. 17, 1972 WL 236, at *1-4 (S.D. Miss. Nov. 27, 1972); EEOC Compliance Manual § 631.2(b)(1) Private Employment Agencies, 2006 WL 4672853 (2006) (newspaper "is not liable as an employment agency" "[t]o the extent that a newspaper doesn't exercise control, or actively classify advertisements") (citing *Morrow*, 1972 WL 236, at *1-4, and Commission Decision No. 74-117, CCH EEOC Decisions (1983) ¶ 6429 n.2 (*Morrow* suggests a newspaper is an employment agency "if a newspaper actively participates in classifying the advertisement which it publishes")).  Here, the FAC alleges Facebook plays a central, affirmative role in identifying and classifying the race and national origin of its users and sending employment ads to users based on such unlawful classifications.  FAC ¶¶ 12, 35-41.

Moreover, Facebook is not a newspaper or a similar entity that merely passively publishes the ads of others.  Facebook functions as a modern day marketing or advertising firm that assists employers to identify workers (including their race, national origin, and location), guides the marketing strategy, creates the ads, and delivers the ads to prospective employees.  *Id.* ¶¶ 11-12.  As the FAC explains:

> In the modern day, when Businesses want to recruit applicants for employment, housing, and credit opportunities, Facebook performs the necessary functions to [1] create the ad; [2] collect, develop and provide databases of information on Facebook users to Businesses so that such Businesses can discriminate between various populations in their recruitment, marketing and/or or advertising campaigns; [3] develop the recruitment, marketing and/or advertising strategy to determine which people will and will not receive the advertisements; and [4] deliver the advertisements to those people.

*Id.* ¶ 12.  The only thing Facebook has in common with a newspaper from the 1970s (or even in 2017) is that it "deliver[s] the advertisements."  *Id.*  Even its delivery of ads is completely different than a newspaper's delivery.  Unlike newspapers that deliver the same paper to everyone, Facebook only sends ads to certain people based on specific racial demographics and locations.  Thus, the San Francisco Chronicle does not have an "African-American version" of the paper that is sent only to African

Americans and only includes ads advertisers want African Americans to see.  But Facebook does, by creating individualized ad campaigns that are customized to specific users based on their race.

**E.**     **Plaintiffs State a Claim Under the Equal Credit Opportunity Act.**

Facebook makes a single challenge to the ECOA claims, that it is not a "creditor," the term that defines who can be sued.  MTD at 18; 15 U.S.C. § 1691 (it is "unlawful for any creditor to discriminate" based on race or national origin); *id.* § 1691e.  Facebook is wrong.  A "creditor . . . includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, *or* selects or offers to select creditors to whom requests for credit may be made."  12 C.F.R. § 1002.2(l) (emphasis added).  Facebook satisfies this definition in two independent ways.

First, Facebook routinely identifies people "who have expressed an interest in . . . credit," such as "credit cards," "Car Finance," "Student loan," so that credit providers can "target their advertisements" to these people, FAC ¶ 41, and "large numbers of . . . credit providers use Facebook to recruit . . . individuals who are seeking . . . credit opportunities."  FAC ¶ 53; *see id. ¶¶* 139-40, 142-43. By recruiting users to apply for credit from other businesses, Facebook "regularly refers applicants or prospective applicants to creditors."  12 C.F.R. § 1002.2(l). Second, by accepting creditors' ads and sending them to users so they can request credit from creditors, FAC ¶¶ 41, 139-40, 142-43, Facebook "selects or offers to select creditors to whom requests for credit may be made." 12 C.F.R. § 1002.2(l).

While Facebook claims § 1002.2(l) is limited to persons who "accept applications and refer applicants to creditors," 12 C.F.R. pt. 202, Supp. I, this staff interpretation does not override § 1002.2(l)'s plain language that merely requires a person to "refer[] applicants or prospective applicants to creditors." 12 C.F.R. § 1002.2(l).  Indeed, the staff interpretation does nothing more than illustrate several types of persons who qualify as creditors —"real estate brokers, automobile dealers, home builders, and home-improvement contractors"—but it does not purport to exempt creditors that refer applicants *without* accepting applications.  12 C.F.R. pt. 202, Supp. I.[14]

---

[14] *See Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 979 (7th Cir. 2004) (stating that "one who regularly refers applicants to lenders is a 'creditor' under the ECOA [] for purposes" of discrimination and discouragement, without requiring the creditor to accept applications itself).  Nor does Facebook cite a single case that interprets § 1002.2(l) to be limited to persons who "accept applications."  Moreover, to accept Facebook's position would require reading "prospective applicant"

### F.   Plaintiffs State Claims Under the Fair Housing Act.

Plaintiffs allege claims under four separate subsections of the FHA, 42 U.S.C. § 3604(a), (c), and (d), and 42 U.S.C. § 3605.  Facebook's challenges to these claims are misplaced.

First, § 3604(a) makes it "unlawful" "[t]o refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race . . . or national origin." 42 U.S.C. § 3604(a).  The Department Housing & Urban Development ("HUD") has identified practices that violate § 3604(a) in 24 C.F.R. § 100.60, and § 100.70.  Facebook's practices are barred by § 100.60 and § 100.70—segregating and limiting which prospective purchasers or renters receive information about housing opportunities and can pursue those opportunities based on their race or national origin. These practices are "tantamount to an unlawful refusal to negotiate" and "otherwise make[] unavailable or denies dwellings because of race[.]"  53 Fed. Reg. 44992, 44996-97 (Nov. 7, 1988).[15]  Section 3604(a) does not merely bar outright denials of housing; it is "as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful."  *Southern Cal. Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1150 (C.D. Cal. 2007) (citations and internal quotations omitted); *see Chew v. Hybl*, No. 96 Civ. 03459, 1997 WL 33644581, at *7 (N.D. Cal. Dec. 9, 1997) (§ 3604(a) is "inten[ded] to prohibit any conduct that tends to further discrimination in housing").

Contrary to Facebook's unsupported assertion, § 3604's "make unavailable" standard does not limit liability exclusively to entities that literally "sell[], lease[], or convey[] real property" to others.

---

out of the regulation's phrase "refer[] applicants or prospective applicants," as an "applicant" is a "person who applies to a creditor[.]"  15 U.S.C. § 1691a(b).

[15] When Facebook identifies the race of its users and limits which users receive ads to pursue housing opportunities based on their race, it is "using different . . . sale or rental standards or procedures . . . or other requirements . . . because of race." 24 C.F.R. § 100.60(b)(4). Its limiting of information on certain housing opportunities to prospective buyers or renters based on race or national origin "[d]iscourag[es] any person from inspecting, purchasing or renting a dwelling because of race [or] national origin," *id.* § 100.70(c)(1), and its segregating, classifying and steering away prospective buyers and renters based on their race or national origin involves "[e]mploying codes or other devices to segregate or reject applicants, purchasers or renters . . . because of race [or] national origin."  *Id.* § 100.70(d)(2); *see* FAC ¶ 149; *Hous. Rights Ctr. v. Snow*, No. 05 Civ 4644, 2007 WL 91148, at *2 (E.D. Cal. Jan. 3, 2007) ("steer[ing]" a protected class "away from particular units" violates § 3604(a).  The regulations that interpret § 3604(a) are entitled to *Chevron* deference.  *See, e.g., Krug*, 564 F. Supp. 2d at 1150-51.

PLS.' OPP. TO FACEBOOK'S MOT. TO DISMISS
Case No. 16-cv-06440-EJD

MTD at 19.  In fact, § 3604(a) "make unavailable" claims are even cognizable against governments whose actions make housing unavailable.  *City of Boise*, 490 F.3d at 1046; *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381 (3d Cir. 2011).  And contrary to Facebook's unsupported claim, there is nothing in § 3604(a) that exempts discriminatory recruitment or advertising.  MTD at 19.  In fact, advertising that discourages certain racial groups from pursuing housing is a type of "conduct" "that otherwise makes unavailable" housing by "discouraging any person from [] purchasing or renting a dwelling."  24 C.F.R. § 100.70(b), (c)(1).  Advertising that targets specific racial groups violates § 3604(a).  *E.g.*, *United States v. Real Estate One, Inc.*, 433 F. Supp. 1140, 1144, 1152 (E.D. Mich. 1977) (§ 3604(a) violation where advertiser focused ads in publications with primarily black readers); *NAACP v. ITT Cmty. Dev. Corp.*, 399 F. Supp. 366, 366 (D.D.C. 1975) (entering consent decree where plaintiffs alleged discriminatory advertising focused on white communities could have "the effect of making housing unavailable on account of race").

Second, Plaintiff states a plausible § 3604(d) claim.  HUD has interpreted § 3604(d) to prohibit "[l]imiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race [or] national origin."  24 C.F.R. § 100.80(b)(4).  By excluding Facebook users from receiving housing ads based on their race or national origin, Facebook is *limiting information* about sale and rental dwellings based on race or national origin.  *Id.*; FAC ¶¶ 160-62.  Contrary to Facebook's claim that Plaintiffs do not allege Facebook itself has made any statements, the FAC repeatedly alleges that Facebook sends the ads "for and on behalf of" advertisers.  FAC ¶¶ 160-65 (Facebook provides the "marketing" and "advertising" "services for and on behalf of Businesses").

Third, Plaintiff states a claim under § 3604(c).  Facebook questions—without authority— whether § 3604(c) "imposes liability on online platforms for providing ad-targeting tools to third-party advertisers."  MTD at 20.  But it is well established that any entity that publishes housing ads online or in print can be liable under § 3604(c), as can advertising or marketing firms.  Robert G. Schwemm, Housing Discrimination Law & Litigation § 15:1 & nn. 5-6 (2017) (citing 24 C.F.R. § 100.75(b); *Ragin v. Steiner, Clateman and Assocs., Inc.*, 714 F. Supp. 709, 713 (S.D.N.Y. 1989)).  "Nothing in [§ 3604(c)'s] language limits the statute's reach to owners or agents or to statements that directly effect a housing transaction.  Indeed, [it] . . . applies on its face to anyone who makes prohibited statements."

1    *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005) (quotations omitted).  Here, the

2    FAC plainly alleges Facebook is *both* as an online publisher of ads and a marketing agency responsible

3    for developing ads and targeting users based on race.  FAC ¶ 12.

4            Also, there is no doubt that Facebook's ads "indicate[] any preference, limitation, or

5    discrimination based on race [or] national origin" or "an intention to make such a preference."  42

6    U.S.C. § 3604(c).  "An oral or written statement violates § 3604(c) if it suggests a preference, limitation

7    or discrimination to the 'ordinary listener' or reader," and "does not require evidence of discriminatory

8    intent."  *Hous. Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1193 (C.D. Cal. 2004) (collecting cases).

9    Facebook uses racial segregation and classifications to decide which users receive housing ads based on

10   race (and only allows people of color to be affirmatively excluded), FAC ¶¶ 155-59, a practice that

11   explicitly suggests to an ordinary person there is a preference for certain racial groups.  Far less explicit

12   racial preferences have violated § 3604(c).  *Sterling*, 404 F. Supp. 2d at 1193 ("notices and banners

13   written only in Korean would suggest to the ordinary reader a racial preference for Korean tenants").

14           Contrary to Facebook's unsupported view that § 3604(c) only regulates the *content* of housing

15   ads but not racial discrimination in selecting *which people* receive ads, HUD has made clear that

16   denying the very same content to people based on their race (or location, if it serves as a proxy for race)

17   violates § 3604(c).  24 C.F.R. § 100.75(c)(3) (stating § 3604(c) bars "selecting . . . locations for

18   advertising the sale or rental of dwellings" that denies these "segments of the housing market

19   information about housing opportunities because of race").[16]  Also, Facebook's ads *do* have *content* that

20   indicates racial preferences.  Its ads explicitly tell users that they are "seeing this" ad because they are a

21   specific race or "ethnic affinity."  FAC ¶ 51.  Telling a person she received an ad due to her race plainly

22   indicates a racial preference. *Cf. Chew*, 1997 WL 33644581, at *6 ("An ordinary listener would

---

23   [16] Facebook claims this regulation is inconsistent with the law, but only offers a self-serving conclusion

24   —without any authority—that § 3604(c) "encompasses only ads that, on their face, are either explicitly
     or implicitly discriminatory."  MTD at 20 n.9. But it is eminently reasonable for HUD to find that an

25   advertising campaign that sends ads exclusively or primarily to people of a certain race conveys a racial
     preference (explicitly or implicitly).  The Justice Department applied this principle in suing a bank under

26   the FHA and ECOA for not advertising in majority black communities.  Complaint, *United States v. Old
     Kent Fin. Corp.*, No. 04-71879 (E.D. Mich. May 19, 2004); *see also ITT Cmty. Dev. Corp.*, 399 F. Supp.

27   at 366 (consent decree entered where plaintiffs alleged defendant "engaged in racially discriminatory
     advertising and marketing practices" by focusing ads away from blacks) (cited by Schwemm § 15:6).

28

---

1  understand facially discriminatory remarks to indicate discrimination.").

2      <u>Fourth</u>, Facebook is wrong that § 3605 does not apply to it.  MTD at 20.  While § 3605 only

3  applies to those "whose business includes engaging in residential real estate-related transactions,"

4  Facebook admits this definition includes those involved in "selling . . . residential real property."  42

5  U.S.C. § 3605(a), (b)(2).  HUD has not defined the term "selling" "residential real property."  *Id.*  But

6  the plain language meaning of "selling" encompasses advertising; and the FAC alleges that Facebook

7  advertises real property via ads to housing applicants.  Merriam-Webster.com (last visited May 18,

8  2017) (defining "selling" as "to cause or promote the sale of," *e.g.*, "using television advertising to *sell*

9  cereal"); FAC ¶¶ 167-70.

10      Finally, on the FHA disparate impact claims, Facebook incorrectly asserts a complaint must

11  allege statistical evidence of disparities.  Before and after *Inclusive Communities*,[17] courts have held in

12  FHA disparate impact and pattern or practice cases that plaintiffs "are not required to prove causation or

13  disparate impact through statistical evidence at the pleading stage."  *Winfield v. City of N.Y.*, No. 15 Civ.

14  5236, 2016 WL 6208564, at *6 (S.D.N.Y. Oct. 24, 2016); *United States v. E. River Hous. Corp.*, 90 F.

15  Supp. 3d 118, 159 (S.D.N.Y. 2015) ("[S]tatistics need not be pled in the complaint in order to survive a

16  motion to dismiss, because in most cases, plaintiffs will be unable to provide reliable statistics before

17  they have access to discovery.") (quotations omitted)); *Garcia v. Country Wide Fin. Corp.*, No. 07 Civ.

18  1161, 2008 WL 7842104, at *6-7 (C.D. Cal. Jan. 17, 2008).

19      Here, Plaintiffs adequately "plead the [three] general elements to make a [FHA disparate impact

20  claim] facially plausible."  *Thomas v. S.F. Hous. Auth.*, No. 16 Civ. 03819, 2017 WL 878064, at *5

21

22  _____

[17] The only authority Facebook offers is a misleading quote from *Inclusive Communities*, where the sole

23  issue was "whether disparate-impact claims are cognizable under the [FHA]" in an appeal from a trial,

not a dismissal. 135 S. Ct. at 2513-14.  There, the Court stated "[a] plaintiff who fails to [1] *allege facts*

24  *at the pleading stage or* [2] *produce statistical evidence* demonstrating a causal connection cannot make

out a prima facie case of disparate impact."  *Id.* at 2523 (emphasis added).  By placing "or" between

25  these two alternatives the Court made clear it was not imposing a new rule that complaint must include

statistics, but was juxtaposing "facts" that must be pled in a complaint and "statistical evidence" that

26  must be "produce[d]" at summary judgment or trial.  *Winfield*, 2016 WL 6208564, at *6 (rejecting view

that *Inclusive Communities* requires statistics to be pled in complaint, and noting a prima facie case is an

27  evidentiary, not a pleading, standard); *see Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 250 (9th Cir.

1997) (housing complaint "need not "make a prima facie showing to survive a motion to dismiss").

28

(N.D. Cal. Mar. 6, 2017).  <u>First</u>, they plead "the existence of outwardly neutral practices."  *Id.*
Facebook, "for and on behalf Businesses" sends "marketing [and] recruitment, . . . advertisements for
housing opportunities based on facially neutral characteristics of the Facebook user"; the characteristics
include (A) a user's location "as specific as the person's zip code," or a one mile radius, and (B) "the
user's similarity to the company's existing customers."  FAC ¶ 149; *see id.* ¶¶ 14, 155, 157, 163, 170.

<u>Second</u>, the FAC describes "a significantly adverse or disproportionate impact on persons of a
particular type produced by the defendant's facially neutral acts or practices."  *Thomas*, 2017 WL
878064, at *5.  It alleges that recruiting and advertising based on neutral "characteristics," "including the
zip code a person lives in or characteristics that are similar to a company's existing customers," "have an
unjustified adverse impact based on race or national origin."  FAC ¶ 14.  These ads "often will
disproportionately reach people of a particular racial or ethnic background or national origin and will not
reach other people from different" backgrounds.  *Id.* ¶ 44; *accord id.* ¶¶ 56-57, 67.  As "metropolitan
areas [] are highly segregated based on race, [] marketing to or recruiting applicants for [] housing []
based on the zip code in which the potential applicants reside can be expected to exclude or include
certain communities based on race or national origin, and has the effect of excluding" people of color.
*Id.* ¶ 45.  "[I]n highly segregated areas, limiting the geographic scope of an advertisement to a one-mile
radius will disproportionately" exclude people of color.  *Id.* ¶ 46. The FAC describes how these practices
impact non-white Facebook users like the Plaintiffs who live in predominantly communities of color.[18]

<u>Third</u>, the FAC alleges "facts demonstrating a causal connection between the specific challenged
practice or policy and the alleged disparate impact."  *Thomas*, 2017 WL 878064, at *5.  It describes how
*Facebook* identifies the location of its users, encourages advertisers to send their ads to narrow
geographical areas, and then sends those ads to users *on behalf of* the advertisers, thereby causing certain

---

[18] As the FAC alleges, Facebook's ad platform "literally redline[s] an entire zip code or group of zip
codes," FAC ¶ 43, which in the case of the named Plaintiffs disproportionately impacts non-white
residents.  *Id.* ¶ 25 (Mobley's zip code is 70% African American); *id.* ¶ 26 (Manriquez's zip code is 53%
Latino and 13% African American); *id.* ¶ 27 (Onuoha's zip code is 38% African American and 15%
Latino).  "As a result" of these facially neutral practices, "Plaintiffs and members of the proposed Class
[non-white Facebook users] have been denied . . . housing . . . opportunities by Facebook[.]"  *Id.* ¶ 58.

PLS.' OPP. TO FACEBOOK'S MOT. TO DISMISS
Case No. 16-cv-06440-EJD

1    non-White users to be excluded from receiving housing opportunities.  FAC ¶¶ 14, 3, 42-46, 56-58, 67.[19]

2         **G.**      **Plaintiffs State Claims Under the California Fair Employment and Housing Act.**

3         Facebook attacks the FEHA § 12940(d) and (k) claims, arguing it is not an employment agency.

4    MTD at 22.  Plaintiffs agree with Facebook that Title VII and FEHA should be treated the same on this

5    issue.  But the FAC adequately alleges Facebook is an employment agency.  *Supra* at 13-14.

6         Nor is there merit to Facebook's challenge to the FEHA § 12940(i) aiding and abetting

7    employment claim.  FEHA § 12940(i) does not require a defendant to be an employment agency; it

8    applies to "any person" who aids or abets "the doing of any of the acts forbidden" under § 12940.

9    FEHA § 12940(i); *cf.* § 12940(d), (k) (only applying to "employment agency").

10        Contrary to Facebook's view, the FAC sufficiently alleges an aiding and abetting violation (and

11   does not solely rely on allegations of failing to prevent others from violating FEHA).  As the cases cited

12   by Facebook make clear, it is sufficient that Facebook gave substantive assistance to others whom

13   Facebook knew were violating the FEHA.  *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138,

14   1146-48 (2005).  The FAC amply alleges this by stating, "Facebook knew that such employers were

15   violating their duties under § 12940(a) to recruit and hire in a non-discriminatory manner," and

16   "Facebook knew that such employers were violating their duties under § 12940(d) to print, [and]

17   circulate . . . publications that are not discriminatory."  FAC ¶¶ 96-97.  It also alleges that Facebook, via

18   its "pattern or practice," "substantially assisted, solicited, encouraged, and/or coerced employers to

19   engage in discriminatory recruiting and hiring" and "discriminatory advertising" that violates § 12940(a)

20   and (d).  FAC ¶¶ 96-97.  In fact, the FAC repeatedly describes how Facebook set up its own ad platform

21   to encourage and facilitate discriminatory recruiting and advertising, and how Facebook engages in

22   discriminatory "recruitment" and "advertising" "for and on behalf of Businesses."  *Id.* ¶¶ 106, 55, 57,

23   63, 84.  Moreover, the FAC repeatedly describes Facebook's intentional discrimination.  *Supra* at 9-10.

24

25

26

27

28

---

[19] While Facebook claims advertisers' decisions to use Facebook's tools defeats a causal connection, the only example it offers is from the tort context, *United States v. Speakman*, 594 F.3d 1165, 1174 (10th Cir. 2010), and it fails to explain why the FHA follows that rule—or why it immunizes the actions Facebook took to develop discriminatory ad tools and send discriminatory ads on behalf of advertisers. Unlike *Inclusive Communities*, which recognized causal connection may be defeated where a "federal law substantially limits [defendant's] discretion," 135 S. Ct. at 2524, Facebook has complete discretion to send or not send race-based ads, focus on very narrow locations, or replicate existing customers.

PLS.' OPP. TO FACEBOOK'S MOT. TO DISMISS
Case No. 16-cv-06440-EJD

Facebook challenges the § 12955(a) claim on the ground that Plaintiff is not an "owner."  MTD at 22.  But the FAC alleges Facebook is a real estate "salesperson" or "agent" of other owners.  FAC ¶¶ 100, 102.  As Facebook admits, FEHA defines "owner" to include a "real estate [] salesperson."  FEHA § 12927(e).  And while "real estate salesperson" is not defined in FEHA, a similar definition of "real estate salesman" under a different state law includes a person who "solicits prospective . . . purchasers . . . of real property."  Cal. Bus. Prof. Code § 10131; *see id.* § 10132 (stating "real estate salesman" is one who does "one or more of the acts set forth in Sections 10131).  As the FAC alleges, Facebook regularly solicits purchasers of real property by "advertising" to and "recruit[ing]" prospective purchasers.  FAC ¶¶ 55-57, 102, 130, 133.  Finding that Facebook meets this definition is consistent with the rule that "the term 'owner' in [] § 12955(a) is to be broadly construed."  *Gurrola v. Jervis*, No. 08 Civ. 8029, 2009 WL 9548218, at *10 (C.D. Cal. Apr. 2, 2009) (citing FEHA § 12993(a)).

Facebook's identical arguments on the § 12955(g) *housing* aiding and abetting claim must be rejected.  MTD at 23-24. The FAC contains similar allegations on how Facebook gives substantial assistance to housing providers whom it knows violate § 12955(a), (c), (i), (j), (k).  FAC ¶¶ 114-20.

Plaintiffs agree with Facebook that the § 12955(k) "make unavailable," § 12955(c) housing statements, and §12955(i) real-estate related transactions claims are indistinguishable from their FHA § 3604(a), § 3604(c) and § 3605 claims, but as described above these claims are adequately pled and cognizable under the FHA.  *Supra*  at 16-19.  Thus, the same types of claims are valid under FEHA.

Facebook claims § 12955(j) only "protects brokers and salespersons, not applicants for housing." MTD at 23.  But the statute does not limit who can be sued in any way.  FEHA § 12955(j) (making it unlawful "[t]o deny a person access to, or membership or participation in, a multiple listing service, real estate brokerage organization, or other service because of race [or] national origin[.]"); *see* Cal. Fair Housing and Public Accommodations § 1:7 (stating § 12955(j) is one of provisions of § 12955 that does not limit "who may be liable").  The only case Facebook cites on this issue involved antitrust law, not § 12955(j) or the FEHA.  MTD at 23.  The FAC adequately alleges Facebook's practices deny its users "access to" and "participation in" "other service[s]" related to housing, causing users to be "denied the

opportunity to receive and respond to housing opportunities and information."  FAC ¶¶ 111-13.[20]

### H.    Plaintiffs State a Claim Under the California Unruh Civil Rights Act.

Plaintiffs state an Unruh Civil Rights Act claim.  <u>First</u>, contrary to Facebook's argument, MTD at 24, the FAC amply alleges intentional discrimination.  *Supra* at 9-10.  While Facebook contends its platform only "allows third parties to target ads," MTD at 24-25, the FAC alleges that Facebook unlawfully targets, classifies, and segregates which users receive recruitment and advertising based on their race and national origin, as determined by Facebook.  *See supra* at 9.

Second, controlling law forecloses Facebook's claim that the FAC does not allege "invidious discrimination."  MTD at 24-25.  "[D]iscrimination against a racial minority" is, by definition, "invidious" under the Unruh Act.  *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 87 n.15 (1985).  The "purpose of the Unruh Act" is "prevent[ing] discrimination . . . on account of race."  *Don Wilson Builders v. Superior Ct. for L.A. Cty.*, 220 Cal. App. 2d 77, 83 (Ct. App. 1963).[21]  Facebook solely cites cases on *age* discrimination (a protected class the Unruh Act does not mention).  MTD at 24.  Facebook's view that it targets ads based on users' "needs" or "interest in content" misses the mark.  *Id.* at 24-25.  Anti-discrimination laws exist to allow all people equal access to opportunities without businesses deciding what their "needs" are in a discriminatory or exclusionary manner.

Third, as under FEHA, Facebook can be liable for aiding and abetting Unruh Act violations.  It solely repeats the same weak argument it makes on aiding and abetting under FEHA.  But as described above, through its discriminatory advertising and recruitment for and on behalf of advertisers, Facebook knew the advertisers were engaging in unlawful discrimination. *Supra* at 21-22. Facebook's "knowledge

---

[20] Plaintiffs will drop their § 17200 claim at the next opportunity to amend the complaint.

[21] Since the 1950s the Unruh Act has established that  "[d]iscrimination on the basis of race or color is contrary to the public policy" of California, and thus "a person whose civil rights are invaded as a result of discrimination against a group on the basis of race . . . may bring an action [under the Unruh Act][.]" *Burks v. Poppy Const. Co.*, 57 Cal. 2d 463, 470 (1962).  While Facebook claims its discriminatory targeting tools "do not rest on unfair or harmful stereotypes" as it relies on users' expressed interest in "content related to certain ethnic affinity groups," MTD at 25, this argument admits Facebook discriminates due to users' *association* with certain racial groups—a form of discrimination the Unruh Act bars.  *Winchell v. English*, 62 Cal. App. 3d 125, 128-29 (Ct. App. 1976) ("[D]iscrimination by a business establishment against persons on account of their association with others of the black race is actionable under the [Unruh] Act.").  And the FAC alleges associational discrimination.  FAC ¶ 80.

of the underlying violation" makes it "liable for aiding a violation of the [Unruh Act]."  *Long v. Playboy Enterprises Int'l, Inc.*, No. 11 Civ. 2128, 2012 WL 12869314, at *3 (C.D. Cal. Mar. 7, 2012).

## III.     Facebook Has No Immunity Under the Communications Decency Act.

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc) ("*Roommates*") compels the conclusion that Facebook has no CDA immunity here, as Facebook *creates or develops* all the information Plaintiffs challenge.  In addition, with respect to most of the information, Facebook is not a publisher, thus precluding CDA immunity.  When "construing all facts in the light most favorable to Plaintiffs, [Facebook] is not at this stage entitled to CDA immunity." *Fraley v. Facebook*, 830 F. Supp. 2d 785, 802 (N.D. Cal. 2011).

### A.     Facebook Creates Or Develops the Information Plaintiffs Challenge in this Case.

Under the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  It "provides immunity only if the interactive computer service does not 'creat[e] or develop[]' the information 'in whole or in part.'"  *Roommates*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)(3) (an "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet")).  The moment a website like Facebook becomes an "information content provider" by creating or developing *in part any* information, Facebook loses CDA immunity over that information.  *Id.*  As The Ninth Circuit explained:

> A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content.  But as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider.  Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content.

*Id.* at 1162-63.  Thus "the fact that" a web site's "users are information content providers does not preclude" the web site "from *also* being an information content provider by helping 'develop' at least 'in part' the information," including when that "information originated with a user."  *Id.* at 1165.

In *Roommates*, the Ninth Circuit applied these principles to hold a website lacked immunity for most types of information plaintiffs challenged, because *Roommates* created or developed in whole or in part the information that arguably violated the FHA.  *Id.* at 1165-66.  The court held that *Roommates*

had "no immunity" for "posting [a] questionnaire" asking users to disclose their sex, sexual orientation, or familial status and "requiring answers to it," as *Roommates'* actions were "entirely its doing." *Id.* at 1165. By "creat[ing] the questions and choices of answers, and design[ing] its website registration process around them," *Roommates* was "undoubtedly the 'information content provider' as to the questions and can claim no immunity for posting them on its web site." *Id.* at 1164.

Furthermore, *Roommates* lacked immunity for publishing profiles of its users containing information on users' protected statuses that Roommates had required users to provide. *Id.* at 1166. "When a business enterprise extracts [] information from potential customers" about their protected statuses "as a condition of accepting them as clients, . . . the enterprise is responsible, at least in part, for developing that information." *Id.* Likewise, *Roommates* had no immunity "for the operation of its search system, which filters listings, or of its email notification system, which directs emails to subscribers according to discriminatory criteria" that some users provided to the web site. *Id.* at 1166.

In the end, the only information *Roommates* had immunity for was the "Additional Comments" section of users' profiles where users "describe[d] themselves and their desired roommate in an open-ended essay." *Id.* at 1161, 1173-74. *Roommates* was "not responsible . . . for the development of this content," since the information "comes entirely from subscribers and is passively displayed by Roommate[s]." *Id.* at 1174. The court emphasized that the "development'" of information "refer[s] not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." *Id.* at 1167-68. Thus, the exception to § 230(c) applies if the website "contributes materially to the alleged illegality of the conduct," *i.e.*, by "help[ing] to develop unlawful content." *Id.* at 1168.

This case is nearly identical to *Roommates*. If anything, the differences weigh more strongly against immunity, especially at the pleading stage.[22] Here, Plaintiffs challenge several types of information that Facebook improperly creates or develops to discriminate in providing employment,

---

[22] While Plaintiffs believe the FAC's allegations clearly bar CDA immunity here, if there is any question over this issue it should be decided after discovery—just as other affirmative defenses like timeliness. *Guenther*, 2017 WL 976939, at *5. Courts have rejected "a one-size-fits all rule for when to apply the CDA. In some cases the applicability of the CDA is apparent from the face of the complaint; in others, it is not." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1044 (N.D. Cal. 2014) (quotations omitted). In *Roommates* and cases Facebook relies upon, courts decided CDA immunity only after robust discovery. 521 F.3d at 1161 n.1; *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 405 (6th Cir. 2014).

housing, and credit opportunities to its users.  First, in creating its users' profiles, Facebook creates information on users' race and national origin, as well as their interest in employment, housing, and credit.  FAC ¶¶ 37-41.  Facebook's degree of creation is far greater than *Roommates.*  Facebook alone determines users as having a particular race or national origin based on Facebook's analysis of a user's online activity, whereas *Roommates* merely asked users to input that information.  FAC ¶¶ 37-40.  Just as in *Roommates*, every Facebook user is "forc[ed]" to have a protected status associated with his or her profile "as a condition of using [its] services." 521 F.3d at 1164.  Like *Roommates*, Facebook creates this information on its users' protected statuses as part of an unlawful scheme—here so that users will be unlawfully "exclude[d]" from receiving "marketing or recruiting from advertisers" who have discriminatory preferences.  FAC ¶¶ 39-40; *see id.* ¶¶ 12-14.

In addition, Facebook provides databases of race and national origin information on its users to advertisers to facilitate discrimination in recruitment and ad campaigns.  By clicking on "drop-down menus," advertisers can view and use this information created and developed by Facebook.  *Id.* ¶¶ 12, 30-41.  Only Facebook—not its users or advertisers—has created or developed the information.  Thus, Facebook has done even more than *Roommates*, which merely "extract[ed] [] information" and published it.  521 F.3d at 1166.[23]

Furthermore, Facebook structures its "search system" so that advertisers will exclude users based on discriminatory criteria in drop-down menus.  FAC ¶¶ 31-37.  In fact, this filtering ability only allows exclusion of people of color, not white users.  *Id.* ¶¶ 38-40.  By expressly incorporating race- and national origin-based classifications and disparate treatment into its system for targeting ads to its users, Facebook has plainly "contribute[d] materially to the alleged illegality of the conduct."  *Roommates*, 521 F.3d at 1168.  As in *Roommates*, Facebook's search system is unlike "ordinary search engines" such as "Google" or "Yahoo!"  *Id.* at 1167 (ordinary search engines "do not use unlawful criteria to limit the

---

[23] Relatedly, when Facebook invites and encourages advertisers to select drop-down menus to target users based on race or national origin, Facebook *alone* is unlawfully asking employers, housing providers, and creditors to state their discriminatory preferences for whom they want to recruit for employment, housing, and credit opportunities.  By "creat[ing] the questions and choices of answers, Facebook is "undoubtedly the 'information content provider' as to the questions and can claim no immunity for posting them on its web site[.]"  *Roommates*, 521 F.3d at 1164.

PLS.' OPP. TO FACEBOOK'S MOT. TO DISMISS
Case No. 16-cv-06440-EJD

scope of searches on them," and are not "designed to achieve illegal ends—as Roommate's search function [wa]s alleged to do[.]").  Like *Roommates*, Facebook "designed its [search] system to use the allegedly unlawful criteria so as to limit the results of each search," so it was "more difficult or impossible for individuals with certain protected characteristics to find housing," employment, and credit opportunities, "something the law prohibits."  *Id.*

Contrary to Facebook's suggestion that Plaintiffs do not allege with any specificity how it actively encourages advertisers to discriminate against users, MTD at 12, the FAC describes in detail how Facebook provides drop-down menus with racial classifications, how the only racial categories that can be excluded are African American, Hispanic, and Asian American (not white), and how Facebook publishes "step-by-step instructions" on how advertisers should target people who fall into various demographics groups (including based on race and national origin) so that advertisers can reach the "right people" and "the people who matter most to your business."  FAC ¶¶ 31-35, 37, 49.  And it "strains both credulity and English" for Facebook to assert its ad platform merely provides neutral tools to advertisers, when its tools exclude only people of color (but not whites) from receiving recruitment and advertising and they use redlining imagery.  *Roommates*, 521 F.3d at 1167; *see* MTD at 9-12.

When "Facebook decide[s] which" users will receive ads within a final audience based on Facebook's own algorithm, Facebook is solely or in part responsible for creating or developing this information.  FAC ¶¶ 15, 29, 50.  Similarly, Facebook cannot claim immunity for its "Lookalike Audience" tool in which Facebook "target[s] advertisements to individuals who are similar to" a company's "existing customers," based on Facebook's analysis of which users share similar demographics or locations.  FAC ¶ 48.  "Facebook, not the advertiser, determines which customers are similar" "to an advertiser's existing customers" and thus will "receive an advertisement in a Lookalike Audience."  *Id.*  By transforming a company's list of customers (the company's content) into a larger list of Facebook users who are similar (Facebook's new content), Facebook has created or developed the information and thus is responsible for it.  *See Fraley*, 830 F. Supp. 2d at 802 (rejecting Facebook's CDA defense where it "uses information" provided by users "to create new content that it publishes" online, and following *Roommates*, 521 F.3d at 1162).

Just as Facebook creates and develops race and national origin information, Facebook creates

and develops information on users' geographic locations.  FAC ¶¶ 31-32, 35, 42-51.  Facebook (1)

determines users' locations; (2) provides those locations to advertisers; (3) structures its search system to

exclude users based on their zip code or how many miles they are from an address; and (4) provides

step-by-step instructions on how advertisers should target ads to a single zip code to reach the right

people, even though Facebook knows that doing so will disproportionately exclude people of color in

highly segregated metropolitan areas.  *Id*.[24]

Finally, Facebook cannot claim immunity when *Facebook itself* tells users why they have "been

selected to see that particular advertisement," like a user who is told by Facebook that he is "part of an

audience called Ethnic affinity-African American (US)" or is "in a specific location or area."  FAC ¶ 51.

### B.  Facebook Is Not a Publisher of Most of the Information Plaintiffs Challenge.

Separately, Facebook lacks CDA immunity for most of the information Plaintiffs challenge,

because Facebook is not a *publisher* of the information.  47 U.S.C. § 230(c)(1).  The CDA only

"precludes liability that treats a web site as the *publisher* or speaker *of information users provide* on the

web site."  *Doe*, 824 F.3d at 850 (emphasis added).  "[W]hat matters is whether the cause of action

inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by

another[,]" *i.e.*, "whether the duty that the plaintiff alleges the defendant violated derives from the

defendant's status or conduct as a 'publisher or speaker.'"  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102

(9th Cir. 2009).  A party acts as a publisher when it "reviews material submitted for publication, perhaps

edits it for style or technical fluency, and then decides whether to publish it."  *Id.*

Plaintiffs concede that several of their claims turn on a legal duty to not publish discriminatory

statements, and thus liability under them may treat Facebook as a publisher.  42 U.S.C. § 3604(c); *id.*

---

[24] Facebook cites *Jane Doe v. Backpage.com*, 817 F.3d 12 (1st Cir. 2016), as an example of where CDA
immunity was granted for a website that enabled advertisers to "'target their advertisements' based on
geography."  MTD at 7-8 (quoting *Jane Doe*, 817 F.3d at 16).  But *Backpage.com* has no relevance here.
There, the First Circuit's sole reference to the ability of users to target ads based on a "geographic area"
was in the background section to describe how the website worked, *Backpage.com*, 817 F.3d at 19, and
the geographic targeting facts were completely irrelevant to the First Circuit's CDA analysis.  In fact, the
court's CDA analysis does not mention the geographical targeting.  And critically, the plaintiff did not
claim *Backpage.com* had created or developed any of the information.  In contrast, here Facebook's
narrow geographic targeting is central to Plaintiffs' disparate impact claims, and is alleged to violate the
law.  Also, Plaintiffs here allege that Facebook creates and develops the geographic content.

§ 2000e-3(b); FEHA § 12940(d); *id.* § 12955(c).  (Of course, it does not bar liability if Facebook creates or develops the information).  But the rest of Plaintiffs' claims do not involve a duty that "derives from [Facebook's] status or conduct as a 'publisher or speaker.'" *Barnes*, 570 F.3d at 1102.  Instead, they attack Facebook's recruitment of applicants for economic opportunities by segregating users by various qualities and providing this information to businesses to recruit applicants in a biased way.  42 U.S.C. § 2000e-2(b) (making it unlawful "for an employment agency to fail or refuse to refer for employment, or otherwise discriminate against any individual because of his race" or "classify or refer for employment any individual on the basis his race"); 42 U.S.C. § 3604(a); 15 U.S.C. § 1691(a)(1).

When Facebook "collect[s], develop[s] and provide[s] databases of information on Facebook users to Businesses so that such Businesses can discriminate . . . in their recruitment," FAC ¶ 12, Facebook is not acting as a publisher who edits the information given by others "and then decides whether to publish it." *Barnes*, 570 F.3d at 1102.  Facebook is acting as a recruiter who chooses which individuals are eligible for particular opportunities in violation of its duty to recruit applicants in a non-discriminatory manner.  *See Lansing v. Sw. Airlines Co*., 980 N.E.2d 630, 639–41 (Ill. App. Ct. 2012) (no immunity for negligent supervision of employee, since employer's "duty to supervise its employee is distinct from any conduct like editing, monitoring or removing offensive content published on the Internet") (cited with approval by *Doe*, 824 F.3d at 853-54).

To grant Facebook immunity for merely collecting information on users and giving it to its advertisers would contravene the Ninth Circuit's caution that "Congress has not provided an all purpose get-out-of-jail free card for businesses that publish user content on the internet[.]" *Doe*, 824 F.3d at 852-53 (quoting *Roommates*, 521 F.3d at 1164).  In fact, in describing how the CDA "was not meant to create a lawless no-man's-land on the Internet," the Ninth Circuit offered an instructive analogy:

> For example, a real estate broker may not inquire as to the race of a prospective buyer, and an employer may not inquire as to the religion of a prospective employee. If such questions are unlawful when posed face-to-face or by telephone, they don't magically become lawful when asked electronically online.

*Roommates*, 521 F.3d at 1164.  The same is true of recruiting here.  If a recruiter cannot compile separate lists of African American, Latino, and Asian American applicants and provide the lists to employers, real estate agents, and creditors to facilitate limiting recruitment based on race or national

origin, the same actions "don't magically become lawful" when the recruiter (Facebook) uses the internet to do so. *Id.*

### C.   Prior Cases Granting Facebook CDA Immunity Are Inapposite.

Facebook points to three inapposite cases where courts granted it CDA immunity. In all three, plaintiffs challenged content that *Facebook users exclusively* created and put on their Facebook pages, *and* attacked classic publisher functions of removing or blocking third-party content. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357-58 (D.C. Cir. 2014) (granting immunity in challenge to Facebook's delay in removing violent Facebook page created by Facebook user); *Caraccioli*, 167 F. Supp. 3d at 1065-66 (granting immunity in challenge to Facebook's refusal to remove user's Facebook file that posted sexually explicit videos of another user); *Sikhs for Justice, Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1094-96 (N.D. Cal. 2015) (granting immunity in challenge to Facebook's decision to block Facebook page "provided by Plaintiff, not [Facebook]" in another country).

This Court described the distinction aptly in *Caraccioli*: a lawsuit seeking to impose liability on Facebook for content 100% created by a Facebook user (*Caraccioli*) stands "in contrast to *Fraley*," a case where *Facebook* took "users' names, photographs and likenesses 'to create new content that it publishes as endorsements of third party products or services,'" 167 F. Supp. 3d at 1065-66 (quoting *Fraley*, 830 F. Supp. 2d at 801), "and [in contrast to] *Roommates*," which "required users to respond to a series of questions and then assembled the answers into a profile page," *id.* (quotations omitted).

Together, these three cases stand for the uncontroversial notion that, where a website merely acts as a passive forum for others' ideas, the CDA establishes commonsense limits to the website's liability for the myriad statements that others might make. Of course, the allegations here are quite different. Here, Plaintiffs challenge Facebook's actions not as a mere forum, but as a decisionmaker that assigns a race label to users, allows and encourages advertisers to choose which users to exclude from economic opportunities, and implements discriminatory restrictions on those opportunities.

Thus, Facebook has no CDA immunity, both because Facebook itself creates or develops the information at issue and because it does not play a traditional publisher role for most of the information.

### CONCLUSION

For the reasons stated above, Facebook's Motion to Dismiss must be denied.

Dated: May 18, 2017

Respectfully submitted,

By: /s/        *Jahan C. Sagafi*
        Jahan C. Sagafi

Jahan C. Sagafi (Cal. Bar No. 224887)
Relic Sun (Cal. Bar No. 306701)
OUTTEN & GOLDEN LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile:  (415) 638-8810
E-mail: jsagafi@outtengolden.com
E-mail: rsun@outtengolden.com

Adam T. Klein (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
Facsimile:  (646) 509-2060
E-mail: atk@outtengolden.com

P. David Lopez (admitted *pro hac vice*)
Peter Romer-Friedman (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW
Second Floor West
Washington, DC 20001
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
E-mail: pdl@outtengolden.com
E-mail: prf@outtengolden.com

William Most (Cal. Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
637 Kerlerec St.
New Orleans, LA 70116
Phone: 504-509-5023
E-mail: williammost@gmail.com

Jason R. Flanders (Cal. Bar No. 238007)
Sarah M.K. Hoffman (Cal. Bar No. 308568)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: 916-202-3018
E-mail: jrf@atalawgroup.com
E-mail: smkh@atalawgroup.com

*Attorneys for Plaintiffs and Proposed Class
Members*

PLS.' OPP. TO FACEBOOK'S MOT. TO DISMISS
Case No. 16-cv-06440-EJD