1  ROSEMARIE T. RING (State Bar No. 220769)
   rose.ring@mto.com
2  JONATHAN H. BLAVIN (State Bar No. 230269)
   jonathan.blavin@mto.com
3  JOSHUA PATASHNIK (State Bar No. 295120)
   josh.patashnik@mto.com
4  ELIZABETH A. KIM (State Bar No. 295277)
   elizabeth.kim@mto.com
5  MUNGER, TOLLES & OLSON LLP
   560 Mission Street
6  Twenty-Seventh Floor
   San Francisco, California 94105-2907
7  Telephone:    (415) 512-4000
   Facsimile:    (415) 512-4077
8
   Attorneys for Defendant Facebook, Inc.
9

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12                   SAN JOSE DIVISION

13

14  SUZANNE-JULIETTE MOBLEY, DANIEL       Case No. 5:16-cv-06440-EJD
    ADRIAN MANRIQUEZ, VICTOR
15  ONUOHA, on behalf of themselves and all   **DEFENDANT FACEBOOK, INC.'S**
    others similarly situated,                **REPLY IN SUPPORT OF MOTION TO**
16                                             **DISMISS FIRST AMENDED**
                 Plaintiffs,                   **COMPLAINT**
17
          vs.                                  Judge:   Hon. Edward J. Davila
18                                             Date:    None Set
    FACEBOOK, INC., and DOES 1-9999,          Time:    None Set
19                                             Crtrm.:  4
                 Defendants.
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ......................................................................................................................... 1

I.      Section 230 of the CDA Bars All of Plaintiffs' Claims ....................................... 1

        A.      Facebook Does Not Create or Develop the Information Plaintiffs Challenge ......... 2

        B.      Plaintiffs' Claims Seek to Treat Facebook as a Publisher ....................................... 7

II.     Plaintiffs Have Failed to Allege Facts Demonstrating Article III Standing......................... 9

III.    Plaintiffs Do Not Allege that Facebook Engaged in Any Unlawful Conduct.................... 11

        A.      Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1981........................................ 11

        B.      Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1982........................................ 13

        C.      Plaintiffs Fail to State a Claim Under the ECOA................................................... 14

        D.      Plaintiffs Fail to State a Claim Under Title VII ................................................... 15

        E.      Plaintiffs Fail to State a Claim Under the FHA ................................................... 16

        F.      Plaintiffs Fail to State a Claim Under the FEHA ................................................. 19

        G.      Plaintiffs Fail to State a Claim Under the Unruh Act............................................ 20

CONCLUSION .................................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*30 Clinton Place Owners Inc. v. City of New Rochelle,*
   2014 WL 890482 (S.D.N.Y. Feb. 27, 2014) ...........................................................13

*Annan-Yarty v. Star Protection Agency, Inc.,*
   127 F. App'x 313 (9th Cir. 2005)............................................................................14

*Backpage.com, LLC v. Cooper,*
   939 F. Supp. 2d 805 (M.D. Tenn. 2013) ..................................................................8

*Bagley v. Ameritech Corp.,*
   220 F.3d 518 (7th Cir. 2000)...................................................................................13

*Bank of Am. Corp. v. City of Miami,*
   137 S. Ct. 1296 (2017) ............................................................................................19

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096 (9th Cir. 2009)...................................................................................8

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................................11

*Brush v. San Francisco Newspaper Printing Co.,*
   315 F. Supp. 577 (N.D. Cal. 1970),
   *aff'd,* 469 F.2d 89 (9th Cir. 1972) (per curiam) ....................................................15

*Carafano v. Metrosplash.com, Inc.,*
   339 F.3d 1119 (9th Cir. 2003)...................................................................................4

*Chase Bank U.S.A., N.A. v. McCoy,*
   562 U.S. 195 (2011) ................................................................................................15

*Chew v. Hybl,*
   1997 WL 33644581 (N.D. Cal. Dec. 9, 1997) ........................................................16

*City of Miami v. Bank of Am. Corp.,*
   171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016)..........................................................18

*Clapper v. Amnesty Int'l USA,*
   133 S. Ct. 1138 (2013) ............................................................................................10

*Cmty. House, Inc. v. City of Boise,*
   490 F.3d 1041 (9th Cir. 2007)............................................................................12, 16

*Daniels v. Dillard's, Inc.,*
   373 F.3d 885 (8th Cir. 2004)...................................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Denny v. Hutchinson Sales Corp.*,
    649 F.2d 816 (10th Cir. 1981) ................................................................................................ 13

*Earll v. eBay Inc.*,
    2012 WL 3255605 (N.D. Cal. Aug. 8, 2012) .......................................................................... 20

*EEOC v. Borden's, Inc.*,
    724 F.2d 1390 (9th Cir. 1984) ................................................................................................ 12

*Evans v. McKay*,
    869 F.2d 1341 (9th Cir. 1989) ................................................................................................ 12

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc) ........................................................................ 2, 3, 5, 6

*Fields v. Twitter, Inc.*,
    200 F. Supp. 3d 964 (N.D. Cal. 2016) ...................................................................................... 8

*Ghosh v. Uniti Bank*,
    566 F. App'x 596 (9th Cir. 2014) ........................................................................................... 13

*Gladstone, Realtors v. Village of Bellwood*,
    441 U.S. 91 (1979) ................................................................................................................. 10

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................................................ 4, 5

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................................... 10

*Herrick v. Grindr, LLC*,
    2017 WL 744605 (S.D.N.Y. Feb. 24, 2017) .......................................................................... 3, 7

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
    943 F.2d 644 (6th Cir. 1991) ................................................................................................. 18

*Housing Rights Ctr. v. Sterling*,
    404 F. Supp. 2d 1179 (C.D. Cal. 2004) ................................................................................. 17

*Imagineering, Inc. v. Kiewit Pac. Co.*,
    976 F.2d 1303 (9th Cir. 1992) ............................................................................................... 13

*Jones v. Alfred H. Mayer Co.*,
    392 U.S. 409 (1968) ............................................................................................................... 14

*Jones v. Dirty World Entm't Recordings, LLC*,
    755 F.3d 398 (6th Cir. 2014) ............................................................................................ 3, 6, 7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lac Du Flambeau Band of Lake Super. Chippewa Indians v. Stop Treaty Abuse-Wisc., Inc.*,
  41 F.3d 1190 (7th Cir. 1994) ...............................................................................14

*Ledbetter v. Goodyear Tire & Rubber Co.*,
  550 U.S. 518 (2007) .............................................................................................12

*Levine v. Vilsack*,
  587 F.3d 986 (9th Cir. 2009)................................................................................11

*Llanos v. Estate of Coehlo*,
  24 F. Supp. 2d 1052 (E.D. Cal. 1998) .................................................................17

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
  658 F.3d 375 (3d Cir. 2011) ................................................................................16

*Myers v. Case Corp.*,
  2000 WL 274197 (N.D. Cal. Mar. 7, 2000) ........................................................12

*In re MyFord Touch Consumer Litig.*,
  46 F. Supp. 3d 936 (N.D. Cal. 2014) ..................................................................17

*NAACP v. Ameriquest Mortgage Co.*,
  635 F. Supp. 2d 1096 (C.D. Cal. 2009)...............................................................13

*NAACP v. ITT Cmty. Dev. Corp.*,
  399 F. Supp. 366 (D.D.C. 1975) ....................................................................16, 18

*Opperman v. Path, Inc.*,
  84 F. Supp. 3d 962 (N.D. Cal. 2015) .....................................................................6

*Pac. Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013)..............................................................................18

*Ragin v. New York Times Co.*,
  923 F.2d 995 (2d Cir. 1991) ................................................................................17

*San Francisco Baykeeper v. West Bay Sanitary Dist.*,
  791 F. Supp. 2d 719 (N.D. Cal. 2011) .................................................................11

*Scott v. Eversole Mortuary*,
  522 F.2d 1110 (9th Cir. 1975)..............................................................................13

*Shaare Tefila Congregation v. Cobb*,
  481 U.S. 615 (1987) .............................................................................................13

*Sullivan v. Little Hunting Park, Inc.*
  396 U.S. 229 (1969) .............................................................................................14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Proj., Inc.*,
  135 S. Ct. 2507 (2015) ................................................................18

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.*,
  362 F.3d 971 (7th Cir. 2004) ........................................................15

*United States v. Real Estate One, Inc.*,
  433 F. Supp. 1140 (E.D. Mich. 1977) ..........................................16

*United States v. Speakman*,
  594 F.3d 1165 (10th Cir. 2010) ....................................................18

**STATE CASES**

*Casey v. U.S. Bank Nat'l Ass'n*,
  127 Cal. App. 4th 1138 (2005) ......................................................19

*Derish v. San Mateo–Burlingame Bd. of Realtors*,
  136 Cal. App. 3d 534 (1982) ........................................................20

*Hill v. StubHub, Inc.*,
  727 S.E.2d 550 (N.C. App. 2012) ...................................................4

*Howard v. Superior Court*,
  2 Cal. App. 4th 745 (1992) ...........................................................19

*Javorsky v. W. Athletic Clubs, Inc.*,
  242 Cal. App. 4th 1386 (2015) ......................................................20

**FEDERAL STATUTES**

15 U.S.C. § 1691(a)(1) ...............................................................7, 9

15 U.S.C. § 1691a(e) .....................................................................14

42 U.S.C. § 1981 .......................................................................11, 12

42 U.S.C. § 1981(a) .......................................................................12

42 U.S.C. § 1981(c) .......................................................................12

42 U.S.C. § 1982 .......................................................................13, 14

42 U.S.C. § 2000e-2(b) ...............................................................7, 8

42 U.S.C. § 3604 ............................................................................19

42 U.S.C. § 3605 ............................................................................19

DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS

**TABLE OF AUTHORITIES**
(continued)

Page(s)

42 U.S.C. § 3604(a) ........................................................................................7, 8, 16

42 U.S.C. § 3604(c) .......................................................................................7, 17, 18

42 U.S.C. § 3604(d) ................................................................................................16

42 U.S.C. § 3605(a) ................................................................................................17

42 U.S.C. § 3605(b) ................................................................................................17

47 U.S.C. § 230(f)(3) ................................................................................................2

**STATE STATUTES**

Cal. Bus. & Prof. Code § 10132 ..............................................................................19

Cal. Civil Code § 51(b) ...........................................................................................20

Cal. Gov't Code § 12927(e) .....................................................................................19

Cal. Gov't Code § 12940(d) ..............................................................................7, 19

Cal. Gov't Code § 12940(k) .....................................................................................19

Cal. Gov't Code § 12955(a) .....................................................................................19

Cal. Gov't Code § 12955(j) .................................................................................19, 20

Cal. Gov't Code § 12955(k) .....................................................................................19

**FEDERAL REGULATIONS**

12 C.F.R. pt. 202, Supp. I .........................................................................................14

12 C.F.R § 1002.2(l) ................................................................................................14

24 C.F.R. § 100.60 ...................................................................................................16

24 C.F.R. § 100.70 ...................................................................................................16

24 C.F.R. § 100.75(c)(3) ..........................................................................................18

53 Fed. Reg. 44992 (1988) .......................................................................................16

68 Fed. Reg. 13144 (2003) .......................................................................................14

**TREATISES**

Restatement (Second) of Torts § 448 ........................................................................18

## INTRODUCTION

Plaintiffs' Opposition ("Opp.") confirms that the First Amended Complaint ("FAC") should be dismissed.  All of Plaintiffs' claims are based on unidentified housing, employment, and credit ads that Plaintiffs argue might be discriminatory because the third parties who placed these ads on Facebook may have decided to target them using the "ethnic affinities" and/or the locations of Facebook users.  As Facebook demonstrates in its opening brief and below, Plaintiffs' attempt to impose liability on Facebook for alleged discriminatory advertising by *third parties* fails as a matter of law, both because Plaintiffs have not, and cannot, establish the requisite elements of their claims as to *Facebook*, and because all of Plaintiffs' claims treat Facebook as a publisher of the challenged advertising and therefore are barred by Section 230 of the Communications Decency Act ("CDA").

Plaintiffs attempt to avoid these fatal defects by conflating and confusing the conduct of third-party advertisers and Facebook with respect to the challenged advertising.  But the FAC's allegations make clear that third-party advertisers *create* the allegedly discriminatory advertising, while Facebook *publishes* it.  Plaintiffs allege that Facebook provides neutral tools that third-party advertisers may, *but are not required to*, use to target ads corresponding to users' interests as expressed through their activities on Facebook, including ethnic affinities and location.  Plaintiffs allege that third-party advertisers decide both the content of the challenged ads (housing, employment, and credit opportunities) and whether and how to target the ads using these neutral tools.  Plaintiffs' allegations do not support any claim against *Facebook* because the FAC establishes, as a matter of law, that *third-party advertisers*, not Facebook, are solely responsible for both the content and targeting that Plaintiffs allege make the challenged advertising unlawful.

## ARGUMENT

### I.    Section 230 of the CDA Bars All of Plaintiffs' Claims

Plaintiffs' claims are barred by the CDA for one simple and straightforward reason:  all of Plaintiffs' claims challenge the publication of ads through Facebook's Ad Platform because of their content (employment, housing or credit) and how they are targeted (ethnic affinities or location).  As the FAC makes clear, third-party advertisers, not Facebook, are solely responsible for both the content of the ads and targeting decisions Plaintiffs allege are discriminatory.  (Motion to Dismiss

DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS

("Mot.") 9-14.)  "Facebook provides tools to businesses … *to allow them to target*" ads to "particular individuals and groups of individuals."  (FAC ¶ 3, emphasis added.)  Nothing in the Opposition changes or even disputes this basic fact.

### A.    Facebook Does Not Create or Develop the Information Plaintiffs Challenge

Relying on the Ninth Circuit's opinion in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc), Plaintiffs first argue that Facebook is not entitled to CDA immunity because Facebook is "responsible, in whole or in part, for the creation or development of [the] information" at issue, 47 U.S.C. § 230(f)(3).  (Opp. 24-28.)  But Plaintiffs do not (and cannot) dispute that third-party advertisers create both the content of the ads (housing, employment or credit) and the targeting of those ads using neutral tools on the Ad Platform (by ethnic affinities or location) which Plaintiffs contend may result in discriminatory advertising.  Instead, Plaintiffs point to various information Facebook purportedly creates *in its development of these neutral tools* that third-party advertisers may use on the Ad Platform.  The fundamental flaw with Plaintiffs' argument is that the creation of such tools is *not itself unlawful* under any of their theories of liability, all of which challenge allegedly discriminatory advertising.  Under well-established CDA case law, Facebook's development of neutral tools does not transform Facebook into a creator or developer of this allegedly unlawful content for purposes of CDA immunity.

Plaintiff's ignore this settled precedent holding that a website does not become a creator or developer of *unlawful content* merely by creating or developing "neutral tools" that third parties might use for lawful or unlawful ends.  *Roommates*, 521 F.3d at 1171.  The creation or development of such "neutral tools" does not "contribute[] materially" to the "allegedly unlawful" nature of the third-party content, and thus does not displace CDA immunity.  *Id.*  Plaintiffs attempt to elide this critical distinction between developing *unlawful content* (in which case the CDA provides no immunity) and developing *neutral tools* that third parties may use to create lawful or unlawful content (in which case CDA immunity applies).

For instance, Plaintiffs argue that Facebook "creates or develops … information on users' race and national origin, as well as their interest in employment, housing, and credit."  (Opp. 25-26.)

Similarly, Plaintiffs contend that Facebook "provides databases of race and national origin information on its users to advertisers to facilitate discrimination," and "structures its 'search system' so that advertisers will exclude users based on discriminatory criteria in drop-down menus." (Opp. 26.)  Not only are these assertions untrue (and mostly absent from the FAC),[1] they do nothing to deprive Facebook of CDA immunity.  These assertions purport to describe Facebook's development of tools third parties may use to targets ads on its Ad Platform.  But Plaintiffs do not (and cannot) allege that Facebook's creation of these tools is unlawful.  Plaintiffs do not seek to hold Facebook liable for simply developing these tools—they seek to hold Facebook liable for how some unidentified third-party advertisers may have used those tools to make targeting decisions that, in Plaintiffs' view, prevented them "from receiving advertisements" for certain unspecified "employment, housing, and credit opportunities."  (FAC ¶¶ 2-3; *see id.* ¶ 12 (alleging Facebook provides tools that allow "Businesses" to "discriminate between various populations in their recruiting, marketing, and/or advertising campaigns.")[2]  But, as discussed below, courts have roundly rejected this kind of attempted end-run around the CDA.

Plaintiffs' claims rest entirely on how third-party advertisers decide to use the neutral tools on Facebook's Ad Platform.  But Plaintiffs do not (and cannot) allege that Facebook is responsible for any of those decisions, or the content of the unidentified ads at issue.  Facebook does not require advertisers to target their ads *at all*, much less in a discriminatory manner.  Absent such allegations, the CDA bars Plaintiffs' suit—regardless of what *other* information Plaintiffs may allege Facebook creates or develops.  As courts have recognized, "[a] material contribution to the alleged illegality of the content does not mean merely taking action … necessary to the display of allegedly illegal content.  Rather, it means being responsible *for what makes the displayed content allegedly unlawful*." *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 410 (6th Cir. 2014) (emphasis added) (citing *Roommates*, 521 F.3d at 1167-68); *see also, e.g.*, *Herrick v. Grindr, LLC*,

---

[1] Plaintiffs nowhere allege in the FAC that Facebook provides advertisers with any "database[]" of users' "race and national origin information."  (Opp. 26.)  Nor could they make such an allegation, as Facebook does no such thing.

[2] As Facebook noted (Mot. 3 n.2), since December 2016, targeting based on ethnic affinity categories for ads offering housing, employment or credit opportunities has been disallowed.  *See* http://newsroom.fb.com/news/2016/11/updates-to-ethnic-affinity-marketing/.

2017 WL 744605, at *3-4 (S.D.N.Y. Feb. 24, 2017) (maker of social networking app immune for creation of fake profiles by users because even if the app "'contributed' to the harassment by providing functionality such as geo-location assistance, that is not what makes the false profiles tortious"); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (CDA immunity applies "unless [defendant] created or developed the particular information at issue"). Here, there is no question that the conduct Plaintiffs challenge as resulting in discriminatory advertising—content and targeting decisions—is the conduct of third-party advertisers alone, not by Facebook. Facebook's alleged creation of *other* information does not defeat CDA immunity.

Plaintiffs conspicuously fail to distinguish, discuss, or even cite the extensive case law cited by Facebook in which courts have applied *Roommates* to hold websites immune under the CDA for creating and providing "neutral tools" that allow third parties to create content that may be lawful or unlawful. (Mot. 11-12.) In each of these cases, the website was the creator or developer *of the neutral tool*—but that did not make it the creator or developer *of the allegedly unlawful content* that third parties used the tool to create. For instance, in *Carafano*, the Ninth Circuit held that a dating website that provided users with a questionnaire and provided a "menu" of pre-written responses to be displayed on a user's profile retained its CDA immunity, because the "selection of the content was left exclusively to the user." 339 F.3d at 1121. Likewise, in *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009), the court rejected the plaintiff's argument that Google's creation and suggestion of the phrase "free ringtone" to advertisers through its Keyword Tool was "neither innocuous nor neutral" because Google allegedly knew that advertisers would use the tool fraudulently. *Id.* at 1197. The court held that Google retained its CDA immunity because it did "nothing more than provide options that advertisers may adopt or reject at their discretion." *Id.* at 1198; *see also, e.g.*, *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. App. 2012) (StubHub immune for ticket-price-suggestion tool where ultimate selection of ticket price was left to the user).

The same is true here. The Ad Platform's targeting tools, using "drop-down menus," FAC ¶ 33, are the quintessential type of "neutral tool" that may be used lawfully (for instance, to target employment ads in Spanish to users associated with the Hispanic (US-Spanish dominant) ethnic affinity), or, in some cases, may be used unlawfully, in violation of Facebook's policies. But the

ultimate decision whether and how to use these targeting tools belongs exclusively to third-party advertisers.  Plaintiffs do not and cannot allege otherwise—indeed, they acknowledge that Facebook provides tools that allow "advertisers" to "exclude users" based on criteria the *advertisers* select.  (Opp. 26; *see* FAC ¶¶ 3, 14, 33, 42.)  CDA immunity thus applies.

Plaintiffs' other arguments to the contrary are equally meritless.  *First*, Plaintiffs argue that "[t]his case is nearly identical to *Roommates*."  (Opp. 25-26.)  It is not.  The critical difference between this case and *Roommates* is that the website in that case "*require[d]*" users to provide demographic information and state their demographic roommate preferences.  521 F.3d at 1165 (emphasis added).  As the Ninth Circuit noted, "[n]ot only does Roommate ask these questions, Roommate makes answering the discriminatory questions a condition of doing business."  *Id*. at 1166.  The Ninth Circuit emphasized, however, that a website "would be immune, so long as it does not *require* the use of discriminatory criteria," even if the website provided tools that "might help some users exclude email from other users of a particular race or sex."  *Id.* at 1169 (emphasis added).  That is precisely the situation here.  Advertisers are not *required* to engage in discriminatory ad targeting—just the opposite, as Facebook's policies clearly prohibit such conduct.  This case thus does not fall into the "narrow exception" *Roommates* carved out for instances in which a website "*force[s]* subscribers" to act unlawfully "'as a condition of using its services.'" *Goddard*, 640 F. Supp. 2d at 1198 (emphasis in original); *see* Mot. 13-14 & n.6.[3]

*Second*, Plaintiffs argue that the Ad Platform is not a "neutral tool[]" because "the only racial categories that can be excluded are African American, Hispanic, and Asian American (not white)."  (Opp. 27.)  This is both false and irrelevant.  As Plaintiffs themselves allege (FAC ¶ 33), advertisers can use the targeting tools to either "include" or "exclude" certain audiences.  For instance, should advertisers seek to do so, they may choose to target their ads (although no longer ads for housing, employment, or credit, *see supra* at 3 n.2) *only* to members of the African American (US) ethnic

---

[3] Plaintiffs argue that this case is like *Roommates* because "every Facebook user is 'forc[ed]' to have a protected status associated with his or her profile 'as a condition of using [its] services.'" (Opp. 26.)  This is not only absent from the FAC, and in fact false, but again, Plaintiffs' claims do not challenge Facebook's association of users with ethnic affinities; rather, they challenge advertisers' decisions about how to use those associations to target their ads.  Moreover, unlike in *Roommates*, Facebook does not require, or seek information, from users about race or ethnicity.

affinity group by choosing to "include" only members of that ethnic affinity.[4]  Regardless, this has

no bearing on whether the targeting tools at issue here are "neutral" for CDA purposes.  What makes

them "neutral" is that—like Google's Keyword Tool or StubHub's pricing tool, *see supra* at 4—

they are agnostic with respect to the legality of third-party content.  These tools have significant

inclusive benefits for both advertisers and users; that some unidentified advertisers may abuse them,

in violation of Facebook's policies, does not remove CDA immunity.

> *Third*, and relatedly, Plaintiffs argue that Facebook "actively encourages advertisers to

discriminate against users" based on the same misunderstanding of the Platform tools—again

wrongfully assuming that the tools only allows advertisers to "exclude" racial minorities and not

"whites."  (Opp. 27.)  Again, this is both false and irrelevant.  Facebook has always *prohibited*

unlawful discriminatory targeting on its Ad Platform.  *See Roommates*, 521 F.3d at 1171 ("website

did absolutely nothing to encourage the posting of defamatory content" where "posting was contrary

to the website's express policies").[5]  But the point is irrelevant.  Courts repeatedly have held that a

website does not forfeit CDA immunity because it allegedly encourages third parties to create

unlawful content; rather, immunity is lost only if the website *requires* third parties to do so.  *See*

Mot. 13 n.5; *Jones*, 755 F.3d at 413-14 (citing *Roommates* and expressly "declin[ing] to adopt" the

"encouragement test of immunity under the CDA"); *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962,

986-87 (N.D. Cal. 2015) (similar).  Plaintiffs do not cite a single case to the contrary.

> *Fourth*, Plaintiffs repeat these errors in their discussion of Facebook's ad-targeting tools that

do not use ethnic affinity.  Here too, Plaintiffs' wrongly conflate Facebook's *creation of neutral*

*tools* with advertisers' alleged unlawful targeting.  Plaintiffs argue that "Facebook cannot claim

immunity for its 'Lookalike Audience' tool in which Facebook 'target[s] advertisements to

---

[4] Indeed, if hypothetically there were a "white" ethnic affinity group, that would make it *easier* for advertisers to discriminate, by allowing them to "include" only users in the "white" affinity group.

[5] Plaintiffs also wrongly state that Facebook tells advertisers that they "should target people who fall into various demographic groups (including based on race and national origin)" and "should target ads to a single zip code to reach the right people."  (Opp. 27-28.)  In reality, the FAC alleges only that Facebook tells advertisers they should "choose the right audience" for their ads and should "target specific groups."  (FAC ¶ 32.)  Plaintiffs do not allege, nor could they, that Facebook tells advertisers they *should* use ethnic affinity targeting—much less that Facebook does so in the context of housing, employment, and credit ads.

1    individuals who are similar to' a company's 'existing customers[.]'"  (Opp. 27, citing FAC ¶ 48.)

2    But as discussed above, even if using the "Lookalike Audience" tool in ad targeting were unlawful

3    under a disparate-impact theory in some narrow set of circumstances (which is highly doubtful), all

4    Facebook does is *create the neutral tool*; advertisers are the ones who decide whether and how to

5    use it, as the FAC makes clear.  (*See* FAC ¶ 48 (alleging that "Businesses" use the Lookalike

6    Audience tool to "target advertisements").  Similarly, Plaintiffs argue that Facebook "creates and

7    develops information on users' geographic locations."  (Opp. 27-28.)  Even if that were true,

8    creating and developing information regarding users' locations is in no way unlawful.  Plaintiffs

9    argue (unconvincingly) that the *use* of this geographic information in ad-targeting decisions may in

10   some instances be unlawful under a disparate-impact theory (Opp. 28), but once again, advertisers,

11   not Facebook, decide whether and how to use such targeting.  As *Herrick* held in applying CDA

12   immunity, "to the extent Grindr has 'contributed' to the harassment by providing functionality such

13   as geo-location assistance, that is not what makes the false profiles tortious."  *Herrick*, 2017 WL

14   744605, at *4.  Likewise here, because advertisers' targeting decisions alone are "what makes the

15   displayed content allegedly unlawful," *Jones*, 755 F.3d at 410, Facebook retains its CDA immunity.

16           **B.      Plaintiffs' Claims Seek to Treat Facebook as a Publisher**

17           Plaintiffs "concede," as they must, that "several of their claims turn on a legal duty to not

18   publish discriminatory statements, and thus liability under them may treat Facebook as a publisher."

19   (Opp. 28, citing 42 U.S.C. § 3604(c); *id.* § 2000e-3(b); Cal. Gov't Code § 12940(d); *id.* § 12955(c).)

20   This refers to Plaintiffs' claims under the FHA, Title VII, and the housing and employment prongs

21   of the FEHA.  Despite this concession, Plaintiffs maintain that several of the rest of their claims do

22   not run afoul of the CDA because they "do not involve a duty that derives from Facebook's status or

23   conduct as a publisher or speaker.  Instead, they attack Facebook's recruitment of applicants for

24   economic opportunities by segregating users by various qualities and providing this information to

25   businesses."  (Opp. 29, citing 42 U.S.C. § 2000e-2(b); *id.* § 3604(a); 15 U.S.C. § 1691(a)(1),

26   internal quotation marks and internal citation omitted.)  This argument is meritless.

27           Facebook is entitled to CDA immunity against *all* of Plaintiffs' claims, including its claims

28

under these statutory provisions.[6]  Plaintiffs suggest that because these provisions do not specifically mention advertising or publication, the CDA does not apply.  That is wrong.  As the Ninth Circuit has held, under the CDA "what matters is not the name of the cause of action," but whether the defendant's liability "derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009).  The relevant question is whether the plaintiff's *theory of what the defendant has done to incur liability* rests on the defendant's actions as a publisher.  *See id.* at 1103 (holding Yahoo immune under CDA against "negligent undertaking" tort claim because "the undertaking that Barnes alleges Yahoo failed to perform with due care" was "removal of … indecent profiles," which is "something publishers do"); *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 969 (N.D. Cal. 2016) (holding that Twitter acted as publisher and thus was immune under CDA against claim for providing material support to ISIS).

Here, *all* of Plaintiffs' claims seek to hold Facebook liable for its role as a publisher of allegedly discriminatory ads.  Plaintiffs' basic theory of liability, which extends to all of their causes of action, is that they have been harmed because Facebook *did not publish* certain desirable housing, employment, and credit ads to them because of how the advertisers chose to target those ads.  The publication of ads, or more precisely the *failure to publish* ads to certain users, lies at the heart of that theory.  Plaintiffs argue that Facebook is as an "employment agency" under Title VII, 42 U.S.C. § 2000e-2(b), but they allege that Facebook qualifies as one because it "regularly receives compensation from employers to place advertisements"—ads that Facebook *publishes*.  (FAC ¶¶ 178-179.)  Receiving compensation for publishing ads is "something publishers do."  *Barnes*, 570 F.3d at 1103; *see Backpage.com, LLC v. Cooper,* 939 F. Supp. 2d 805, 824 (M.D. Tenn. 2013) (law regulating websites' receipt of funds for certain ads was preempted by CDA because "charging advertisers a fee in exchange for hosting and providing space for the advertisers' message 'is something publishers do'").  Similarly, Plaintiffs argue that Facebook is acting as a seller or renter of housing under 42 U.S.C. § 3604(a), but they allege that Facebook has done so by providing "targeting tools" that allow "Businesses" to decide "which Facebook customers will *receive … advertisements* for housing opportunities."  (FAC ¶ 148, emphasis added.)  And Plaintiffs argue that

---

[6] In any event, as discussed below, *see infra* at 14-16, Facebook is not subject to these provisions.

Facebook is acting as a "creditor" under ECOA, 15 U.S.C. § 1691(a)(1), but they allege that Facebook has violated this provision because its "targeting tools" allow "Businesses" to decide "which Facebook customers will *receive ... advertisements* for credit transactions." (FAC ¶ 139, emphasis added.) Decisions about how ads are published, or, as Plaintiff puts it, which users "will receive…advertisements," are quintessential publishing decisions protected by the CDA. Plaintiffs cannot, once confronted with the CDA, disclaim the FAC's reliance on Facebook's role as a publisher of the ads it claims are discriminatory.

Plaintiffs argue that applying the CDA here would "grant Facebook immunity for merely collecting information on users and giving it to its advertisers." (Opp. 29.) But Plaintiffs are not seeking to hold Facebook liable for allegedly transmitting to advertisers information about users' race or ethnicity—something Facebook does not do. Rather, Plaintiffs seek to hold Facebook liable for "allow[ing] … Businesses" to select which groups of Facebook users to target their ads toward or away from (FAC ¶ 3), and for then publishing those ads to users based on the targeting decisions made by these third parties. The targeting and publishing of ads is inescapably central to Plaintiffs' theory of liability, and constitutes a protected publisher function.

## II.  **Plaintiffs Have Failed to Allege Facts Demonstrating Article III Standing**

Plaintiffs' Opposition confirms that the FAC must be dismissed for the separate reason that Plaintiffs have failed to allege facts that, if true, would establish Article III standing—i.e., that they have suffered a concrete injury that is fairly traceable to Facebook. (Mot. 14-16.)

Plaintiffs contend that they have been harmed by not seeing ads for unidentified housing, employment, and credit opportunities. (Opp. 7.) But Plaintiffs do not identify a single discriminatory ad or any advertiser who has allegedly used Facebook's Ad Platform to discriminate against them. Plaintiffs allege only that tools on Facebook's Ad Platform make discriminatory targeting *possible,* not that discriminatory targeting *actually occurred*. In any event, not seeing allegedly desirable ads is not enough to establish the kind of harm necessary for Article III standing. Millions of advertisers use Facebook to reach billions of potential customers, and thus any given Facebook user will see only a very small fraction of the ads published on Facebook. Indeed, the reason the Ad Platform's targeting tools exist is to facilitate the publication of ads to those users

who are most likely to be interested in the content.

Plaintiffs' opposition relies on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), for the proposition that "a person of color has standing when she is denied information on an economic opportunity that is provided to a white person." (Opp. 7.) But the facts in *Havens*, and similar cases involving race-based denials of information regarding housing availability, stand in stark contrast to those alleged here. In *Havens*, an African-American woman and a white man, acting as "testers" of an apartment complex's rental practices, made inquiries on the same day about renting an apartment. 455 U.S. at 367-68. The African-American woman "was told that no apartments were available," while the white man "was told that there were vacancies." *Id.* at 368. The Supreme Court held that the woman had adequately "alleged injury to her statutorily created right to truthful housing information," because the facts alleged indicated that, because of her race, the apartment complex operator had falsely told her that no apartments were available. *Id.* at 374; *accord Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 95 (1979) (finding standing where brokerage firm allegedly steered black "testers" toward more racially integrated neighborhood).

This case is worlds apart. As noted, Plaintiffs have failed to identify a single advertiser who allegedly has treated them differently than similarly situated white Facebook users. Nor have Plaintiffs alleged (as might be analogous to the situation in *Havens* or *Gladstone*) that they compared the ads they were shown with the ads similarly situated white Facebook users in their communities were shown to determine whether one set of ads was more desirable than the other. All Plaintiffs allege is that they may have been shown certain ads but not others (which is inevitable), and that certain unspecified advertisers may have chosen to target their ads in part on the basis of Plaintiffs' ethnic affinities on Facebook or Plaintiffs' locations. That is insufficient.

Plaintiffs complain that requiring them to identify specific ads or advertisers they claim discriminated against them "would require Plaintiffs to identify information to which they lack access." (Opp. 8.) But there is no "lack of information" exception to Article III standing at the pleading stage. If Plaintiffs lack access to the information necessary to determine whether they can plausibly allege injury, their claims cannot go forward. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148-49 (2013) (holding that plaintiffs' asserted injury was "necessarily conjectural"

1   because it rested on their "assumptions" and "speculat[ion]" as to how government officials would

2   "exercise their discretion in determining which communications to target" for surveillance).

3   Finally, Plaintiffs fail to rebut Facebook's argument that they have not shown that any

4   asserted injuries are "fairly traceable" to Facebook.  (Mot. 15-16.)  Plaintiffs ignore the controlling

5   principle set forth in *Bennett v. Spear*, 520 U.S. 154 (1997), and its progeny:  where an injury results

6   from the "independent action of some third party not before the court" (here, advertisers), a plaintiff

7   can establish fair traceability only by showing that the defendant's action had a "determinative or

8   coercive effect" upon the third party.  *Id.* at 169.  Plaintiffs do not allege that Facebook required

9   advertisers to use discriminatory targeting, or that Facebook "coerc[ed]" advertisers into doing so.

10  *See Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009) (finding no standing where defendant's

11  action had no "determinative or coercive effect" on third-party action causing plaintiff's injury).[7]

12  **III.   Plaintiffs Do Not Allege that Facebook Engaged in Any Unlawful Conduct**

13  **A.   Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1981**

14  Plaintiffs' section 1981 claim fails because Plaintiffs allege (1) no *intentional* discrimination,

15  and (2) no conduct by Facebook impairing Plaintiffs' ability to enter into any contract.[8]

16  *No intentional discrimination*.  Plaintiffs concede that section 1981 "bars only intentional

17  discrimination."  (Opp. 10.)  Plaintiffs argue they have alleged facts plausibly suggesting that

18  Facebook engaged in intentional discrimination.  (Opp. 9-10.)  Not so.  None of Plaintiffs' factual

19  allegations remotely suggests that *Facebook* (as opposed to certain unnamed advertisers)

20  intentionally discriminates against users based on their race or ethnicity.  Plaintiffs cite FAC ¶¶ 33-

21  39 in support of their argument that Facebook engages in "express racial classifications and

22  segregation of users, resulting in inferior treatment of people of color compared to whites."  (Opp.

---

[7] Plaintiffs cite *San Francisco Baykeeper v. West Bay Sanitary Dist.*, 791 F. Supp. 2d 719 (N.D. Cal. 2011), for the proposition that "an indirect causal relationship" may suffice to establish standing.  (Opp. 8.)  But that case is factually and legally inapposite:  the question was whether an environmental plaintiff could sue one defendant who had allegedly discharged pollutants, even though "other polluters" had also discharged pollutants.  791 F. Supp. 2d at 749.  That is very different from the situation here, where Plaintiffs indisputably would suffer *no* injury absent the independent decision of an advertisers to (allegedly) engage in discriminatory ad targeting.

[8] Plaintiffs do not argue that either section 1981 or any of their other federal causes of action provides for aiding-and-abetting liability.  (*See* Mot. 17-21.)

9.)  Yet these paragraphs allege only that Facebook allows advertisers to target their ads based in part on "Ethnic Affinity" categories, which Plaintiffs allege "involve or relate" to race and other protected traits.  FAC ¶¶ 36-37.  Even taken at face value, none of this establishes that Facebook acted with any discriminatory animus, which is an essential pleading element of a Section 1981 claim.  *See Evans v. McKay*, 869 F.2d 1341, 1344-45 (9th Cir. 1989) (section 1981 requires a plaintiff to plead "racial animus"); *Myers v. Case Corp.*, 2000 WL 274197, at *5 (N.D. Cal. Mar. 7, 2000) (same).  Plaintiffs fail to allege any such racial animus on Facebook's part—particularly given that Facebook expressly prohibits the use of its platform for any discriminatory purposes.[9]

Plaintiffs' other arguments fare no better.  Plaintiffs repeat the erroneous assertion that only minority users, not white users, can be excluded from viewing ads.  (Opp. 9.)  Allegations in the FAC belie this assertion.  *Supra* at 5-6 & n.4; *see* FAC ¶ 33.  But even if it were true, it does not plausibly suggest discriminatory intent.  Plaintiffs also argue that Facebook "performs … race-based services for and on behalf of Businesses … including by playing a direct role in identifying applicants, developing advertising strategies, and creating and delivering ads to users."  (Opp. 9.)  But the FAC says nothing about any "race-based services'" its allegations are limited to describing Facebook's role in creating neutral targeting tools, which evinces no discriminatory intent.

*No impairment of any contract.*  Plaintiffs' section 1981 claim also fails because Plaintiffs have not alleged any conduct by Facebook "impair[ing]" their ability to "make and enforce" any "contract[]."  42 U.S.C. § 1981(a), (c).  Plaintiffs argue that Facebook has "interfere[d]" with their ability to "enter into contracts for employment, housing, and credit" by "denying them information on opportunities to enter into such contracts" (Opp. 11), but the case law does not support this novel theory.  Plaintiffs are required to identify a "specific contract" into which they entered or sought to

---

[9] The possibility that certain advertisers may misuse the Ad Platform to engage in unlawful ad targeting does not suggest that Facebook intentionally treats any user worse than any other user on the basis of race or ethnicity.  This case thus bears no resemblance to the cases Plaintiffs cite (Opp. 10) involving "facially discriminatory polic[ies]" expressly treating a protected group *worse* than a non-protected group.  *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007) ("[a] facially discriminatory policy is one which on its face applies less favorably to a protected group," such as the "men-only" policy at issue (emphasis added)); *EEOC v. Borden's, Inc.*, 724 F.2d 1390, 1393 (9th Cir. 1984) (policy denied severance pay to employees 55 or older); *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 518, 634 (2007) (discussing "facially discriminatory pay structure that puts some employees on a lower scale because of" protected trait).

enter but were impaired in doing so by Facebook.  *Bagley v. Ameritech Corp.*, 220 F.3d 518, 520 (7th Cir. 2000); *see, e.g.*, *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1313 (9th Cir. 1992) (defendant's "acts were committed in order to intentionally deprive [plaintiffs] of an opportunity to enter into" contracts, but section 1981 claim failed because plaintiffs did not identify any specific "contract [defendant] prevented [plaintiffs] from entering into").  Plaintiffs' only response is that the FAC "identifies the Statement of Rights and Responsibilities," (the "SRR") (Opp. 11), which are the terms and conditions between Facebook and its users.  But the SRR is not a contract for housing, employment, or credit, and Plaintiffs do not (and cannot) allege any facts suggesting that Facebook discriminates against users in any way with respect to the SRR, or that Facebook prevented them from entering into the SRR (which Plaintiffs did by signing up for Facebook accounts).

### B.   Plaintiffs Fail to State a Claim Under 42 U.S.C. § 1982

For similar reasons, Plaintiffs fail to state a section 1982 claim.  They argue that intentional discrimination is not a required element of a section 1982 claim (Opp. 12), but the only authority they cite is an outlier district court opinion, *NAACP v. Ameriquest Mortgage Co.*, 635 F. Supp. 2d 1096, 1104 (C.D. Cal. 2009), whose discussion of the issue was cursory.  In fact, the most recent decision by the Ninth Circuit affirms the longstanding rule that intentional discrimination *is* required, as other circuits also have concluded.  *See Ghosh v. Uniti Bank*, 566 F. App'x 596, 597 (9th Cir. 2014) (citing *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004) and *Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 822 (10th Cir. 1981)); *see also, e.g.*, *30 Clinton Place Owners Inc. v. City of New Rochelle*, 2014 WL 890482, at *3 (S.D.N.Y. Feb. 27, 2014) ("claims under Sections 1981 and 1982 fail for the same reason" as Plaintiffs "have not plausibly alleged *intentional* discrimination"); *cf. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987) ("§ 1982 … was 'intended to protect from discrimination identifiable classes of persons who are subjected to *intentional discrimination.*'" (emphasis added)).  As set forth above, Plaintiffs have not alleged any intentional discrimination.  *Supra* at 11-12.

Plaintiffs also err in arguing that Facebook, which does not sell, lease, or convey real property to users, can be held liable under section 1982.  Section 1982 prohibits "racial discrimination in the sale of property," *Scott v. Eversole Mortuary*, 522 F.2d 1110, 1113 (9th Cir.

1    1975), not in creating targeting categories for advertising.  *See also Annan-Yarty v. Star Protection*

2    *Agency, Inc.*, 127 F. App'x 313, 315 (9th Cir. 2005) (section 1982 claim "fails because this action

3    does not involve the purchase or rental of property or housing").  As the Supreme Court has held,

4    section 1982 does not prohibit even overtly discriminatory advertising.  *See* Mot. 17; *Jones v. Alfred*

5    *H. Mayer Co.*, 392 U.S. 409, 413 (1968).  It thus strains credulity to suggest that it prohibits the

6    creation of race-neutral ad-targeting tools.  Beyond this basic flaw, Plaintiffs' claim that the Ad

7    Platform has deprived them of information regarding opportunities for housing transactions (Opp.

8    12) is wrong on its own terms.  The case law Plaintiffs rely upon requires direct interference with a

9    *specific* parcel of property or property right, which Plaintiffs have not alleged.  *See Sullivan v. Little*

10   *Hunting Park, Inc.* 396 U.S. 229, 237 (1969) (involving property owner's attempt to assign his

11   membership in a community park to an African-American tenant); *Lac Du Flambeau Band of Lake*

12   *Super. Chippewa Indians v. Stop Treaty Abuse-Wisc., Inc.*, 41 F.3d 1190, 1191-93 (7th Cir. 1994)

13   (defendants prevented plaintiffs from exercising treaty-guaranteed fishing rights).

14   **C.    Plaintiffs Fail to State a Claim Under the ECOA**

15   Plaintiffs fail to state a claim under the ECOA because Facebook is not a "creditor."  (Mot.

16   18.)  A "creditor" is "any person who regularly extends, renews or continues credit."  15 U.S.C.

17   § 1691a(e).  Plaintiffs do not (and cannot) allege that Facebook does any of those things.  Instead,

18   Plaintiffs rely exclusively on a regulation, 12 C.F.R § 1002.2(l), which provides that a "creditor"

19   includes persons who "regularly refer[] applicants or prospective applicants to creditors."  (Opp.

20   15.)   But the FAC does not allege that Facebook does this either.  It alleges only that Facebook

21   publishes third-party ads, including ads for credit, and provides advertisers with targeting tools.

22   Plaintiffs' theory contravenes not only the plain text of the statute, but also the CFPB's

23   official interpretation of the very regulation Plaintiffs rely upon.  That interpretation explains that

24   section 1002.2(l) includes as creditors only persons "who [] accept applications and refer applicants

25   to creditors" or "select creditors to whom credit requests can be made."  12 C.F.R. pt. 202, Supp. I;

26   *see also* 68 Fed. Reg. 13144, 13156 (2003) (same).  While Plaintiffs argue that this interpretation is

27   wrong (Opp. 15), it is entitled to deference as it is not "plainly erroneous or inconsistent with the

28

1   regulation in question."  *Chase Bank U.S.A., N.A. v. McCoy*, 562 U.S. 195, 211 (2011).[10]

2   ## D.   Plaintiffs Fail to State a Claim Under Title VII

3         Just as Facebook is not a creditor under the ECOA, so too it is not an "employment agency,"

4   which is an essential element of Plaintiffs' Title VII claim.  (Opp. 13.)  As Plaintiffs recognize,

5   controlling Ninth Circuit precedent holds that an entity (such as a newspaper) that publishes third-

6   party employment ads is not an "employment agency."  *Brush v. San Francisco Newspaper Printing*

7   *Co.*, 315 F. Supp. 577, 578 (N.D. Cal. 1970), *aff'd*, 469 F.2d 89, 90 (9th Cir. 1972) (per curiam).

8   That is the end of the matter.  Plaintiffs' reliance on an-out-of-circuit, unpublished district court

9   opinion and EEOC guidance citing that opinion (Opp. 14) does not change this controlling law.

10        Separately, Plaintiffs argue that Facebook "is not a newspaper or similar entity," but rather

11  "functions as a modern day marketing or advertising firm that assists employers" in recruiting

12  workers.  (Opp. 14.)  But Plaintiffs do not allege (nor could they) that Facebook is responsible for

13  advertisers' targeting decisions, for creating the relevant content of the ads, or for designing the

14  actual employers' marketing or recruiting strategies.[11]  The only "assistance" the FAC alleges

15  Facebook provides are the tools that allow advertisers to target their ads.  (FAC ¶ 3.)  That is not

16  sufficient to transform Facebook into an employment agency.  Also unavailing is Plaintiffs

17  contention that Facebook's "delivery of ads is completely different than a newspaper's delivery"

18  because Facebook "create[s] individualized ad campaigns that are customized to specific users

19  based on their race."  (Opp. 14-15.)  Whether ad targeting on Facebook's platform is individualized

20  is simply irrelevant to the question of whether Facebook is an *employment agency*.  If Plaintiffs'

21  theory were correct, then media outlets focusing on specific demographic segments (such as Black

22  Entertainment Television or Univision) presumably would qualify as employment agencies, while

23

24  [10] Plaintiffs cite *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971 (7th Cir. 2004)
    (Opp. 15 n.14), but that case does not help them:  the defendant there, a car dealership, *did* accept

25  the plaintiff's application for credit, but made a "decision not to submit" her "credit application to
    any lender."  362 F.3d at 975.  Nothing comparable is alleged with respect to Facebook.

26  [11] Plaintiffs assert that Facebook "performs the necessary functions" to allow businesses to "create

27  … advertisement[s]" and "develop … recruitment, marketing, and/or advertising strateg[ies]."
    (FAC ¶ 12.)  It is unclear what Plaintiffs mean by the phrase "performs the necessary functions," but

28  Plaintiffs do not and cannot allege facts plausibly suggesting that Facebook *actually* creates ad
    content for third parties or designs advertisers' recruiting, marketing, and advertising strategies.

1   general-audience media would not.  Nothing in Title VII supports such a nonsensical rule.

2         **E.**      **Plaintiffs Fail to State a Claim Under the FHA**

3         Plaintiffs' assorted claims under the FHA also fail.  *First*, Plaintiffs fail to state a claim under

4   42 U.S.C. § 3604(a) and its regulations 24 C.F.R. § 100.70(c)(1) and (d)(2).  Section 3604(a) makes

5   it unlawful to "refuse to sell or rent after the making of a bona fide offer" or "refuse to negotiate for

6   the sale or rental of, or otherwise make unavailable or deny" a dwelling because of a protected trait.

7   Plaintiffs concede that Facebook does not sell, lease, or convey real property to users.  (Opp. 16.)

8   Plaintiffs argue that Facebook's provision of neutral targeting tools on its Ad Platform, used by all

9   types of advertisers, constitutes a "refusal to negotiate" or "otherwise make unavailable" under the

10   regulations.  But these regulations support Facebook's position, not Plaintiffs'.  Sections 100.60 and

11   100.70 address practices by entities that either sell, lease, or convey real property, like realtors or

12   landlords, or that can deny permits, services, or facilities that are "prerequisites to obtaining

13   dwellings," like condominium associations and municipal services.  53 Fed. Reg. 44992, 44997

14   (1988); 24 C.F.R. § 100.60 (prohibited conduct includes "imposing different sales prices or rental

15   charges," "using different qualification criteria," and "evicting tenants"); *id.* § 100.70

16   ("Discouraging the purchase or rental of a dwelling … by exaggerating drawbacks," "discharging …

17   an employee, broker, or agent because he or she refused to participate in a discriminatory housing

18   practice," or "refusing to provide municipal services … or insurance").  None of the cases Plaintiffs

19   cite extends the scope of section 3604(a) beyond entities that control the sale or rental of actual

20   identified dwellings by virtue either of ownership, agency, or the police power.[12]  Plaintiffs do not

21   and cannot allege that Facebook has engaged in any such conduct.

22         *Second*, Plaintiffs' section 3604(d) claim fails for similar reasons.  It is third-party

---

[12] *See Comm. House, Inc. v. City of Boise*, 490 F.3d 1041, 1046 (9th Cir. 2007) (defendant owned the housing); *Chew v. Hybl*, 1997 WL 33644581, at *1 (N.D. Cal. Dec. 9, 1997) (same); *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 378-80 (3d Cir. 2011) (defendant city's redevelopment plan made housing unavailable by physically displacing residents). Even the cases Plaintiffs cite for the proposition that discriminatory advertising may constitute unlawful racial steering involve a real estate brokerage company and a development corporation that directly sold property.  *United States v. Real Estate One, Inc.*, 433 F. Supp. 1140, 1146 (E.D. Mich. 1977) (defendant was "engaged in business primarily as a broker for the resale of existing homes"); *NAACP v. ITT Cmty. Dev. Corp.*, 399 F. Supp. 366, 368-69 (D.D.C. 1975) (defendant was a development corporation engaged in "sale of property").

advertisers, not Facebook, who "represent[]" in their ads whether a dwelling is "available for inspection, sale, or rental."  Plaintiffs argue that Facebook "sends ads 'for and on behalf of' advertisers" (Opp. 17, citing FAC ¶¶ 160-65), but the FAC alleges no actual conduct by Facebook to support that conclusory and baseless assertion of agency.  *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 956 n.2 (N.D. Cal. 2014) ("Post–*Iqbal* and/or *Twombly*, courts have held that a conclusory allegation[] of an agency relationship is not enough.").

*Third*, section 3605(a) does not apply to Facebook either.  It applies only to entities "whose business includes engaging in residential real estate-related transactions," defined as including the "making or purchasing" of real estate loans, or the "selling, brokering, or appraising of residential real property."  42 U.S.C. § 3605(a)-(b).  Plaintiffs do not (and cannot) allege that Facebook does any of these things, so by the plain text of section 3605(a), it does not apply to Facebook.  Plaintiffs argue that "'selling' encompasses advertising'" and that Facebook is therefore liable.  (Opp. 19.)  But even if "selling" includes "advertising," it would still reach only the *advertiser*, not Facebook.

*Fourth*, Plaintiffs' theory of liability under section 3604(c) also fails.  Plaintiffs do not dispute that section 3604(c) prohibits any ad that "indicates any preference, limitation, or discrimination based on" a protected trait, and that the controlling test is whether the challenged ad "would discourage an ordinary reader" of a protected class from applying to rent or purchase the dwelling, or would "suggest" to the ordinary reader that certain classes are "preferred or dis-preferred."  *Llanos v. Estate of Coehlo*, 24 F. Supp. 2d 1052, 1057 (E.D. Cal. 1998).  As demonstrated by the cases Plaintiffs cite, this test applies only where the plaintiff actually sees an ad that contains either facially or implicitly discriminatory content.  *See id.*; *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991) (evaluating content); *Housing Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1193 (C.D. Cal. 2004) (discussing language of notices).  Plaintiffs allege no such thing here.  To the contrary, they claim that they were harmed because they were *prevented from seeing* certain *desirable* ads.  (Mot. 20.)  That does not state a claim under section 3604(c).[13]

---

[13] Plaintiffs contention that the "Why am I seeing this" function is discriminatory is nonsensical. (Opp. 18.)  A statement informing a user that she *saw* a housing ad due to her ethnic affinity does not reflect any desire to *exclude* her from any housing opportunity.  Moreover, this theory of

1    Plaintiffs' argument that 24 C.F.R. § 100.75(c)(3) prohibits discriminatory targeting (Opp.

2    18) also fails.  This regulation prohibits "[s]electing media or locations for advertising" so as to

3    "deny particular segments of the housing market information about housing opportunities."  24

4    C.F.R. § 100.75(c)(3).  Facebook does not "select" the "media or locations" advertisers use; rather,

5    it *is* the media advertisers select.  Plaintiffs' reliance on cases suggesting that advertisers may be

6    liable for ads that target predominantly white audiences (Opp. 18 n.16) confirms the point:  these

7    cases were brought *against the advertisers* ("a bank," *id.*, and a real estate developer, *ITT Cmty.*

8    *Dev. Corp.*, 399 F. Supp. at 368-69), not against the publishers that ran the ads.  *Cf. Housing*

9    *Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 650 (6th Cir. 1991)

10   (holding that similar theory of liability under section 3604(c) does not extend to newspapers).

11   *Fifth*, Plaintiffs fail to state an FHA disparate-impact claim because they do not "allege

12   facts" or "produce statistical evidence demonstrating a causal connection" between Facebook's

13   provision of neutral targeting tools and any alleged disparate impact.  *Tex. Dep't of Hous. & Cmty.*

14   *Affairs v. Inclusive Cmtys. Proj., Inc.*, 135 S. Ct. 2507, 2523 (2015); *City of Miami v. Bank of Am.*

15   *Corp.*, 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016) ("*Inclusive Communities* requires that an FHA

16   disparate impact complaint [first] show statistically-imbalanced … patterns which adversely impact

17   a minority group.").  Plaintiffs allege only the existence of the targeting tools, not facts or statistical

18   evidence showing that they have created any disparate racial impact.

19   Plaintiffs also fail to allege the requisite "robust" causal connection between Facebook's

20   provision of neutral targeting tools and any disparate impact, *see Inclusive Cmtys.*, 135 S. Ct. at

21   2523, because any discriminatory targeting would be caused by the intentional decisions of

22   advertisers alone, thereby "break[ing] the causal chain" between any harm and Facebook's conduct.

23   *United States v. Speakman*, 594 F.3d 1165, 1174 (10th Cir. 2010) (citing Restatement (Second) of

24   Torts § 448).  In response, Plaintiffs argue only that tort causation principles do not apply to the

25   FHA.  (Opp. 21 n.19.)  But the Ninth Circuit has held that FHA claims "sound[] basically in tort"

26   and thus tort causation principles do indeed apply to FHA claims.  *Pac. Shores Props., LLC v. City*

27

28   liability bears no relationship to Plaintiffs' theory of injury, which is that they suffered harm by
     virtue of *not seeing* ads, not because of the "Why am I seeing this" function.

1    *of Newport Beach*, 730 F.3d 1142, 1167-68 (9th Cir. 2013).[14]

2              **F.      Plaintiffs Fail to State a Claim Under the FEHA**

3        Plaintiffs' FEHA claims also fail.  *First*, Facebook is not an "employment agency" (*supra* at

4    15-16) and thus is not subject to California Government Code sections 12940(d) and (k).  (Mot. 22.)

5        *Second*, Plaintiffs fail to allege the elements of an aiding-and-abetting claim.  Plaintiffs agree

6    that common law aiding-and-abetting standards apply (Opp. 21), requiring them to allege that

7    Facebook provided "substantial assistance" to advertisers in engaging in unlawful targeting, with the

8    "intent of facilitating" their discrimination.  *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138,

9    1144, 1146 (2005); *see also, e.g.*, *Howard v. Superior Court*, 2 Cal. App. 4th 745, 749 (1992)

10   (requiring "a conscious decision to participate in tortious activity for the purpose of assisting another

11   in performing a wrongful act").  Nothing in the FAC supports an inference that Facebook provides

12   the Ad Platform's neutral targeting tools with the intent that advertisers engage in unlawful

13   discrimination (which, again, Facebook expressly prohibits).  Nor have Plaintiffs identified a single

14   advertiser whose unlawful targeting Facebook is alleged to have aided or abetted.

15       *Third*, Plaintiffs fail to state a claim under section 12955(a) because Facebook is not an

16   "owner" of housing.  Plaintiffs argue that Facebook is an "owner" because it is a "real estate …

17   salesperson" (Opp. 22, citing Cal. Gov't Code § 12927(e)), but the very statute Plaintiffs cite in

18   support of that argument (Cal. Bus. & Prof. Code § 10132) defines "real estate salesperson" as "a

19   natural person who … is employed by a licensed real estate broker."  Facebook is neither.

20       *Fourth*, Plaintiffs cannot state a claim under section 12955(k) or (i) for the same reasons

21   their claims under 42 U.S.C. §§ 3604 and 3605 fail.  (Mot. 23; *supra* at 16-19.)  These FEHA

22   provisions mirror the comparable FHA provisions, and here too, Facebook is not liable because it

23   has not "ma[d]e unavailable or den[ied] a dwelling" to anyone, Cal. Gov't Code §12955(k), nor is it

24   an "entity whose business involves real-estate related transactions," *id.* §12955(i).

25       *Fifth*, Plaintiffs cannot state a claim under Cal. Gov't Code section 12955(j), which prohibits

26   _____

27   [14] Moreover, the Supreme Court recently clarified that the causation standard governing FHA
     disparate-impact claims is *more demanding* than in tort law, not (as Plaintiffs argue) less
28   demanding.  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (holding that, unlike
     in tort law, "foreseeability" is not "sufficient to establish proximate cause under the FHA").

1   discriminatory denial of "access to, or membership or participation in, a multiple listing service, real

2   estate brokerage organization or other service."  Plaintiffs do not allege that Facebook has denied

3   anyone access to such services, and at any rate, only licensed brokers and salespersons have a right

4   to such access, *see Derish v. San Mateo–Burlingame Bd. of Realtors*, 136 Cal. App. 3d 534, 539-40

5   (1982) (service could exclude public from access).  Plaintiffs dismiss *Derish* as an "antitrust" case

6   (Opp. 22), but cite no authority for their argument that section 12955(j) is meant to confer upon

7   members of the general public a right to join such services.  Nor do Plaintiffs explain how Facebook

8   has denied anyone the ability to join these third-party services.

9   ### G.   Plaintiffs Fail to State a Claim Under the Unruh Act

10   Plaintiffs' Unruh Act claim also fails.  *First*, Plaintiffs allege no discriminatory intent.  *See*

11   *supra* at 11-12; *Earll v. eBay Inc.*, 2012 WL 3255605, at *5 (N.D. Cal. Aug. 8, 2012) (dismissing

12   Unruh Act claim where "allegations describe a facially neutral" policy and so did not "demonstrate

13   intentional discrimination").  *Second*, Plaintiffs are wrong in asserting that ethnic affinity targeting,

14   by definition, constitutes "invidious discrimination" because the Unruh Act purportedly prohibits all

15   targeting based on any protected trait.  This argument proves far too much.  If Plaintiffs are correct,

16   then women's clothing stores could not target ads to women (since "sex" is a protected trait, Cal.

17   Civil Code § 51(b)), and Spanish-language TV stations could not target ads to Spanish speakers

18   (since "primary language" is a protected trait, *id.*).  The Unruh Act does not prohibit such ad

19   targeting because it is not "malicious, hostile, or damaging" to anyone.  *Javorsky v. W. Athletic*

20   *Clubs, Inc.*, 242 Cal. App. 4th 1386, 1404 (2015).  Likewise, Facebook's provision of tools that

21   advertisers may or may not use to target ads also is not unlawful.  *Third*, Plaintiffs' Unruh Act

22   aiding-and-abetting claim fails for the same reasons their FEHA aiding-and-abetting claim fails:

23   Plaintiffs fail to allege substantial assistance or discriminatory intent.  *See supra* at 19; Mot. 22-25.[15]

24   ### CONCLUSION

25   The Court should dismiss Plaintiffs' FAC without leave to amend.

26

27

28

---

[15] Plaintiffs concede their UCL claim should be dismissed.  (Opp. 23, n.20.)

1    DATED:  June 8, 2017                         MUNGER, TOLLES & OLSON LLP
2                                                     ROSEMARIE T. RING
                                                      JONATHAN H. BLAVIN
3                                                     JOSHUA PATASHNIK
                                                      ELIZABETH A. KIM
4

5

6                                                By:       /s/ Rosemarie T. Ring
                                                     ROSEMARIE T. RING
7                                                Attorneys for Defendant Facebook, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28