Mary Kelly Persyn (CABN 264782)
PERSYN LAW & POLICY
912 Cole Street PMB 124
San Francisco, CA 94117
Telephone: (628) 400-1254
Email: marykelly@persynlaw.com

*Attorneys for Amicus Curiae Upturn*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SUZANNE-JULIETTE MOBLEY, DANIEL ADRIAN MANRIQUEZ, VICTOR ONUOHA, on behalf of themselves and all others similarly situated,<br><br>　　　　　Plaintiff(s),<br><br>　　vs.<br><br>Facebook, Inc.,<br><br>　　　　　Defendant(s). | Case Number: 5:16-cv-06440-EJD<br><br>**BRIEF OF *AMICUS CURIAE* UPTURN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: November 16, 2018<br>Time: N/A<br>Judge: Honorable Edward J. Davila<br>Courtroom: 4 |

# **TABLE OF CONTENTS**

I. **Preliminary Statement** ................................................................................................. 1

II. **Argument** ..................................................................................................................... 1

    A. Facebook participates in the targeting and delivery of advertisements, making decisions about how, where, when, and to whom it shows advertisements. ................... 1

    B. By creating Lookalike Audiences for housing advertisers based on its users' protected class status, Facebook develops content that materially contributes to violations of the Fair Housing Act. ........................................................................................................ 2

    C. By making *independent* decisions about the delivery of advertisements based on its users' protected class status, Facebook exposes itself to claims under the Fair Housing Act. ................................................................................................................................ 5

III. **Conclusion** ................................................................................................................... 7

# TABLE OF AUTHORITIES

**CASES**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ............................................................................................. 7

*Dyroff v Ultimate Software Grp., Inc.*,
Case No. 17-cv05259-LB (N.D. Cal. Nov. 26, 2017) ......................................................... 6

*Fair Hous. Council of San Fernando Valley v. Roommates, LLC*,
521 F.3d 1157 (9th Cir. 2008) ......................................................................................... 4, 7

*Jones v. Dirty World Entm't Recordings LLC*,
755 F.3d 398 (6th Cir. 2014) ............................................................................................. 7

**STATUTES & REGULATIONS**

42 U.S.C § 3604 ..................................................................................................................... 4

47 U.S.C. § 230 .............................................................................................................. *passim*

24 C.F.R § 100.75 .................................................................................................................. 6

24 C.F.R. § 100.80 ................................................................................................................. 4

**OTHER AUTHORITIES**

The United States Department of Justice, Statement of Interest of the United States of America, *National Fair Housing Alliance, et al., v. Facebook, Inc.*, Case No. 18-cv-02689-JGK (S.D.N.Y. Aug. 17, 2018) ............................................................................................ 6

Facebook Advertiser Help Center, "Ad Delivery & Optimization." .................................... 5

Facebook Business, Advertiser Help, "About Lookalike Audiences." ................................ 3

Facebook, Advertiser Help Center, "Ads Help - Desktop - Delivery," Retrieved from The Internet Archive. ................................................................................................................... 5

Anupam Datta, et al., *Proxy Discrimination in Data-Driven Systems*, arXiv:1707.08120, (2017) .................................................................................................................................... 3

Till Speicher, et al., *Potential for Discrimination in Online Targeted Advertising*; Proceedings of the 1st Conference on Fairness, Accountability and Transparency, PMLR 81:5-19, (2018) ..................................................................................................................... 3

## I. PRELIMINARY STATEMENT[1]

Facebook's Ad Platform perpetuates discrimination in ways clearly contemplated by the Fair Housing Act.[2]

Amicus offers this brief to describe the powerful, often unnoticed technologies that underpin Facebook's Ad Platform. These technical descriptions help show that Plaintiffs have pleaded factual content sufficient to allow this Court to conclude that Facebook's Ad Platform is not fully immunized by 47 U.S.C. § 230 ("Section 230").

Amicus also calls the Court's attention to the compelling public interests in this litigation. People's ability to enjoy their free expression rights on the internet depends, in significant part, on the protections afforded to intermediaries by Section 230. But Section 230 must not, and need not, vitiate the Fair Housing Act in order to accomplish these goals.

Accordingly, Amicus asks the Court to deny Facebook's Motion to Dismiss. In the alternative, should the Court grant Facebook's Motion to Dismiss, Amicus asks the Court to do so without prejudice, with leave for Plaintiffs to amend their Complaint.

## II. ARGUMENT

### A. Facebook participates in the targeting and delivery of advertisements, making decisions about how, where, when, and to whom it shows advertisements.

In its pleadings, Facebook suggests that advertisers are "wholly responsible for deciding where, how, and when to publish their ads." Def.'s Mtn. to. Dism. at 21. This is not an accurate description of how Facebook's Ad Platform works.

On Facebook's Ad Platform, any ad that is seen by a user must first go through two phases: targeting and delivery. During the ad targeting phase, Facebook helps the advertiser create a "target audience": a list of users who are *eligible*, but not guaranteed, to see a given ad.

---

[1] Amicus certifies that no person or entity, other than Amici, its members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief, in whole or in part. Amicus appreciates the research assistance of Hannah Masuga, Geng Ngarmboonanant, and Dan Stein.
[2] In the interest of brevity, and because this brief's purpose is primarily to convey technical particulars, Amicus does not address the other statutory claims in the Plaintiffs' First Amended Complaint.

1

BRIEF OF *AMICUS CURIAE* UPTURN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                                                CASE NO.: 5:16-CV-06440-EJD

Because target audiences can be quite large, numbering in the hundreds of thousands or millions, it is often the case that not all of these users will actually see the ad.

During the ad delivery phase, Facebook itself makes decisions, independently of the advertiser, about which users within an ad's target audience will actually see the ad. The users to whom Facebook chooses to show an ad can be said to constitute that ad's "actual audience." As described in Part II.C, Facebook makes these delivery decisions based on its own predictions about what kinds of users are most likely to engage with that ad. Advertisers have no meaningful control over Facebook's delivery decisions.

Both of these phases are addressed in Plaintiffs' First Amended Complaint ("FAC"). FAC ¶ 31 (describing various targeting features); FAC ¶ 13 (alleging Facebook "delivers," "channels," and "executes" advertisements). This brief does not elaborate on Facebook's Core and Custom Audience targeting features, which Plaintiffs discuss at length. Instead, this brief offers further description of Facebook's Lookalike Audience targeting product and its ad delivery procedures, both of which are especially relevant to this Court's analysis of Section 230 immunity.

### B. By creating Lookalike Audiences for housing advertisers based on its users' protected class status, Facebook develops content that materially contributes to violations of the Fair Housing Act.

A Lookalike Audience is a target audience, created by Facebook, that "looks like" a group of people indicated by the advertiser.

To create a Lookalike Audience, Facebook starts by soliciting from an advertiser a "source audience," such as a list of phone numbers or e-mail addresses. Once it has this list, Facebook takes several steps to create a new, custom-built target audience (the "Lookalike Audience") for the advertiser. First, Facebook locates user accounts that match the phone numbers, email addresses, or other identifiers in the advertiser-provided source audience. Second, Facebook uses proprietary algorithms to extract "common qualities" of those users

based on their demographics, interests, behavior on Facebook, and other personal information.[3] Almost all of this data is unavailable to the advertiser. Finally, Facebook creates a targeting list comprised of new users, who were not included in the source audience but who share common qualities found in the source audience. Facebook describes this new target audience as comprising people who "are similar to (or 'look like')" people in the source audience.[4]

Researchers have shown that, when creating Lookalike Audiences, Facebook reproduces protected class characteristics of the source audience — including gender, age, and ethnicity — by creating target audiences with similar demographics.[5] Importantly, and somewhat counterintuitively, this demographic reflection can happen regardless of whether details about protected class features like race are overtly specified by users anywhere on Facebook.[6] Facebook's extensive data about its users includes strong proxies for protected class membership, and these proxies can lead to a Lookalike Audience whose protected status traits match those of the source audience.

An illustrative example: From a small source audience of 100 mostly white parents, Facebook could create a Lookalike Audience of hundreds of thousands, if not millions, of people — most of whom are white parents. The advertiser might, or might not, have intended for Facebook to find white parents. In any case, Facebook tells advertisers very little about how it creates Lookalike Audiences, and almost nothing about their demographic composition. Facebook does not appear to warn advertisers that the audiences it creates might be biased, or to provide reasonable ways for advertisers to identify such bias before running their ads.

---

[3] *See* Facebook Business, Advertiser Help, "About Lookalike Audiences," *available at* https://www.facebook.com/business/help/164749007013531 (" . . . we identify the common qualities of the people in it (ex: demographic information or interests).")
[4] *Id.*
[5] *See* Till Speicher, Muhammad Ali, Giridhari Venkatadri, Filipe Nunes Ribeiro, George Arvanitakis, Fabrício Benevenuto, Krishna P. Gummadi, Patrick Loiseau, Alan Mislove, *Potential for Discrimination in Online Targeted Advertising*. Proceedings of the 1st Conference on Fairness, Accountability and Transparency, PMLR 81:5-19, 13-14 (2018).
[6] *See, e.g.,* Anupam Datta, Matt Fredrikson, Gihyuk Ko, Piotr Mardziel, Shayak Sen, *Proxy Discrimination in Data-Driven Systems*, arXiv:1707.08120, 1 (2017) ("Machine learnt systems inherit biases against protected classes, historically disparaged groups, from training data. Usually, these biases are not explicit, they rely on subtle correlations discovered by training algorithms, and are therefore difficult to detect.").

3

BRIEF OF *AMICUS CURIAE* UPTURN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO.: 5:16-CV-06440-EJD

Section 230 does not immunize services that create or develop content that contributes materially to illegality. *Fair Hous. Council of San Fernando Valley v. Roommates, LLC*, 521 F.3d 1157, 1167 (9th Cir. 2008). Section 230 immunity can extend to certain aspects of a service and not others, allowing the Court to analyze Facebook's Ad Platform as distinct from its social network. *Id.* at 1162.

By creating Lookalike Audiences in this way, Facebook has clearly created or developed content. Moreover, the target audiences that Facebook creates exert control over which users are eligible to see an ad and which users are *entirely excluded by omission*. When target audiences exclude users along protected class lines, those audiences materially contribute to illegality under the Fair Housing Act. *See, e.g.,* 24 C.F.R. § 100.80(b)(4) (unlawful actions include "[l]imiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin."); 42 U.S.C. § 3604(a) and (f) (prohibiting conduct that "otherwise makes unavailable" fair housing opportunities).

Finally, Facebook's Lookalike Audience product is not the type of "neutral tool" that Section 230 aims to, and often does, protect. Def.'s Mtn. to. Dism. at 10-11. Lookalike Audiences are simply not analogous to rudimentary dropdown menus or keyword suggestions, as Facebook claims. Def.'s Mtn. to. Dism. at 10-11. The Lookalike Audiences that Facebook creates for advertisers are unique, distinct, powerful, and legally salient pieces of content. The Lookalike Audience creation process, and indeed the final audience itself, are both thoroughly opaque to the advertiser, depriving the advertiser of opportunity to exercise its own judgment and discretion over that content.

In sum, Lookalike Audiences are created by Facebook, not by the advertiser. Advertisers do not know — because Facebook does not tell them — who is in a Lookalike Audience. Facebook chooses each member of the Lookalike Audience, reaching *beyond* the source audience that the advertiser already knows. Wherever such an audience happens to be racially

4

BRIEF OF *AMICUS CURIAE* UPTURN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

CASE NO.: 5:16-CV-06440-EJD

exclusionary or otherwise discriminatory on protected status grounds, it is Facebook — not the advertiser — that compiles the exclusionary target audience.

### C. By making *independent* decisions about the delivery of advertisements based on its users' protected class status, Facebook exposes itself to claims under the Fair Housing Act.

Once the targeting phase is complete, Facebook decides which users within a target audience will see a given ad. To deliver ads, Facebook conducts billions of automated analyses every day – one each time an ad is displayed – instantaneously filling available ad space as users scroll through its site.

These analyses are referred to as "auctions," but the mathematics and judgment Facebook uses are in fact far more complex and opaque than a standard "highest bidder" auction. These auctions determine which ad is shown to a particular user, among all of the ads that the user is eligible to receive (by virtue of their inclusion in those ads' target audiences).

Facebook does not determine the outcomes of these auctions neutrally, strictly on price. Rather, Facebook seeks to "match the right ad to the right person at the right time" by making its own predictions about which ads the user is most likely to interact with, the perceived "quality" of the ad, and other factors.[7] These predictions are based on Facebook's own knowledge about that user's characteristics and past behavior, the behavior of similar users, and whether similar users have interacted with the ads competing in that auction. Like Lookalike Audiences, these predictions can favor or disfavor users based on their protected class status.

As Facebook has described in its own documentation, if Facebook detects a pattern of men interacting with a particular ad, it will automatically *and without instruction from or notification to the advertiser* steer that ad toward other men in the future.[8] This specific behavior is easy to observe in practice. For example, between June 11 and June 16, 2018, Amicus ran a test

---

[7] Facebook, Advertiser Help Center, "Ad Delivery & Optimization," https://www.facebook.com/business/help/430291176997542.

[8] Facebook, Advertiser Help Center, "Ads Help - Desktop - Delivery," Retrieved from The Internet Archive, https://web.archive.org/web/20160930124257/https://www.facebook.com/business/help/934288416682198?helpref=faq_content.("if there are more and lower-cost optimization events among men than women, then we'd automatically spend more of your budget on the men in the larger target audience . . . .").

5

BRIEF OF *AMICUS CURIAE* UPTURN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

CASE NO.: 5:16-CV-06440-EJD

advertisement for a bus driver job that was targeted to all U.S. users over the age of 18 (a target audience of more than 200 million users). The ad was delivered by Facebook to an actual audience of roughly 10,200 users that was 80 percent male, *despite the fact that the ad was not targeted based on gender*. This is exactly how Facebook's ad delivery system is designed to work. Similar outcomes can emerge with any other ad, including with housing ads, when users' protected class status predicts their likelihood of engaging with those ads.

In sum, Facebook *itself* decides which users within a target audience will (and will not) see a particular ad. And by its own description, Facebook's ad delivery decisions can operate based on protected characteristics.

The heart of Section 230 is the principle that an online intermediary should not absorb liability for unlawful content created entirely by another. This principle has been upheld even when an intermediary's algorithms play a role in steering its users toward unlawful content. *Dyroff v Ultimate Software Grp., Inc.*, Case No. 17-cv05259-LB, 14 (N.D. Cal. Nov. 26, 2017) (defendant is "not an 'information content provider' merely because its content-neutral tools (such as its algorithms and push notifications) steer users to unlawful content.").

Facebook's delivery of housing ads is entirely distinguishable. Here, what truly matters is Facebook's *conduct* — its steering of housing ads away from protected groups — not the legality of the underlying ad *content*.[9] (As the Department of Justice noted in its Statement of Interest in *National Fair Housing Alliance, et al., v. Facebook, Inc.*, "unlawful discrimination can occur through the *choice* of who receives an ad." The United States Department of Justice, Statement of Interest of the United States of America*, National Fair Housing Alliance, et al., v. Facebook, Inc.,* Case No. 18-cv-02689-JGK (S.D.N.Y. Aug. 17, 2018) (emphasis added)). The claim that Facebook unlawfully steers the delivery of housing ads does not "inherently require[] the court to

---

[9] Facebook materially contributes to the location of the advertisement — in other words, determining which users see what advertisements. *See* 24 C.F.R. 100.75(c)(3) ("Discriminatory notices, statements and advertisements include, but are not limited to: … electing media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.").

treat the defendant as the 'publisher or speaker' of the content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). Indeed, the nature of the third-party content here – the words comprising the housing ad itself – is irrelevant to steering claims involving Facebook's ad delivery system.

Even if the Court finds that it must treat Facebook as a publisher or speaker with respect to the operation of its ad delivery system, Facebook here too develops content that materially contributes to violations of the Fair Housing Act. In *Roommates*, the Ninth Circuit held that Roommate was "not entitled to [Section 230] immunity for *the operation* of its search system . . . which *directs* emails to subscribers *according to discriminatory criteria*." *Roommates,* 521 F.3d at 1167 (emphasis added) (also finding that Roommate "steer[s] users based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose.") *Id*. This was enough to determine that Roommate "developed" content that contributed materially to unlawfulness under the Fair Housing Act. *Id.*

Just so here. Facebook, through the operation of its ad delivery system, independently directs housing ads based on its users' protected class characteristics. Facebook's users, in the normal course of using Facebook's services, cannot help but reveal to Facebook preferences and personal characteristics that enable this discrimination to occur. As a result, Facebook develops content that contributes materially to unlawfulness under the Fair Housing Act.

### III.   CONCLUSION

In the ways described above, Facebook, no less than its advertisers, is "responsible for what makes the displayed content allegedly unlawful." *Jones v. Dirty World Entm't Recordings LLC,* 755 F.3d 398, 410 (6th Cir. 2014). As a result, Facebook's Ad Platform should not be fully immunized by Section 230, and as such, it should face the scrutiny of the Fair Housing Act.

For the foregoing reasons, Amicus asks this Court to DENY Defendant Facebook's Motion to Dismiss. In the alternative, should the Court GRANT Defendant Facebook's Motion to Dismiss, Amicus asks the Court to do so without prejudice for leave to amend.

7

BRIEF OF *AMICUS CURIAE* UPTURN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

CASE NO.: 5:16-CV-06440-EJD

| | | |
|---|---|---|
| 1 | Date: November 16, 2018 | Respectfully submitted, |
| 2 | | By: <u>Mary Kelly Persyn</u> |
| 3 | | Mary Kelly Persyn (CABN 264782) |
| | | **PERSYN LAW & POLICY** |
| 4 | | 912 Cole Street PMB 124 |
| | | San Francisco, CA 94117 |
| 5 | | Telephone: (628) 400-1254 |
| | | Email: marykelly@persynlaw.com |

8

BRIEF OF *AMICUS CURIAE* UPTURN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO.: 5:16-CV-06440-EJD